# EXHIBIT 1

SETTLEMENT AGREEMENT

dated as of

April 27, 2007

by and among

BLUE CROSS AND BLUE SHIELD ASSOCIATION
BLUE CROSS AND BLUE SHIELD OF ALABAMA
PREMERA BLUE CROSS
ALSO DBA PREMERA BLUE CROSS BLUE SHIELD OF ALASKA
CAREFIRST, INC.
GROUP HOSPITALIZATION AND MEDICAL SERVICES INC.
CAREFIRST OF MARYLAND, INC.
BLUE CROSS AND BLUE SHIELD OF FLORIDA, INC.
HAWAII MEDICAL SERVICE ASSOCIATION
THE REGENCE GROUP
REGENCE BLUESHIELD
REGENCE BLUESHIELD OF IDAHO, INC.
REGENCE BLUECROSS BLUESHIELD OREGON
REGENCE BLUECROSS BLUESHIELD OF UTAH
WELLMARK, INC. DBA WELLMARK BLUE CROSS AND BLUE SHIELD OF IOWA
WELLMARK OF SOUTH DAKOTA, INC.
DBA WELLMARK BLUE CROSS AND BLUE SHIELD OF SOUTH DAKOTA
LOUISIANA HEALTH SERVICE & INDEMNITY COMPANY,
DBA BLUE CROSS AND BLUE SHIELD OF LOUISIANA
HMO LOUISIANA, INC.
BLUE CROSS AND BLUE SHIELD OF MASSACHUSETTS, INC.
BLUE CROSS AND BLUE SHIELD OF MASSACHUSETTS HMO BLUE, INC.
BLUE CROSS BLUE SHIELD OF MICHIGAN, INC.
BCBSM, INC., DBA BLUECROSS BLUESHIELD OF MINNESOTA
HMO OF MISSISSIPPI, INC.
BLUE CROSS & BLUE SHIELD OF MISSISSIPPI
BLUE CROSS AND BLUE SHIELD OF MONTANA, INC.
HORIZON HEALTH CARE SERVICES, INC., DBA
HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY
EMPIRE HEALTHCHOICE ASSURANCE, INC., DBA
EMPIRE BLUE CROSS BLUE SHIELD

BLUE CROSS AND BLUE SHIELD OF NORTH CAROLINA
HOSPITAL SERVICE ASSOCIATION OF NORTHEASTERN PENNSYLVANIA
TRIPLE-S, INC.
TRIPLE-S, INC. OF PUERTO RICO
BLUE CROSS BLUE SHIELD OF RHODE ISLAND
BLUE CROSS AND BLUE SHIELD OF SOUTH CAROLINA
BLUECROSS BLUESHIELD OF TENNESSEE, INC.
TENNESSEE HEALTH CARE NETWORK, INC.
HEALTH CARE SERVICE CORPORATION

And other Subsidiaries listed on the Signature Pages

THE REPRESENTATIVE PLAINTIFFS,

THE SIGNATORY MEDICAL SOCIETIES,

AND CLASS COUNSEL

## SETTLEMENT AGREEMENT

This Agreement is made and entered into as of the Execution Date by and among the Representative Plaintiffs in the Action (on behalf of themselves and each of the Class Members (as defined below)), by and through Class Counsel, Blue Cross Blue Shield Association, Blue Plans, and those medical societies identified on the signature pages hereto (such medical societies are herein collectively referred to as the "**Signatory Medical Societies**") (the Representative Plaintiffs, the Class Members, Blue Parties and the Signatory Medical Societies are herein collectively referred to as the "**Parties**"). The Parties intend this Agreement to resolve, discharge and settle the Released Claims, fully, finally and forever according to the terms and conditions set forth below.

### W I T N E S S E T H:

WHEREAS, certain Representative Plaintiffs in the Action filed the Complaint;

WHEREAS, Blue Parties deny the material factual allegations and legal claims asserted in the Complaint, including without limitation any and all charges of wrongdoing or liability arising out of any of the conduct, statements, acts or omissions alleged, or that could have been alleged, in the Complaint including without limitation the allegations that the Representative Plaintiffs and/or other Class Members have suffered damages; that Blue Parties improperly manipulated claim procedures or capitation payments or any other payments; that Blue Parties paid at incorrect rates or improperly applied reimbursement policies; that Blue Parties fraudulently misrepresented the criteria for insurance coverage determination, treatment decisions, claims payments and adequacy of capitation payments; that Blue Parties conspired with or aided and abetted wrongful conduct of any other Person; and that the Representative Plaintiffs and/or other Class Members were harmed by the conduct alleged in the Complaints;

WHEREAS, Blue Parties have asserted a number of defenses to the claims set forth in the Complaint that Blue Parties believe are meritorious; nonetheless, Blue Parties have a desire to make more transparent, simplify and otherwise improve the systems through which they conduct business with Class Members and have concluded that further conduct of the Action would be protracted and expensive and that it is desirable that the Action be fully and finally settled in the manner and upon the terms and conditions set forth in this Agreement;

WHEREAS, the Representative Plaintiffs believe that the claims asserted in the Complaint have merit; nonetheless Representative Plaintiffs and Class Counsel recognize and acknowledge the expense and length of continued proceedings that would be necessary to prosecute the Action against Blue Parties through trial and appeals;

WHEREAS, Representative Plaintiffs and Class Counsel also have taken into account the uncertain outcome and the risk of any class action, especially in complex actions such as the Action, as well as the difficulties and delays inherent in such actions, and counsel for the Representative Plaintiffs believe that the settlement set forth in this

Agreement confers substantial benefits upon the Representative Plaintiffs and the other Class Members;

WHEREAS, based on their evaluation of all of these factors, and recognizing that Blue Parties' compliance with the terms of this Agreement is beneficial to Class Members and that such compliance does not and shall not violate any legal right of Class Members, the Representative Plaintiffs and Class Counsel have determined that this Agreement is in the best interests of themselves and the other Class Members; and

WHEREAS, the Signatory Medical Societies have determined that it is in their best interests to obtain the benefits afforded to such Signatory Medical Societies by the applicable provisions of this Agreement, and, in exchange therefor, to make the commitments and agreements contained herein, including without limitation those contained in § 13.

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED by and among the Parties that, subject to the approval of the Court, the Action and the Released Claims shall be finally and fully resolved, compromised, discharged and settled under the following terms and conditions:

1.   **Definitions.**

As used in this Agreement and all exhibits to this Agreement, the following terms have the meaning specified.

1.1      "Action" means Love, et al. v. Blue Cross Blue Shield Association, et al., (formerly Thomas, et al. v. Blue Cross Blue Shield Association, et al.), Civil Action No. CV-03-21296-MORENO\SIMONTON in the United States District Court for the Southern District of Florida, Miami Division.

1.2      "Active Physician" means a Class Member who is a Physician and who is not a Retired Physician as of the Preliminary Approval Date.

1.3      "Active Physician Amount" shall have the meaning assigned to that term in § 8.3(b) of this Agreement.

1.4      "Adverse Determination" shall have the meaning assigned to that term in § 7.11(b)(i) of this Agreement.

1.5      "Affiliate" or "Affiliates" means with respect to any Person, any other Person controlling, controlled by or under common control with such first Person. The term "control" (including without limitation, with correlative meaning, the terms "controlled by" "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or otherwise.

1.6      "Agreement" means this Settlement Agreement, inclusive of all exhibits hereto.

4

1.7    "AMA" means the American Medical Association.

1.8    "Attorneys' Fees" means the funds for attorneys' fees and expenses that may be awarded by the Court to Class Counsel.

1.9    "Bar Order" means an order of the Court barring the assertion of claims against the Released Parties for contribution, indemnity or other similar claims by other Persons in the form included as part of the Final Order and Judgment.

1.10   "Base Amount" shall have the meaning assigned to that term in § 8.3(d) of this Agreement.

1.11   "BCBSA" means the Blue Cross and Blue Shield Association.

1.12   "Billing Dispute" shall have the meaning assigned to that term in § 7.10(a) of this Agreement.

1.13   "Billing Dispute Reviewer" shall have the meaning assigned to that term in § 7.10 of this Agreement.  The Billing Dispute Reviewer shall have the requisite skill, experience and independence to carry out the functions set forth in § 7.10.

1.14   "BlueCard Program" means the program governed by BCBSA that requires licensees of BCBSA to use certain policies, procedures and/or technology to service Blue Cross and/or Blue Shield members located outside of a licensee's service area.

1.15   "Blue Compliance Dispute Facilitator" shall have the meaning assigned to that term in § 12.1(a) of this Agreement.

1.16   "Blue Parties" means BCBSA and all of the Blue Plans, and "Blue Party" means any one of the Blue Parties.

1.17   "Blue Plan" means an entity identified as such on the signature pages hereto and its Subsidiaries.

1.18   "Capitation" means the payment by a Blue Plan to Physicians, Physician Groups or Physician Organizations of a per member per month amount (including but not limited to percentage of premium) by which a Blue Plan transfers to the Physicians, Physician Groups or Physician Organizations the financial risk for those Covered Services as set forth in the contract between the Blue Plan and the Physicians, Physician Groups or Physician Organizations.

1.19   "CCI" means CMS's published list of edits and adjustments that are made to health care providers' claims submitted for services or supplies provided to patients insured under the federal Medicare program and/or under other federal insurance programs.

1.20   "Claim" shall have the meaning assigned to that term in § 13.1(a) of this Agreement.

5

1.21    "Claim Form" shall have the meaning assigned to that term in § 8.3(h) of this Agreement.

1.22    "Claim Form Instructions" shall have the meaning assigned to that term in § 8.3(h) of this Agreement.

1.23    "Class" means any and all Physicians, Physician Groups and Physician Organizations who provided Covered Services to any Plan Member or services to any individual enrolled in or covered by a Plan offered or administered by any Person named as a defendant in the Complaint or by any other primary licensee of the BCBSA or by any of their respective current or former subsidiaries or Affiliates, in each case from May 22, 1999 through the Preliminary Approval Date. The Class shall exclude: (i) all Persons who, in accordance with the terms of this Agreement, execute a timely request for exclusion (Opt-Out) from the Class; and (ii) the Blue Parties, their Affiliates and any of their officers, directors and employees.

1.24    "Class Compliance Dispute Facilitator" shall have the meaning assigned to that term in § 12.1(a) of this Agreement.

1.25    "Class Counsel" means those persons identified in § 5 as Class Counsel.

1.26    "Class Member" means any Person who is a member of the Class.

1.27    "Clinical Information" means clinical, operative or other medical records and reports kept in the ordinary course of a Physician's, Physician Group's or Physician Organization's business, and, where applicable, requested statements of Medical Necessity.

1.28    "CMS" means the Centers for Medicare and Medicaid Services (formerly known as Health Care Financing Administration).

1.29    "CMS-1500" means the health care provider claim form number 1500 created by CMS, as such form exists on the date of this Agreement and as it may be amended, modified or superseded thereafter during the term of this Agreement.

1.30    "Complaint" means the initial complaint and any and all subsequent complaints filed in the Action.

1.31    "Complete Claim" means a claim for Covered Services that (a) is timely received by the Blue Plan, (b) has a corresponding referral (whether in paper or electronic format), if required for the applicable claim, (c) meets all the requirements of § 7.17(b), (d) (i) when submitted via paper has all the elements of the CMS-1500 (or successor standard) forms or (ii) when submitted via an electronic transaction, uses only permitted standard code sets (e.g., CPT®-4, ICD-9, HCPCS) and has all the elements of the standard electronic formats, as required by applicable federal authority and state regulatory authority, (e) is a claim for which the Blue Plan is the primary payor or its responsibility as a secondary payor has been established, (f) contains no defect or error that would affect the

6

adjudication of the claim, (g) includes supporting documentation consistent with this Agreement sufficient for the Blue Plan to make a payment determination, and (h) is under a Plan for which all applicable premiums have been paid.

1.32    "Compliance Dispute" means any claim that a Blue Party has failed to carry out any of its obligations under § 7 of this Agreement and Exhibit H to this Agreement; provided, however, that none of the following shall be deemed a Compliance Dispute: (a) a Released Claim, (b) a Retained Claim, (c) a Billing Dispute, or (d) a claim for which the review process for Adverse Determinations set forth in § 7.11 is available.

1.33    "Compliance Dispute Claim Form" means a document in substantially the same form as Exhibit C, attached hereto.

1.34    "Compliance Dispute Facilitator" means the individuals selected to be the Class Compliance Dispute Facilitator, the Blue Compliance Dispute Facilitator or both, as the term is used herein.

1.35    "Compliance Dispute Officer" shall have the meaning assigned to that term in § 12 of this Agreement.

1.36    "Court" means the United States District Court for the Southern District of Florida.

1.37    "Covered Services" means, with respect to a particular Blue Plan, a health care benefit that is within the coverage described in the Plan Documents applicable to an eligible Plan Member of such Blue Plan.

1.38    "CPT®", "CPT® Codes" or "AMA CPT® book" means medical nomenclature in the publication entitled "CPT, Standard Edition", "CPT® Professional Edition", "CPT Assistant" and "Principals of CPT Coding" published by the AMA containing a systematic listing and coding of procedures and services provided to patients by physicians and certain non-physician health professionals.  When used herein, "CPT®", "CPT® Codes" or "AMA CPT® book" refers to such medical nomenclature in the publication as it exists as of the date of this Agreement and as it may be amended, modified or superseded thereafter during the term of this Agreement.

1.39    "CPT® Conventions" mean rules for the application of codes that go across all sections and subsections of the AMA CPT book, e.g. indented codes and add on codes.

1.40    "CPT® Guidelines" mean those guidelines set out in the introduction, in the beginning to each of the six major sections, in the subsections and in the code level parenthetic statements and cross references (excluding from this definition any reference to another publication that is not subject to the existing CPT Editorial Panel process, such as, but not limited to "CPT Assistant" or "Principles of CPT Coding") contained in the AMA publication "CPT, Professional Edition".

7

1.41    "Credentialing Committee" means any committee maintained by a Blue Plan that has decision-making authority regarding credentialing and re-credentialing of individual Physicians as Participating Physicians with the Blue Plan.

1.42    "Delegated Entity" (1) as the term applies to arrangements in California with respect to which a Blue Plan is operating as a Blue Cross and/or Blue Shield licensee, means (i) a risk-bearing organization, organized delivery system, limited or specialized licensed health plan or other risk-bearing entity as defined by California law, or (ii) a full service licensed health plan where it is reasonably necessary because a Blue Plan does not have reasonable capacity to provide or administer coverage in those geographic areas or specialty services; and (2) as the term applies otherwise, means, with respect to a particular Blue Plan, an entity that: (i) is not an Affiliate of such Blue Plan and is not another licensee of BCBSA, (ii) maintains its own contracts with Physicians separate from any contracts between such Blue Plan and Physicians, and (iii) by agreement with such Blue Plan, (A) agrees to provide Plan Members with access to such Physicians pursuant to terms of such agreements, and (B) performs some or all of the functions with respect to Plans which otherwise would be performed by such Blue Plan, including without limitation claims adjudication, utilization review, utilizations management and Physician credentialing.

1.43    "Downcoding" shall have the meaning assigned to that term in § 7.19 of this Agreement.

1.44    "Edit" means a practice or procedure pursuant to which one or more adjustments are made to CPT® Codes or HCPCS Level II Codes included in a claim that result in (a) payment being made based on some, but not all, of the CPT® Codes or HCPCS Level II Codes included in the claim, (b) payment being made based on different CPT® Codes or HCPCS Level II Codes than those included in the claim, (c) payment for one or more of the CPT® Codes or HCPCS Level II Codes included in the claim being reduced by application of Multiple Procedure Logic, (d) payment for one or more of the CPT® Codes or HCPCS Level II Codes being denied, or (e) any combination of the above.

1.45    "Effective Date" shall have the meaning assigned to that term in § 14.4 of this Agreement.

1.46    "Effective Period" shall have the meaning assigned to that term in the preamble to § 7 of this Agreement.

1.47    "Enrollment" or "Enrollment Date" shall mean the date upon which a Plan Member becomes eligible to receive Covered Services.

1.48    "EOB" means an Explanation of Benefit or any comparable form or statement communicating to a Plan Member the results of a Blue Plan's adjudication of claim(s) with respect to or on behalf of such Plan Member.

1.49    "ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

1.50    "Execution Date" means the later of (i) the date on which the signatures of all Blue Parties have been delivered to Class Counsel, and (ii) the date on which the signatures of all Representative Plaintiffs, Signatory Medical Societies and Class Counsel have been delivered to all Blue Parties.

1.51    "External Review" shall have the meaning assigned to that term in § 7.11(e)(i) of this Agreement.

1.52    "FDA" means the U.S. Food and Drug Administration.

1.53    "FEHBA" means the Federal Employees Heath Benefits Act and the rules and regulations and contracts promulgated or entered thereunder.

1.54    "Final Order and Judgment" means the order and form of judgment approving this Agreement and dismissing the Blue Parties, with prejudice, in the Action in the form attached hereto as Exhibit D.

1.55    "Final Order Date" means the date on which the Court enters the Final Order and Judgment.

1.56    "Foundation" shall have the meaning assigned to that term in § 8.3(g) of this Agreement.

1.57    "Force Majeure" shall have the meaning assigned to that term in § 7.32 of this Agreement.

1.58    "Fully-Insured Plan" means a Plan as to which a Blue Plan assumes all or a majority of healthcare cost and/or utilization risk.

1.59    "HCPCS Level II Codes" means alphanumeric codes used to identify those codes not included in CPT® and that are commonly referred to as Healthcare Common Procedure Coding System Level II Codes.

1.60    "HIPAA" means the Health Insurance Portability and Accountability Act of 1996.

1.61    "Implementation Date" shall have the meaning assigned to that term in the preamble to § 7 of this Agreement.

1.62    "Independent Review Organization" shall have the meaning assigned to that term in § 7.11(e)(i).

1.63    "Individually Negotiated Contract" means a contract pursuant to which the parties to the contract, as a result of negotiation, agreed to one or more modifications to the terms of a Blue Plan's applicable standard form agreement that substantially modify the standard form agreement and that are made to individually suit, in whole or in part, the needs of a Participating Physician,

9

Participating Physician Group or Participating Physician Organization (including but not limited to higher or customized rates and/or other customized payment methodologies).

1.64    "Intellectual Property Claim" means any claim of patent, copyright, or trademark infringement or trade secret or other proprietary rights asserted or threatened against a Blue Party.

1.65    "Interest Rate" means a 4.75% annual rate of return without compounding.

1.66    "Joint Compliance Dispute Program" shall have the meaning assigned to that term in § 12.1(c) of this Agreement.

1.67    "Mailed Notice" means the form of the notice attached hereto as Exhibit E.

1.68    "Medical Necessity" and "Medically Necessary" shall have the meaning assigned to those terms in § 7.16(a) of this Agreement.

1.69    "Multiple Procedure Logic" means the practices or procedures used by a Blue Plan to reduce the allowable amount for one or more of the CPT® Codes or HCPCS Level II Codes included in a claim as a result of multiple surgical procedures or services having been performed on the same patient on the same date of service.

1.70    "NASCO" means National Account Service Company, LLC.

1.71    "Negotiated Purchaser" shall have the meaning assigned to that term in § 7.36 of this Agreement.

1.72    "Non-Participating" means, with respect to a Physician, Physician Group, or Physician Organization, a Physician, Physician Group, or Physician Organization that is not a Participating Physician, Participating Physician Group, or Participating Physician Organization.

1.73    "Notice Administrator" shall mean the Person appointed to administer the provisions relating to Notice to potential Class Members, under § 6.

1.74    "Notice Date" shall have the meaning assigned to that term in § 6.1 of this Agreement.

1.75    "Objection Date" shall have the meaning assigned to that term in § 6 of this Agreement.

1.76    "Opt-Out" shall have the meaning assigned to that term in § 6.1 of this Agreement.

1.77    "Opt-Out Deadline" shall have the meaning assigned to that term in § 6.1 of this Agreement.

1.78 "Overpayment" means, with respect to a claim submitted by or on behalf of a Physician, Physician Group or Physician Organization, any erroneous or excess payment that a Blue Plan makes for any reason including, but not limited to, (i) payment at an incorrect rate, (ii) duplicate payments for the same Physician Service, (iii) payment with respect to an individual who was not a Plan Member on the date the Physician provided the Physician Service(s) that are the subject of such payment, and (iv) payment for any non-Covered Service.

1.79 "Participating Physician" means a Physician who has entered into a valid written contract with a Blue Plan (or who has agreed pursuant to an arrangement with a Physician Group, Physician Organization or other entity which has a valid written contract with a Blue Plan) to provide Covered Services to that Blue Plan's Plan Members and, where applicable, who meets the Blue Plan's credentialing requirements, during the effective period of such a contract. The fact that a Physician has entered into an agreement with a rental network does not make that Physician a Participating Physician.

1.80 "Participating Physician Group" means a Physician Group that has entered into a valid written contract with a Blue Plan to provide Covered Services to that Blue Plan's Plan Members.

1.81 "Participating Physician Organization" means a Physician Organization that has entered into a valid written contract with a Blue Plan to provide Covered Services to that Blue Plan's Plan Members.

1.82 "Participating Psychiatrist" means a Psychiatrist who is a Participating Physician.

1.83 "Parties", each a "Party" shall have meaning assigned to that term in the preamble of this Agreement.

1.84 "Person" or "Persons" means all persons and entities (including without limitation natural persons, firms, corporations, limited liability companies, joint ventures, joint stock companies, unincorporated organizations, agencies, bodies, governments, political subdivisions, governmental agencies and authorities, associations, partnerships, limited liability partnerships, trusts, and their predecessors, successors, administrators, executors, heirs and assigns).

1.85 "Physician" means an individual duly licensed by a state licensing board as a Medical Doctor or as a Doctor of Osteopathy and shall include both Participating Physicians and Non-Participating Physicians.

1.86 "Physician Advisory Committee" shall have the meaning assigned to that term in § 7.9(a) of this Agreement.

1.87 "Physician Group" means two or more Physicians, and those claiming by or through them, who practice under a single taxpayer identification number.

11

1.88    "Physician Organization" means any association, partnership, corporation or other form of organization (including without limitation independent practice associations and physician hospital organizations), that arranges for care to be provided to Plan Members by Physicians organized under multiple taxpayer identification numbers.

1.89    "Physician Services" means Covered Services that a Physician provides to a Plan Member, as specified in applicable agreements with a Blue Plan or otherwise.

1.90    "Physician Specialty Society" means a United States medical specialty society that represents diplomats certified by a board recognized by the American Board of Medical Specialties.

1.91    "Plan" means a benefit plan through which a Plan Member obtains health care benefits set forth in pertinent Plan Documents.

1.92    "Plan Documents" means the documents defining the health care benefits available to a Plan Member, including the Plan Member's summary plan description, certificate of coverage or other applicable coverage document, and the terms and conditions under which such benefits are available under the Plan.

1.93    "Plan Member" means an individual enrolled in or covered by a Plan offered and administered by a Blue Plan.

1.94    "Post-Service Appeal" shall have the meaning assigned to that term in § 7.11(c)(ii)(A) of this Agreement.

1.95    "Precertification" ("Precertify" or "Precertifies") means the prior approval by a Blue Plan that the service or supply is Medically Necessary and/or not experimental or investigational.

1.96    "Preliminary Approval Date" means the date the Preliminary Approval Order is entered by the Court.

1.97    "Preliminary Approval Hearing" shall have the meaning assigned to that term in § 4 of this Agreement.

1.98    "Preliminary Approval Order" means the preliminary approval order as attached hereto at Exhibit F.

1.99    "Pre-Service Appeal" shall have the meaning assigned to that term in § 7.11(c)(i) of this Agreement.

1.100    "Product Network" means a network of Participating Physicians who, pursuant to contracts with a Blue Plan, provide Covered Services to Plan Members for one or more products or types of products offered by the Blue Plan (e.g., HMO, PPO, POS, Indemnity) in exchange for a specified type of compensation (e.g., fee for service, Capitation).

1.101   "Programs" shall have the meaning assigned to that term in § 7.29(k)(iii) of this Agreement.

1.102   "Provider Website" means the secure (password protected) online resources for Participating Physicians to obtain information about a Blue Plan, its products and policies and other information described in more detail in this Agreement.

1.103   "Psychiatrist" means a Physician who is duly licensed by a state licensing board to provide mental health services and shall include without limitation both Participating Physicians and Non-Participating Physicians.

1.104   "Public Website" means the online resources for the public to obtain information about a Blue Party, its products and policies and other information.

1.105   "Published Notice" means the form of notice attached hereto as Exhibit G.

1.106   "Qualified Reviewer" shall have the meaning assigned to that term in § 7.11(c)(ii)(A) of this Agreement.

1.107   "Released Parties" shall have the meaning assigned to that term in § 13.1(a) of this Agreement.

1.108   "Released Claims" shall have the meaning assigned to that term in § 13.1(c) of this Agreement.

1.109   "Releasing Parties" shall have the meaning assigned to that term in § 13.1(a) of this Agreement.

1.110   "Remittance Advice" means the form sent by a Blue Plan to health care providers explaining the Blue Plan's computation of benefits and payment amounts on a claim.  The Remittance Advice is sometimes referred to as an "Explanation of Payment" form or "EOP."

1.111   "Representative Plaintiffs" means collectively Rick Love, M.D, Joe Frank Smith, M.D., Scott Elledge, M.D., and Andreas Melendez-Desos, M.D.

1.112   "Representative Plaintiffs in Other Actions" means collectively Maxwell Cooper, M.D., Michon Morita, M.D., Andrew Cheng, M.D., Charles Rothberg, M.D., Mitchell Garden, M.D., Miriam Levitt, M.D., Robert J. Hughes, M.D., Joseph K. Newsom, M.D., Joseph K. Newsom, Jr., M.D., Robert Waters, M.D., John R. Nobles, M.D., Zachary Rosenberg, M.D., Dewayne P. Darby, M.D., Donald S. Horner, M.D., Amity Obstetrics & Gynecology Associates, P.A., G. William Haggerson, M.D., Forsyth Surgical Associates, P.A., and Lakeland Anesthesia, Inc.

1.113   "Retained Claims" shall have the meaning assigned to that term in § 13.6 of this Agreement.

1.114 "Retired Physician" means a Class Member who, subsequent to May 22, 1999, has become an inactive Physician, has retired from the practice of, or has otherwise ceased to practice, medicine or has died as of the Preliminary Approval Date.

1.115 "Retired Physician Amount" shall have the meaning assigned to that term in § 8.3(a) of this Agreement.

1.116 "Reversion Amount" shall have the meaning assigned to that term in § 8.4 of this Agreement.

1.117 "Self-Insured Plan" means any Plan other than a Fully-Insured Plan.

1.118 "Settlement Administration Account" shall have the meaning assigned to that term in § 8.2(b) of this Agreement.

1.119 "Settlement Administrator" shall have the meaning assigned to that term in § 8.3 of this Agreement.

1.120 "Settlement Amount" shall have the meaning assigned to that term in § 8.2 of this Agreement.

1.121 "Settlement Fund" shall have the meaning assigned to that term in § 8.2 of this Agreement.

1.122 "Settlement Fund Payment" shall have the meaning assigned to that term in § 8.2(a) of this Agreement.

1.123 "Settlement Hearing" shall have the meaning assigned to that term in § 6.2 of this Agreement.

1.124 "Settlement Hearing Date" shall have the meaning assigned to that term in § 6.2 of this Agreement.

1.125 "Shane" shall mean Shane v. Humana, Inc., et al., Master File No. 00-1334 MDL-Moreno ("Shane I") and Shane v. Humana, Inc., et al, Case No. 04-21589-CIV-Moreno ("Shane II") in the United States District Court for the Southern District of Florida, Miami Division.

1.126 "Signatory Medical Societies" shall have the meaning assigned to that term in the preamble of this Agreement.

1.127 "Significant Edit" means an Edit that a Blue Plan reasonably believes, based on its experience with submitted claims, will cause, on the initial review of submitted claims, the denial of or reduction in payment for a particular CPT® Code or HCPCS Level II Code more than two-hundred and fifty (250) times per year in any state in which the Blue Plan operates.

1.128 "Subsidiary" or "Subsidiaries" shall mean the entity or entities identified as such on the signature page of this Agreement.

14

1.129  "Tag Along Actions" shall have the meaning set forth in § 15.1.

1.130  "Terminating Blue Plan" shall have the meaning set forth in § 14.2(h).

1.131  "Termination Date" shall have the meaning assigned to that term in § 14.6 of this Agreement.

1.132  "TriCare" shall have the meaning assigned to that term in § 7.30(b) of this Agreement.

1.133  "Unopposed Amount" shall have the meaning assigned to that term in § 9.1 of this Agreement.

**2.     Intentionally Left Blank**

**3.     Commitment to Support and Communications with Class Members**

The Parties agree that it is in their best interests to consummate this Agreement and all the terms and conditions contained herein and to cooperate with each other and to take all actions reasonably necessary to obtain Court approval of this Agreement and entry of the orders of the Court that are required to implement its provisions. They also agree to support this Agreement in accordance with and subject to the provisions of this Agreement.

Class Counsel and Representative Plaintiffs and Representative Plaintiffs in Other Actions shall make every reasonable effort to encourage putative Class Members to participate and not to Opt-Out. In addition, Class Counsel shall make all reasonable efforts to enforce the Compliance Dispute resolution provisions of this Agreement set forth in § 12.

Representative Plaintiffs, Representative Plaintiffs in Other Actions, Class Counsel and Blue Parties agree that Blue Parties may communicate with putative Class Members regarding the provisions of this Agreement, so long as such communications are not inconsistent with the Mailed Notice or other agreed upon communications concerning the Agreement. Blue Parties will refer to the Settlement Administrator or to Class Counsel any inquiries from Class Members about claims to be filed under this Agreement.

**4.     Preliminary Approval of Settlement**

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, the Parties shall submit this Agreement, together with the exhibits attached hereto, to the Court as soon as practicable following the Execution Date at a hearing (the "**Preliminary Approval Hearing**") for, among other things, its conditional certification of a settlement class, preliminary approval of the Agreement, the Mailed Notice, the Published Notice and the Claim Form and shall apply to the Court for an order of preliminary approval and conditional class certification, substantially in the form of Exhibit F ("**Preliminary Approval Order**").

5. **Notice to Putative Class Members; Notice to Parties Pursuant to This Agreement**

After the Court has entered the Preliminary Approval Order and approved the Mailed Notice, the Published Notice and the Claim Form, notice to putative Class Members shall be disseminated in such form as the Court shall direct; provided that the forms of notice are substantially similar to the Mailed Notice and the Published Notice. A copy of the Claim Form shall be included with the copy of the Mailed Notice that is disseminated to putative Class Members.

Class Counsel and Blue Parties shall be jointly responsible for identifying names and addresses of putative Class Members and shall cooperate with each other and the Notice Administrator to make such identifications and determinations.

Blue Parties shall pay the reasonable cost of notice to putative Class Members, including without limitation first class mail costs for the mailing of the Mailed Notice, substantially in the same form as Exhibit E. Payment by Blue Parties of the cost of the Mailed Notice shall be non-refundable and shall be in addition to the other agreements made herein. Blue Parties shall pay for the cost to publish the Published Notice three times in the legal notices section in the national editions of THE WALL STREET JOURNAL and USA TODAY. If publication in one or more of said publications on the foregoing schedule is determined not to be practicable, then either Class Counsel or Blue Parties may apply to the Court for alternative notice by publication. Each Blue Plan shall also publish the Mailed Notice on its Public Website. The Blue Parties shall, to the extent feasible, also publish the Published Notice in a nationwide periodical addressing issues of concern to Physicians such as The Journal of the American Medical Association or The American Medical News. Each Blue Plan shall maintain the Public Website notices at such Blue Plan's cost through at least the Objection Date.

All notices to any Party (including without limitation any designations made by Class Counsel pursuant to this Agreement) required under this Agreement shall be sent by first class U.S. Mail, by hand delivery, or by facsimile, to the recipients designated in this Agreement. Timeliness of all submissions and notices shall be measured by the date of receipt, unless the addressee refuses or delays receipt. The Persons designated to receive notices under this Agreement are as follows, unless notification of any change to such designation is given to each other Party hereto pursuant to this § 5:

Representative Plaintiffs and Signatory Medical Societies: Notice to be given to Class Counsel on behalf of Representative Plaintiffs and Signatory Medical Societies.

Class Counsel:

Archie C. Lamb, Jr.
Law Offices of Archie C. Lamb, LLC
2017 Second Avenue North

Harley S. Tropin
Janet L. Humphreys
Adam M. Moskowitz
Kozyak Tropin & Throckmorton, PA

16

Birmingham, AL  35203

Aaron S. Podhurst
Podhurst Orseck, PA
25 W. Flagler Street, Suite 800
Miami, FL  33130-1780

Nicholas B. Roth
Eyster Key Tubb Weaver & Roth, LLP
402 East Moulton Street, SE
Eyster Building
Decatur, AL  35601

Mark Gray
GRAY WHITE & WEISS
1200 PNC Plaza
500 West Jefferson
Louisville, KY 40202

Robert Foote
FOOTE & MEYERS
416 S. 2nd Street
Geneva, IL 60134

James B. Tilghman
STEWART TILGHMAN FOX &
BIANCHI
1 SE 3rd Avenue, Ste 3000
Miami, FL 33131-1764

Dennis G. Pantazis
WIGGINS CHILDS QUINN &
PANTAZIS
1400 SouthTrust Tower
420 North 20th Street
Birmingham, AL 35203

Kenneth Trujillo
TRUJILLO RODRIGUEZ & RICHARDS,
LLC
1717 Arch Street
Suite 3838
Philadelphia, Pennsylvania 19103

2525 Ponce de Leon, 9th Floor
Miami, FL  33131-2335

Edith M. Kallas
Joseph P. Guglielmo
Whatley Drake & Kallas, LLC
1540 Broadway
New York, NY 10036

Joe R. Whatley, Jr.
Charlene P. Ford
Othni J. Lathram
Whatley Drake & Kallas, LLC
2323 Second Avenue North
Birmingham, AL  35203-3807

J. Mark White
WHITE ANDREWS ARNOLD & DOWD
2025 3rd Avenue North, Ste 600
Birmingham, AL  35203

Guido Saveri
R. Alexander Saveri
Cadio Zirpoli
SAVERI & SAVERI
111 Pine Street, Ste 1700
San Francisco, CA 94111-5619

Kenneth S. Canfield
Ralph Knowles
DOFFERMYRE SHIELDS CANFIELD
KNOWLES & DEVINE
1355 Peachtree St., Ste 1600
Atlanta, GA 30309

James E. Hartley, Jr.
DRUBNER HARTLEY & O'CONNOR
500 Chase Parkway, 4th Fl.
Waterbury, CT 06708

STROM LAW FIRM LLC
2110 N. Beltline Boulevard
Suite A
Columbia, South Carolina 29204-3905

POMERANTZ HAUDEK BLOCK
GROSSMAN & GROSS
100 Park Avenue
New York, New York 10017-5516

David L. Steed
CORNELIUS & COLLINS
Suite 1500 Nashville City Center
511 Union Street, P.O. Box 190695
Nashville, Tennessee 37219-0695

MCCUTCHEN BLANTON JOHNSON &
BARNETTE LLP
1414 Lady Street
P.O. Drawer 11209
Columbia, South Carolina 29211

Blue Parties:

| Blue Cross and Blue Shield Association | Chester T. Kamin JENNER & BLOCK LLP 330 North Wabash Chicago, IL 60611 | Daniel A. Engel Blue Cross and Blue Shield Association 225 North Michigan Avenue Chicago, IL 60601 |
|---|---|---|
| Blue Cross and Blue Shield of Alabama | Michael A. Pope MCDERMOTT WILL & EMERY LLP 227 W. Monroe Street Chicago, IL 60606 | Grey Till, Esquire Blue Cross and Blue Shield of Alabama 450 River Chase Parkway East Birmingham, Alabama 35244 |
| Premera Blue Cross, also dba Premera Blue Cross Blue Shield of Alaska | Gwendolyn C. Payton LANE, POWELL PC 1420 5th Avenue, Suite 4100 Seattle, WA 98101 | |
| CareFirst, Inc.; Group Hospitalization and Medical Services Inc.; CareFirst of Maryland, Inc. | Daly D. E. Temchine EPSTEIN, BECKER & GREEN, P.C. 1227 25th Street, N.W., Suite 700 Washington, D.C. 20037 | |

| | | |
|---|---|---|
| Blue Cross and Blue Shield of Florida, Inc. | Michael A. Pope MCDERMOTT WILL & EMERY LLP 227 W. Monroe Street Chicago, IL 60606 | |
| Hawaii Medical Service Association | Jess H. Griffiths GODBEY GRIFFITHS REISS 1001 Bishop St., 2300 Pauahi Tower Honolulu, HI 96813 | |
| The Regence Group Regence BlueShield; Regence BlueShield of Idaho, Inc.; Regence BlueCross BlueShield Oregon; Regence BlueCross BlueShield of Utah | Michael A. Pope MCDERMOTT WILL & EMERY LLP 227 W. Monroe Street Chicago, IL 60606 | |
| Wellmark, Inc. dba Wellmark Blue Cross Blue Shield of Iowa; Wellmark of South Dakota, Inc. dba Wellmark Blue Cross and Blue Shield of South Dakota | Michael A. Pope MCDERMOTT WILL & EMERY LLP 227 W. Monroe Street Chicago, IL 60606 | |
| Louisiana Health Service & Indemnity Company dba Blue Cross and Blue Shield of Louisiana; HMO Louisiana, Inc. | Michael A. Pope MCDERMOTT WILL & EMERY LLP 227 W. Monroe Street Chicago, IL 60606 | |
| Blue Cross and Blue Shield of Massachusetts, Inc.; Blue Cross and Blue Shield of Massachusetts HMO Blue, Inc. | Daly D. E. Temchine EPSTEIN, BECKER & GREEN, P.C. 1227 25th Street, N.W., Suite 700 Washington, D.C. 20037 | |

| | | |
|---|---|---|
| Blue Cross Blue Shield of Michigan, Inc. | Joseph A. Fink<br>Dickinson Wright PLLC<br>215 S. Washington Square<br>Suite 200<br>Lansing, MI  48933 | |
| BCBSM, Inc., dba BlueCross BlueShield of Minnesota | Michael A. Pope<br>MCDERMOTT WILL & EMERY LLP<br>227 W. Monroe Street<br>Chicago, IL 60606 | |
| HMO of Mississippi, Inc.; Blue Cross & Blue Shield of Mississippi | Michael A. Pope<br>MCDERMOTT WILL & EMERY LLP<br>227 W. Monroe Street<br>Chicago, IL 60606 | |
| Blue Cross and Blue Shield of Montana, Inc. | Daly D. E. Temchine<br>EPSTEIN, BECKER & GREEN, P.C.<br>1227 25th Street, N.W., Suite 700<br>Washington, D.C.  20037 | |
| Horizon Blue Cross Blue Shield of New Jersey | Daly D. E. Temchine<br>EPSTEIN, BECKER & GREEN, P.C.<br>1227 25th Street, N.W., Suite 700<br>Washington, D.C.  20037 | |
| Empire Blue Cross Blue Shield | Daly D. E. Temchine<br>EPSTEIN, BECKER & GREEN, P.C.<br>1227 25th Street, N.W., Suite 700<br>Washington, D.C.  20037 | |
| Blue Cross and Blue Shield of North Carolina | Emily M. Yinger<br>HOGAN & HARTSON L.L.P.<br>8300 Greensboro Drive, Suite 1100<br>McLean, VA  22102 | |
| Hospital Service Association of Northeastern Pennsylvania | Michael A. Pope<br>MCDERMOTT WILL & EMERY LLP<br>227 W. Monroe Street<br>Chicago, IL 60606 | |

| | | |
|---|---|---|
| Triple-S, Inc.; Triple-S, Inc. of Puerto Rico | Cesar Alcover, Esq.<br>Casellas Alcover & Burgos<br>Popular Center Bldg<br>Suite 1400<br>208 Ponce de León Avenue<br>San Juan, Puerto Rico 00918<br>P.O. Box 364924<br>San Juan, Puerto Rico 00936-4924 | |
| Blue Cross Blue Shield of Rhode Island | Michael A. Pope<br>MCDERMOTT WILL & EMERY LLP<br>227 W. Monroe Street<br>Chicago, IL 60606 | |
| Blue Cross and Blue Shield of South Carolina | Michael A. Pope<br>MCDERMOTT WILL & EMERY LLP<br>227 W. Monroe Street<br>Chicago, IL 60606 | |
| Health Care Service Corporation | Michael A. Pope<br>MCDERMOTT WILL & EMERY LLP<br>227 W. Monroe Street<br>Chicago, IL 60606 | |
| BlueCross BlueShield of Tennessee, Inc.; Tennessee Health Care Network, Inc. | Michael A. Pope<br>MCDERMOTT WILL & EMERY LLP<br>227 W. Monroe Street<br>Chicago, IL 60606 | |

In the event that any Party receives a notice from any other Party (in accordance with the provisions of § 5 of this Agreement and as required by any other provision of this Agreement), for which there is a written acknowledgement of receipt, and such receiving Party does not respond to such notice within thirty (30) days of receipt thereof (unless a different time is set forth in this Agreement), such receiving Party shall be deemed to have accepted any proposal made by the notifying Party in such notice and shall be deemed to have waived any rights under this Agreement with respect to the matter that is the subject of such notice.

6.   **Procedure for Final Approval; Limited Waiver**

Following the dissemination of the Mailed Notice and Published Notice as described in § 5, Representative Plaintiffs, Signatory Medical Societies, Class

Counsel and the Blue Parties shall seek the Court's final approval of this Agreement.  Putative Class Members shall have until the Objection Date to file, in the manner specified in the Mailed Notice, any objection or other response to this Agreement.  The Parties agree to urge the Court to set the Objection Date for a date that is at least seventy-five (75) days after the Notice Date (the **"Objection Date"**).

### 6.1    Opt-Out Timing and Rights

The Parties will jointly request of the Court that the Mailed Notice and the Published Notice be disseminated no earlier than 30 days and no later than 60 days after the Preliminary Approval Date. The Notice Date (the **"Notice Date"**) shall be the date on which the notice is first mailed or published.

The Mailed Notice and the Published Notice shall provide that putative Class Members may request exclusion from the Class by providing notice, in the manner specified in the Notice, on or before a date set by the Court as the Opt-Out Deadline.  Representative Plaintiffs, Class Counsel and the Blue Parties agree to urge the Court to set the Opt-Out Deadline for the date that is 60 days after the Notice Date (the **"Opt-Out Deadline"**).

Putative Class Members have the right to exclude themselves (**"Opt-Out"**) from this Agreement and from the Class by timely submitting a request to Opt-Out and otherwise complying with the agreed upon Opt-Out procedure approved by the Court.  Putative Class Members who are Physician Groups or Physician Organizations shall be entitled to exclude themselves, as distinct legal entities, from the Class, but shall have no right to exercise the Opt-Out rights of individual Physicians practicing under their auspices, unless the Physician Group or Physician Organization has written authorization to act on behalf of the Physician which has been submitted to the Notice Administrator; otherwise, in order to Opt-Out, individual Physicians associated with a Physician Group or Physician Organization must submit a request to Opt-Out in the manner specified in the Notice by the Opt-Out Deadline.  Putative Class Members who so timely request to Opt-Out shall be excluded from this Agreement and from the Class.  Any putative Class Member who does not submit a request to Opt-Out in the manner specified in the Notice by the Opt-Out Deadline or who does not otherwise comply with the agreed upon Opt-Out procedure approved by the Court shall be a Class Member and shall be bound by the terms of this Agreement and the Final Order and Judgment.  Any Class Member shall be deemed to have taken all actions necessary to withdraw and revoke the assignment to any Person of any claim against the Blue Parties.

Any putative Class Member who timely submits a request to Opt-Out shall have until the Settlement Hearing Date to deliver to the Notice Administrator a written revocation of such putative Class Member's

22

request to Opt-Out. The Notice Administrator shall timely apprise the Parties of such revocations as of that date. The Parties shall timely apprise the Court of all such revocations.

Within fifteen (15) days after the Opt-Out Deadline, the Notice Administrator shall furnish the Blue Parties with a complete list in machine-readable form of all Opt-Out requests submitted by the Opt-Out Deadline. Within ten (10) days after the Settlement Hearing Date, the Notice Administrator shall furnish the Blue Parties with a complete list, in machine readable form, of all Opt-Out requests submitted by the Opt-Out deadline and not withdrawn by the Settlement Hearing Date. The Blue Parties shall pay costs of obtaining a copy of the Opt-Out requests.

**6.2    Setting the Settlement Hearing Date and Settlement Hearing Proceedings**

The Representative Plaintiffs, the Signatory Medical Societies, Class Counsel and the Blue Parties agree to urge the Court to hold a hearing to consider final approval of this Agreement (the **"Settlement Hearing"**) on a date that is at least 120 days and is as soon as practicable after the Notice Date (the **"Settlement Hearing Date"**), and to work together to identify and submit any evidence that may be required by the Court to satisfy the burden of proof for obtaining approval of this Agreement and the orders of the Court that are necessary to effectuate the provisions of this Agreement, including without limitation, the Final Order and Judgment and the orders contained therein. At the Settlement Hearing, the Representative Plaintiffs, the Signatory Medical Societies, Class Counsel and the Blue Parties shall present evidence necessary and appropriate to obtain the Court's approval of this Agreement, the Final Order and Judgment and the orders contained therein (including without limitation the Bar Order), and shall meet and confer prior to the Settlement Hearing to coordinate their presentation to the Court in support of Court approval thereof.

**7.    Settlement Consideration: Business Practice Initiatives**

The settlement consideration to the Class Members includes, among other things, initiatives and other commitments with respect to the Blue Plans' business practices. The Parties agree that the business practice initiatives and other commitments set forth below, which absent this Agreement Blue Plans would be under no obligation to undertake, constitute substantial value, and will enhance and facilitate the delivery of Physician Services by Class Members. Many of the Blue Plans have investigated and begun to implement certain of the business practice initiatives described in or contemplated by this § 7 after the Action began and/or while the Parties were engaged in discussions to resolve the Action. Such initial and partial implementation, which shows the Parties' good faith desire to resolve the Action, were undertaken to form part of the consideration of the settlement. Blue Plans shall have the unilateral and unrestricted right to block

23

access to and/or not apply any or all of the business practice initiatives described in or contemplated by this § 7 to Physicians, if any, who Opt-Out of the Agreement. Without in any way qualifying or limiting the foregoing, Blue Plans (a) are informed that it is not uncommon for some members of a class action to opt out for a variety of reasons independent of, among other things, the substantive allegations in the complaint or the terms of a proposed settlement, and (b) state their present intention to exercise, in whole or in part, the rights referred to in the immediately preceding sentence to Persons eligible to become Class Members who nevertheless Opt-Out.

Each Blue Plan covenants and agrees that, during the period from and after the Execution Date and until the Preliminary Approval Date, they shall not effect any material changes in the business practices that are the subject of the Complaint and governed by the provisions of this Agreement, except changes to such business practices that are contemplated by or otherwise consistent with this Agreement.

Except as otherwise provided in Exhibit H, each Blue Party shall be obligated to implement those commitments applicable to it as provided in this § 7 and to commence such implementation as set forth in Exhibit I (the applicable "**Implementation Date**"). Each Blue Party shall continue implementing each such commitment until the Termination Date, except as and only to the extent that a term of this Agreement has been extended by a Blue Party as provided in § 14.6(b). With respect to each commitment of a Blue Party set forth in this § 7 (and not otherwise amended, modified, limited or excluded by Exhibit H), the "**Effective Period**" shall be the period of time beginning on the Implementation Date shown on Exhibit I and ending as specified in § 14.6(b). Notwithstanding anything to the contrary contained in this Agreement, with respect to each commitment set forth in this § 7 (and as otherwise amended, modified, limited or excluded by Exhibit H), from and after the Termination Date, a Blue Party shall be under no obligation whatsoever to continue to implement such commitment, except as provided in § 14.6(b).

**7.1     Intentionally Left Blank**

**7.2     Intentionally Left Blank**

**7.3     Availability of Fee Schedules and Scheduled Payment Dates**

Each Blue Plan shall develop and implement a plan not later than twelve (12) months after the Final Order Date reasonably designed to permit its Participating Physician, Participating Physician Group, or Participating Physician Organization that, in each case, has entered into a written contract directly with the Blue Plan, to the extent the Participating Physician, Participating Physician Group or Participating Physician Organization is compensated on a non-capitated basis, to view, by CD-ROM or electronically (at the Blue Plan's option), on a confidential basis, complete fee information showing the applicable fee schedule amounts for

24

such Participating Physician, Participating Physician Group, or Participating Physician Organization pursuant to that Participating Physician's, Participating Physician Group's, or Participating Physician Organization's direct written agreement with the Blue Plan. A Participating Physician, Participating Physician Group or Participating Physician Organization may elect to receive a hard copy of the fee schedule in lieu of the foregoing. The fee schedule information will be provided by the fee for service dollar amount allowable for each CPT® Code for those CPT® Codes that a Participating Physician, Participating Physician Group, or Participating Physician Organization in the same specialty typically uses in providing Covered Services. A Participating Physician, Participating Physician Group or Participating Physician Organization may request and the Blue Plan will provide the fee for service dollar amount allowable for other CPT® Codes that its Participating Physician, Participating Physician Group or Participating Physician Organization actually bills the Blue Plan. A Blue Plan may base actual compensation on the Blue Plan's maximum allowable amount and/or other contract adjustments. Commencing with the Final Order Date and continuing until implementation of the initiative described above, each Blue Plan, upon written request from a Participating Physician, Participating Physician Group, or Participating Physician Organization that, in each case, has entered into a written contract directly with that Blue Plan, will provide, by hard copy, the fee schedule for up to one hundred (100) CPT® Codes customarily and routinely used by such Participating Physician, Participating Physician Group, or Participating Physician Organization, as specified by such Participating Physician, Participating Physician Group, or Participating Physician Organization. Each Blue Plan shall be obligated to honor only two such requests made annually by such Participating Physician, Participating Physician Group, or Participating Physician Organization. Each Blue Plan will attempt to include provisions in its agreements with Delegated Entities that require comparable disclosure. Each Blue Plan will not require its Participating Physicians, Participating Physician Groups, or Participating Physician Organizations to provide that Blue Plan with billing rates as a precondition to that Blue Plan providing fee information pursuant to this section.

**7.4   Intentionally Left Blank**

**7.5   Reduced Precertification Requirements**

A number of Blue Plans have reduced, and each Blue Plan will commence or continue to attempt to limit, the number of services and supplies requiring Precertification, and have standardized the services and supplies for which Precertification is required within each market, line of business (e.g., group, individual, etc.) or product for its Fully-Insured and Self-Insured Plans. Each Blue Plan will continue to review its Precertification requirements for further opportunities to reduce the number of services and supplies requiring Precertification. Each Blue Plan may continue to

require Precertification for services and supplies and may alter or amend the number of services and supplies requiring Precertification in response to changes in market conditions, medical technology, and utilization patterns. Each Blue Plan shall post to its Provider Website not later than three (3) months after the Final Order Date those services or supplies for which Precertification is routinely required for its products, and shall update such posting to the extent the services or supplies for which Precertification is routinely required changes. Notwithstanding the above, a Blue Plan's Self-Insured Plan customers may specify services or supplies for which Precertification is required that differ from or are in addition to the services or supplies for which that Blue Plan routinely requires Precertification for its Fully-Insured Plans, and such Self-Insured Plans may contract with a different entity to provide Precertification services. Each Blue Plan will propose to its Self-Insured Plan customers that they utilize the Blue Plan's standard list of services and supplies for which Precertification is required. With a Self-Insured Plan's approval, each such Blue Plan will post such Self-Insured Plan's customized list of Precertification requirements to the Blue Plan's Provider Website.

**7.6     Greater Notice of Policy and Procedure Changes**

Each Blue Plan shall, if it intends to make a material adverse change(s) in the terms of its contracts (including policies and procedures incorporated by reference therein) with its Participating Physicians, Participating Physician Groups, or Participating Physician Organizations, give at least ninety (90) days written notice to each Participating Physician, Participating Physician Group, or Participating Physician Organization affected thereby with whom the Blue Plan has directly contracted (except to the extent that a shorter notice period is required to comply with changes in applicable law), which notice shall reasonably apprise its Participating Physician, Participating Physician Group, or Participating Physician Organization of such change(s), and the change(s) shall not become effective before the conclusion of the notice period. If a Participating Physician, Participating Physician Group, or Participating Physician Organization objects to the change(s) that is subject to the notice, the Participating Physician, Participating Physician Group, or Participating Physician Organization must, within thirty (30) days of the date of the notice (which shall be the date the notice is sent by United States mail, by facsimile, or, if the Blue Plan offers it, electronically at the option of the Physician, Physician Group, or Physician Organization), give written notice to terminate his, her, or its contract with the Blue Plan, which termination shall be effective at the end of the notice period of the material adverse change unless, within sixty-five (65) days of the date of the original notice of change(s), the Blue Plan gives written notice to the objecting Participating Physician, Participating Physician Group, or Participating Physician Organization that it will not implement, as to the objecting Participating Physician, Participating Physician Group, or Participating Physician Organization, the material adverse change(s) to

26

which the Participating Physician, Participating Physician Group, or Participating Physician Organization objected. The continuation of care provisions in § 7.13(c) shall apply to any contract termination pursuant to this § 7.6.

**7.7     Intentionally Left Blank**

**7.8     Disclosure of and Commitments Concerning Claims Payment Practices**

(a)     Each Blue Plan recognizes the benefit of greater standardization in its claims systems and, to that end, each Blue Plan expects to consolidate its claims systems in certain of its multi-state regions, where applicable, which will result in greater consistency with respect to its automated "bundling" and other claims payment rules within those regions.

(b)     Each Blue Plan agrees that, except for Medicaid, State Childrens' Health Insurance Programs, and other similar government programs for low-income persons and/or for members of state-established high risk pools, its automated "bundling" and other claims payment rules shall be consistent in all material respects, within each state in which such Blue Plan operates as a Blue Cross and/or Blue Shield licensee, for claims submitted by or on behalf of such Blue Plan's Plan Members.

(c)     Intentionally Left Blank

(d)     Each Blue Plan agrees to disclose its Significant Edits on its Provider Website by not later than six (6) months after the Final Order Date, or as soon thereafter as practicable. Each Blue Plan agrees to update its disclosure of Significant Edits once per calendar year to reflect changes in the Blue Plan's Significant Edits and the Blue Plan's experience with submitted claims; provided that the Blue Plan shall promptly disclose newly-adopted Significant Edits.

(i)     Not later than six (6) months after the Final Order Date or as soon thereafter as practicable, each Blue Plan shall publish on its Provider Website, for each commercially available claims editing software product then in use by the Blue Plan, a list identifying each customized Edit added to the standard claims editing software product at the Blue Plan's request.

(ii)     Not later than the Final Order Date, a Blue Plan shall not routinely require submission of Clinical Information, before or after payment of claims, in connection with that

27

Blue Plan's adjudication of a Physician's claims for payment, except as to claims for unlisted codes, claims to which a modifier 22 is appended, and other limited categories of claims as to which the Blue Plan determines that routine review of Clinical Information is appropriate; provided that the Blue Plan shall disclose any of its categories of such nature on its Public Website and its Provider Website. Notwithstanding the foregoing, a Blue Plan may require submission of Clinical Information in connection with a Blue Plan's adjudication of a Physician's claims for payment for the purpose of investigating fraudulent or abusive (whether intentional or unintentional) billing practices, but only so long as, and only during such times as, the Blue Plan has a reasonable basis for believing that such investigation is warranted. A Participating Physician may contest, in accordance with § 12, any requirement that the Participating Physician submit Clinical Information in connection with a Blue Plan's adjudication of the Participating Physician's claims for payment for the purpose of investigating fraudulent or abusive (whether intentional or unintentional) billing practices. Nothing in this Agreement is intended or shall be construed to limit a Blue Plan's right to require submission of Clinical Information when such requirement is not in connection with a Blue Plan's adjudication of a Physician's claims for payment or is otherwise permitted by this Agreement, including, but not limited to, the right to require submission of Clinical Information for Precertification purposes consistent with § 7.5.

(iii)    Not later than six (6) months after the Final Order Date, each Blue Plan shall publish on its Provider Website those limited code combinations as to which it has determined that particular services or procedures, relative to modifiers 25 and 59, are not appropriately reported together with those modifiers and the Blue Plan's application of the rule differs from CPT® Codes; provided that no such determination shall be inconsistent with the undertakings set forth in this Agreement.

(e)    Each Blue Plan shall promptly update the disclosures required by § 7.8(d)(i), (d)(ii) and (d)(iii) when changes are made to the policies, procedures, or determinations referenced therein.

## 7.9    Physician Advisory Committee

(a)    Prior to the later to occur of (i) three (3) months after the Final Order Date and (ii) selection of the members of the Physician

28

Advisory Committee in accordance with § 7.9(b) of this Agreement, each Blue Plan shall take all actions reasonably necessary on its part to establish a Physician Advisory Committee ("**Physician Advisory Committee**") to discuss issues arising from or related to the relationships and interactions between and among Physicians, their patients, and the Blue Plan. These issues may include, but are not limited to: (a) improvement of health care and clinical quality; (b) improvement of communications, relations and cooperation between Physicians and the Blue Plan; and/or (c) matters of a clinical or administrative nature that impact the interaction between Physicians and the Blue Plan. The Physician Advisory Committee shall meet at least once every six months during the Effective Period. All communications to the Physician Advisory Committee by Participating Physicians and/or Non-Participating Physicians shall be accomplished through members of the Physician Advisory Committee who shall represent the interests of such Participating and/or Non-Participating Physicians and whose contact information shall be posted on the Provider Website.

**(b)**     The Physician Advisory Committee shall include twelve (12) members, one of whom shall be the Blue Plan's Chief Medical Officer or his designee, who shall serve as chairperson of the Physician Advisory Committee.

Except as otherwise provided in this § 7.9(b), the remaining members of the Physician Advisory Committee shall be Participating Physicians.

The Blue Plan shall select three (3) members in addition to its Chief Medical Officer not later than sixty (60) days after the Preliminary Approval Date. The state medical society shall select four (4) members of a Blue Plan's Physician Advisory Committee with consultation, as such state society deems necessary, with appropriate organized medical and Physician professional organizations. The state medical society selected Physicians shall include at least one board-certified primary care Participating Physician, at least one board-certified specialist Participating Physician, and at least one Participating Physician who occupies a leadership position with a specialty medical society, state or local medical society, or large free-standing or hospital based group Physician practice. Those eight (8) members shall select the remaining four (4) members, one of whom may be a Non-Participating Physician. All members of the Physician Advisory Committee for a Blue Plan must practice or reside within the service area of such Blue Plan.

The Blue Plan and state medical society as provided above shall strive to select Physicians who are committed to the Physician

29

Advisory Committee functioning as a constructive and collaborative body. If any member discontinues serving on the Physician Advisory Committee, that member's position shall be filled in the same manner as the member was originally selected.

The names of the members of the Physician Advisory Committee and the dates of the Physician Advisory Committee meetings shall be posted on the Blue Plan's Provider Website.

(c)    Any motion for the Physician Advisory Committee to consider an issue must be proposed by the chairperson or any other voting member of the Physician Advisory Committee. The issue shall be heard only if, at a meeting at which a quorum exists, a majority of the voting members of the Physician Advisory Committee present vote in favor of hearing the issue.

For purposes of this subparagraph (c), "quorum" shall mean seven (7) or more voting members of the Physician Advisory Committee of which at least two (2) members were selected by the state medical society as provided in § 7.9(b), two (2) members were selected by the Blue Plan, and two (2) members were selected by the members selected by the Blue Plan and the state medical society as provided in § 7.9(b).

Upon a majority vote of the voting members of the Physician Advisory Committee, the Physician Advisory Committee may make recommendations to the Blue Plan, provided that such recommendations are within the Physician Advisory Committee's purview as described in § 7.9(a).

The Blue Plan shall consider whether the implementation of any recommendation of the Physician Advisory Committee is: (a) reasonable considering the opportunities and constraints of the current health care financing/administration marketplace; (b) consistent with the best interests of the Blue Plan's Participating Physicians, Plan Members, customers, shareholders and other constituents; and (c) in furtherance of scientifically and clinically sound medical care. If the Blue Plan decides not to accept a recommendation of the Physician Advisory Committee, the Blue Plan shall communicate that decision in writing to the Committee with an explanation of the Blue Plan's reasons, and the Blue Plan shall also disclose the recommendation and response on its Provider Website. The Blue Plan agrees to post on its Provider Website a listing of all Physician Advisory Committee recommendations made to the Blue Plan and the Blue Plan's responses to such recommendations.

(d)    Each member of the Physician Advisory Committee shall agree to maintain and treat as confidential any proprietary information

reasonably designated as such by the Blue Plan.  No member of the Physician Advisory Committee shall serve as a member of an advisory or similar committee established by any other managed care company or health insurer, but this provision is not meant to exclude Physicians who serve on credentialing or similar committees for other companies.

(e)     Each Blue Plan shall develop and implement reasonable payment provisions for the expenses of members of its Physician Advisory Committee, including without limitation a reasonable per diem to be set by the Blue Plan. Such payment provisions shall be consistent with the Blue Plan's typical payment provisions for Physicians serving on its existing committees of this type.

### 7.10    New Dispute Resolution Process for Physician Billing Disputes

(a)     Not later than four (4) months after the Final Order Date, each of the Blue Plans shall take actions necessary to establish a Billing Dispute External Review Process.  The Billing Dispute External Review Process shall provide for a Billing Dispute Reviewer, to resolve disputes with Physicians and Physician Groups arising from Covered Services provided to the Blue Plan's Plan Members by such Physicians and/or Physician Groups concerning (i) the Blue Plan's application of the Blue Plan's coding and payment rules and methodologies for fee for service claims (including without limitation any bundling, Downcoding, application of a CPT® modifier, and/or other reassignment of a code by the Blue Plan) to patient specific factual situations, including without limitation the appropriate payment when two or more CPT® Codes are billed together, or whether a payment enhancing modifier is appropriate, or (ii) any Retained Claims, so long as such Retained Claims are submitted by the Physician to the Billing Dispute Reviewer prior to the later to occur of (x) ninety (90) days after the Final Order Date, or (y) thirty (30) days after exhaustion of the Blue Plan's internal appeals process.  Each such matter shall be a "**Billing Dispute**." The Billing Dispute Reviewer shall not have jurisdiction over any other disputes, including without limitation those disputes that fall within the scope of the External Review process set forth in § 7.11 of this Agreement, Compliance Disputes and disputes concerning the scope of Covered Services; nor shall any Billing Dispute Reviewer have jurisdiction or authority to revise or establish any reimbursement policy of the Blue Plan.

(b)     Nothing contained in this § 7.10 is intended, or shall be construed, to supersede, alter or limit the rights or remedies otherwise available to any Plan Member under § 502(a) of ERISA or to supersede in any respect the claims procedures for Plan Members

31

of § 503 of ERISA, or required by applicable state or federal law or regulation. In the case of: (i) a state or federal law that requires the Blue Plan and Physician to use an external billing dispute review process, (ii) a state or federal law that requires the Blue Plan to establish and make available an external review process, and such process provides at least substantially the same procedural protections and rights as the process set forth in this § 7.10, and is a process that provides for disputes to be resolved at a cost to the Physicians that is not substantially greater than the cost set forth in this § 7.10 in time frames not materially longer than the time frames set forth in this § 7.10 and that any determinations are rendered by an independent, external person or entity, or (iii) an external review process that is established by a state or federal governmental body that the Blue Plan is required to make available and such process provides at least substantially the same procedural protection and rights as the process set forth in this § 7.10, only the program described in subclauses (i)-(iii) shall be utilized for Billing Disputes with respect to Plan Members covered by such process. Notwithstanding the foregoing, if there is any state or federal external review process that does not meet the requirements for use set forth herein, but is otherwise available to a Physician or Physician Group, the Physician or Physician Group shall be limited to bringing an appeal either under the process set forth in this § 7.10 or the available state or federal process, but not both.

(c)    Any individual Physician or Physician Group may submit a Billing Dispute to the Billing Dispute Reviewer after the Physician or Physician Group exhausts the Blue Plan's internal appeals process, and when the amount in dispute exceeds $500. Billing Disputes may be submitted only by individual Physicians and Physician Groups. Each Blue Plan shall post a description of its Physician internal appeals process on its Provider Website.

(1)    Notwithstanding the foregoing, an individual Physician or Physician Group may submit a Billing Dispute with an amount in dispute less than $500 if such Physician or Physician Group notifies the Billing Dispute Reviewer that the Physician or Physician Group intends to submit additional Billing Disputes during the one (1) year period following the submission of the original Billing Dispute which involve issues that are similar to those of the original Billing Dispute. The Billing Dispute Reviewer will defer consideration of such Billing Dispute while the Physician or Physician Group accumulates such additional similar Billing Disputes. In the event that a Billing Dispute is deferred pursuant to the preceding sentence and, as of the Termination Date, the Physician or Physician Group has

32

not accumulated the requisite amount of Billing Disputes and the Blue Plan has chosen not to continue the Billing Dispute process following the Termination Date, then any rights the Physician or Physician Group had as to such Billing Disputes, including rights to arbitration, shall be tolled from the date the Billing Dispute was submitted to the Billing Dispute Reviewer through and including the Termination Date.

(2)     In the event additional similar Billing Disputes (x) are not submitted within one (1) year of the original Billing Dispute, or (y) do not involve disputes that in aggregate exceed $500, the Billing Dispute Reviewer shall dismiss the original Billing Dispute and any such additional Billing Disputes.

(3)     The Physician or Physician Group must exhaust the Blue Plan's internal appeals process before submitting a Billing Dispute to the Billing Dispute Reviewer. A Physician or Physician Group shall be deemed to have exhausted the Blue Plan's internal appeals process if the Blue Plan does not communicate a decision on an internal appeal within thirty (30) days of the Blue Plan's receipt of all documentation reasonably needed to decide the internal appeal. In the event the Blue Plan and Physician or Physician Group disagree as to whether the requirements of the preceding sentence have been satisfied, such disagreement shall be resolved by the Billing Dispute Reviewer. Except as otherwise provided in this § 7.10(c), all Billing Disputes must be submitted to the Billing Dispute Reviewer no more than ninety (90) days after a Physician or Physician Group exhausts the Blue Plan's internal appeals process, and the Billing Dispute Reviewer shall not hear or decide any Billing Dispute submitted more than ninety (90) days after the Blue Plan's internal appeals process has been exhausted. The Blue Plan shall supply appropriate documentation to the Billing Dispute Reviewer not later than thirty (30) days after requested by the Billing Dispute Reviewer, which request shall not be made, if Billing Disputes are submitted pursuant to this § 7.10(c)(1), until Billing Disputes have been submitted with amounts in dispute that in aggregate exceed $500.

(4)     Except to the extent otherwise specified in this § 7.10(c), procedures for review by the Billing Dispute Reviewer, including without limitation the documentation to be supplied to the reviewer and the prohibition on *ex parte* communications between any party and the Billing

33

Dispute Reviewer, shall be set by agreement between the Blue Plan and Class Counsel, or their designee, with input from the Billing Dispute Reviewer. Such procedures shall provide that (x) a Physician or Physician Group submitting a Billing Dispute to the Billing Dispute Reviewer shall state in the documents submitted the amount in dispute, and (y) that the Billing Dispute Reviewer shall not be permitted to issue an award that exceeds the greater of the amount in dispute stated by such Physician or Physician Group in the documents submitted to the Billing Dispute Reviewer or the amount payable under the terms of the applicable contract between the Blue Plan and the Physician or Physician Group.

(d)     Each Blue Plan and Class Counsel shall select the person(s) or organization(s) that shall serve as the Billing Dispute Reviewer (on a local, regional or national basis). If the Blue Plan and Class Counsel cannot agree on the Billing Dispute Reviewer within 120 days of the Preliminary Approval Date, the matter shall be deemed a Compliance Dispute and referred to the Compliance Dispute Officer. Billing Disputes shall be stayed and any time limitation shall be tolled pending resolution of such Compliance Dispute. Beginning one (1) year after any Billing Dispute Reviewer is selected by the Blue Plan and Class Counsel, either of Class Counsel or the Blue Plan may request the appointment of a new Billing Dispute Reviewer. The new person or organization to serve as the Billing Dispute Reviewer shall be selected within thirty (30) days of written notice of any such request. If the Blue Plan and Class Counsel cannot agree on the selection, the matter shall be deemed a Compliance Dispute and referred to the Compliance Dispute Review Officer. In deciding Billing Disputes, the Billing Dispute Reviewer shall be bound by the terms of the applicable Plan, any applicable agreement between the Physician or Physician Group and the Blue Plan, and the provisions of this Agreement. If the dispute cannot be resolved by reference to the foregoing documents, then the Billing Dispute Reviewer shall resolve Billing Disputes by determining, first, whether the billing was coded and submitted properly based on generally accepted medical coding standards, including but not limited to CPT® Coding and CCI/CMS guidelines, and second, whether the Blue Plan's reimbursement policies were properly applied, including those reimbursement policies required or permitted under this Agreement, including without limitation reimbursement policies posted by the Blue Plan pursuant to § 7.8(d).

(e)     A Blue Plan's contract(s) with the person(s) or organization(s) selected to serve as a Billing Dispute Reviewer shall require

34

decisions to be rendered not later than thirty (30) days after receipt of the documents necessary for the review and to provide notice of such decision to the parties promptly thereafter.

(f)     In the event that the Billing Dispute Reviewer issues a decision requiring payment by the Blue Plan, that Blue Plan shall make such payment within fifteen (15) days after the Blue Plan receives notice of such decision.

(g)     Any decision under this § 7.10 shall be binding on the Blue Plan and the Physician or Physician Group.  For Retained Claims, all Billing Disputes shall be directed not to the Court nor to any other state court, federal court, arbitration panel (except as hereinafter provided) or any other binding or non-binding dispute resolution mechanism but instead shall be submitted to final and binding resolution before the Billing Dispute Reviewer so long as such Billing Dispute arises after the selection of the Billing Dispute Reviewer pursuant to § 7.10(d).  Retained Claims as defined in § 13.6 shall not be barred as untimely so long as they are submitted within thirty (30) days of the selection of the Billing Dispute Reviewer.

(h)     For any Billing Dispute that a Physician or Physician Group submits to the Billing Dispute Reviewer, the Physician or Physician Group submitting such Billing Dispute shall pay to the Blue Plan a filing fee calculated as follows: (i) if the amount in dispute is $1,000 or less, the filing fee shall be equal to $50; or (ii) if the amount in dispute exceeds $1,000, the filing fee shall be equal to $50 plus 5% of the amount by which the amount in dispute exceeds $1,000, but in no event shall the fee be greater than 50% of the cost of the review. The Blue Plan shall refund the applicable filing fee paid by a Physician or Physician Group who submits a Billing Dispute to the Billing Dispute External Reviewer in the event the Physician or Physician Group is the prevailing party with respect to such Billing Dispute.

(i)     The determination made with respect to any Billing Dispute pursuant to this section shall not act as precedent as to any other Billing Dispute under this section or any other proceeding brought outside of this § 7.10, provided that evidence of the determination may be received in a Compliance Dispute involving a systemic remedy under § 12.6(f) of the Agreement.

**7.11    Determinations Related to Medical Necessity or the Experimental or Investigational Nature of Any Proposed Health Care Service or Supply**

(a)     **Initial Determinations**

35

A Physician designated by each Blue Plan shall be responsible for making the initial determination for such Blue Plan whether proposed health care services or supplies are Medically Necessary or experimental or investigational in nature. A nurse or other health care professional, acting for a medical director, may approve any proposed health care service or supply as being Medically Necessary, but only a Physician designated by the Blue Plan may deny any such service or supply as being not Medically Necessary or experimental or investigational in nature.

(b) **Plan Member Internal Appeal and External Review Process**

(i) Each Blue Plan shall maintain an internal appeal and external review process permitting its Plan Members to seek internal and independent external review of any determination made by the Blue Plan that certain services provided to the Blue Plan's Plan Members by Physicians are not Covered Services because they are not Medically Necessary or are experimental or investigational in nature ("**Adverse Determination**") where the Blue Plan both makes the Adverse Determination and administers its Plan Member appeals and external review processes.

(ii) As set forth in this § 7.11, each Blue Plan will establish and maintain an internal appeal and external review process for Physicians with respect to Adverse Determinations to the extent the Blue Plan both makes the Adverse Determination and administers its Plan Member appeals and/or external review processes.

(iii) Except where any applicable law or regulation requires a different definition, each Blue Plan shall use the definition of Medical Necessity set forth in § 7.16 (a) of this Agreement in the internal appeal and external review processes set forth in this § 7.11; provided, however, that nothing in this Agreement shall: (a) limit or prevent the Blue Plan from denying coverage on the grounds that services are experimental or investigational; or (b) alter or restrict the Blue Plan's rights under its contracts with Participating Physicians to restrict or prohibit them from billing the Blue Plan's Plan Member for services determined to be not Medically Necessary or experimental or investigational. Each Blue Plan agrees that Physicians may bill its Plan Members for services determined to be not Medically Necessary or experimental or investigational when the Physician provides the Blue Plan's Plan Member with advance written notice that (a) identifies the proposed services, (b) informs that Plan Member that such services

36

may be deemed by the Blue Plan to be not Medically Necessary or experimental or investigational, and (c) provides an estimate of the cost to that Plan Member for such services and that Plan Member agrees in writing in advance of receiving such services to assume financial responsibility for such services.

(iv)     In applying experimental and investigational exclusions in a Plan to either proposed health care services or as part of a Post-Service Appeal to the Blue Plan, each Blue Plan shall consider credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community, Physician Specialty Society recommendations, the views of Physicians practicing in relevant clinical areas, the individual clinical circumstances of the particular Blue Plan's Plan Member, the views of the treating Physician and any other relevant factors.

(c)     **Physician Internal Appeals of Adverse Determinations.**

(i)     **Pre-Service Appeals**.

Physicians shall have the right to file an appeal of an Adverse Determination prior to rendering the service ("**Pre-Service Appeals**"), if they are appealing on behalf of the Blue Plan's Plan Member.  For urgent Pre-Service Appeals, the Physician shall be automatically deemed the authorized representative of the Blue Plan's Plan Member. For all other Pre-Service Appeals, authorization must be obtained from the Blue Plan's Plan Member in writing. Pre-Service Appeals filed by Physicians on behalf of the Blue Plan's Plan Member will be handled by the Blue Plan under the appeal process available to its Plan Member based on the terms of that Plan Member's Plan and the applicable state and federal laws and regulations.

(ii)     **Post-Service Appeals**

(A)     With respect to an appeal of an Adverse Determination made after the service has been rendered ("**Post-Service Appeals**"), each Blue Plan shall adopt a one level internal appeal process for Physicians.  That process shall ensure that only a Physician in the same specialty, as defined in subsection (B) below, as the Physician who treated the condition (hereinafter "**Qualified Reviewer**"), other than the Physician that made the initial Adverse Determination, may deny the appeal of the Physician who treated the condition.  A nurse or

37

other health care professional employed by the Blue Plan may review the internal appeal and may grant but not deny the appeal.  If the nurse or other healthcare professional does not grant the appeal, then a Qualified Reviewer, designated by the Blue Plan, other than the one that made the initial Adverse Determination, shall review and decide the internal appeal in accordance with the Blue Plan's health care clinical guidelines.

(B)     For purposes of this section, "same specialty" shall mean a Physician with similar credentials and licensure as those who typically treat the condition or health problem in question in the appeal or a Physician who has experience treating the same problems as those in question in the appeal, in addition to experience treating similar complications of those problems.

(C)     Prior to requesting an internal Post-Service Appeal, the Physician shall use best efforts to first seek written authorization to proceed as the representative of the Blue Plan's Plan Member. If the Physician obtains consent to proceed on behalf of the Blue Plan's Plan Member, then the Physician's appeal rights are those of the Blue Plan's Plan Member and the Physician is bound by the decision rendered in the Plan Member's appeal process.

**(d)     Timeframes for Physician Internal Appeals of Adverse Determinations**

All internal Post-Service Appeals filed by Physicians shall be adjudicated within the time limits established under regulations issued by the Department of Labor regardless of whether ERISA applies.

**(e)     Adverse Determination External Review Process for Physicians**

(i)     If a Blue Plan upholds its initial Adverse Determination through the internal Post-Service Appeals process and the cost of the service at issue exceeds the threshold amount, if any, the Blue Plan's Plan Member would need to satisfy in order to seek external review under the terms of the applicable health benefit plan, the Blue Plan shall make available to its Physicians the option to seek external review of the Adverse Determination through an independent review organization ("**Independent Review Organization**") identified by the Blue Plan ("**External**

38

Review"). The Physician shall have the option to submit a written request for External Review within sixty (60) days from the date of the internal Post-Service Appeal denial decision by the Blue Plan. Election to pursue External Review under this § 7.11 is at the option of the Physician, who may instead choose any other remedy available as a matter of law or contract.

(ii)   External Review is not available for a Physician before that Physician has exhausted the Blue Plan's internal Post-Service Appeal process unless both the Blue Plan and the Physician agree to forego the internal Post-Service Appeal and proceed directly to External Review, or the Blue Plan cannot provide a Qualified Reviewer for internal appeal.

(iii)  Physicians seeking External Review shall pay the Blue Plan a filing fee of fifty dollars ($50) if the amount in dispute is $1,000 or less or $250 if the amount in dispute exceeds $1,000. Payment must be submitted along with the External Review request; provided, however, that the Physician shall be entitled to a refund of such payment in the event that the Physician prevails in the Blue Plan's External Review process.

(iv)   Any decision issued pursuant to an External Review process, regardless of whether such External Review process is initiated and pursued by the Blue Plan's Plan Member or the Physician, shall be binding upon both the Physician and the Blue Plan.

(v)    The Blue Plan will contract with the Independent Review Organization (on a local, regional, or national basis) to conduct a de novo review of the case. For coverage issues other than a determination of Medical Necessity, the Plan Documents of the Blue Plan's Plan Member will control. In the event an External Review process is initiated, the Blue Plan shall promptly, but in any event no later than ten (10) business days following receipt of the request, submit documentation pertaining to the appeal to the Independent Review Organization. The Blue Plan shall require that the Independent Review Organization provide a decision within thirty (30) days of the Blue Plan's submission of all necessary information. The external reviewer designated to conduct the review by the Independent Review Organization shall be of the same specialty (but not necessarily the same sub-specialty) as the appealing Physician.

(vi)   The Independent Review Organization's compensation shall not be tied to the outcome of the reviews performed. Likewise, the selection process among qualified

Independent Review Organizations will not create any incentives for Independent Review Organizations to make decisions in a biased manner.

(vii) In the event that: (A)(i) a state or federal law requires the Blue Plan and Physician to use an external review process, (ii) a state or federal law requires the Blue Plan to establish and make available an external review process, and such process provides at least substantially the same procedural protections and rights as the process set forth in this § 7.11, and is a process that provides for disputes to be resolved at a cost to the Physicians that is not substantially greater than the cost set forth in this § 7.11(e) in time frames not materially longer than the time frames set forth in this § 7.11(e), and that any determinations are rendered by an independent, external person or entity, or (iii) an external review process is established by a state or federal governmental body that the Blue Plan is required to make available, and such process provides at least substantially the same procedural protections and rights as the process set forth in this § 7.11, as set forth in § 7.11 (e)(ii) above, and (B) any of these processes are: (i) made available to Physicians without the written authorization of the Blue Plan's Plan Member, or (ii) available to the Physician with the written authorization of the Blue Plan's Plan Member and the Physician has obtained such written authorization, then the Physician shall be required to use the state or federal external review process in lieu of the external review process established in this § 7.11. Notwithstanding the foregoing, if there is any state or federal external review process that does not meet the requirements for use set forth herein, but is otherwise available to a Physician or Physician Group, the Physician or Physician Group shall be limited to bringing an appeal either under the process set forth in this § 7.11 or the available state or federal process, but not both.

(viii) Notwithstanding the preceding provisions of this § 7.11, and in addition to any requirements contained above, the Physician may not initiate an internal Post-Service Appeal or External Review of any denied service if:

(A) The Blue Plan's Plan Member (or his or her representative) or the Physician (either independently where the Blue Plan is required to accept an independent Physician appeal by state law or as the representative of the Blue Plan's Plan Member) filed a Pre-Service Appeal pertaining to the same denied service; or

40

(B)     The Blue Plan's Plan Member (or his or her representative) is currently seeking or has sought review related to the same denied service.  In the event both Blue Plan's Plan Member (or his or her representative) and the Physician seek review of the same denied service, the Plan Member's review shall go forward and the Physician's request for review will be dismissed;

(C)     As to External Review only, the Blue Plan's Plan Member is covered under a Self-Insured Plan and the Plan sponsor has not agreed by contract to participate in the Blue Plan's External Review program set forth in this § 7.11(e); or

(D)     The Blue Plan's Plan Member (or his or her representative) has filed suit under § 502(a) of ERISA or other suit for the denial of health care services or supplies regarding an Adverse Determination.  In that event, or if such a suit is subsequently initiated, the Plan Member's lawsuit shall go forward and the Physician's claims shall be dismissed and may not be brought by or on behalf of the Physician in any forum; provided that such dismissal shall be without prejudice to any Physician seeking to establish that the rights sought to be vindicated in such lawsuit belong to such Physician and not to such Blue Plan's Plan Member.

(E)     Nothing contained in this § 7.11 is intended, or shall be construed, to supersede, alter or limit the rights or remedies otherwise available to any Person under § 502(a) of ERISA or to supersede in any respect the claims procedures under § 503 of ERISA.

**(f)     Precedential Effect**

The determination made with respect to any Adverse Determination pursuant to any internal appeal and External Review process referenced in this § 7.11 shall not act as precedent as to any other Medical Necessity or experimental or investigational determination under this § 7.11 or any other proceeding brought outside of this § 7.11, provided that evidence of the determination may be received in a Compliance Dispute involving a systemic remedy under § 12.6(f) of the Agreement.

**7.12     Intentionally Left Blank**

**7.13     Participating in Blue Plans' Networks**

41

(a)    **Credentialing of Physicians**

Each Blue Plan will allow Physicians to submit credentialing applications (including, as relevant, licensure and hospital privileges or other required information) and will begin to process such applications prior to the time that the Physician formally changes or commences employment or changes location, provided that the Physician must represent that he or she has new employment or intends to move to a new location within the Blue Plan's service area.  The Blue Plan shall complete primary source verification and notify the Physician as to whether he or she is credentialed within ninety (90) days of receiving a Physician's completed application to be a Participating Physician unless in spite of the Blue Plan's best efforts and because of a failure of a third party to provide necessary documentation, the Blue Plan cannot obtain the necessary information to make a decision within ninety (90) days.  In such event, the Blue Plan shall make every effort to obtain such information as soon as possible. Each Blue Plan commits that the Credentialing Committee for its service area shall meet at least once every forty-five (45) days to consider credentialing applications for which primary source verification has been completed.  If a Physician is already credentialed by the Blue Plan but changes employment or changes location, the Blue Plan will only require the submission of such additional information, if any, as is necessary to continue the Physician's credentials based upon the changed employment or location.

(b)    **All Products Clauses**

Each Blue Plan agrees that it shall not require a Participating Physician to participate in a capitated fee arrangement in order to participate in Product Networks in which such Participating Physician is compensated on a fee for service basis.  Each Blue Plan further agrees that it shall not require a Participating Physician to participate in its Medicare Advantage or Medicaid Product Networks in order to participate in its commercial Product Networks.  Except where a Participating Physician (or Participating Physician Group comprised of Participating Physicians or Participating Physician Organization) has agreed in an Individually Negotiated Contract to participate in more than one Product Network for a specified period of time (in which case the terms of such Individually Negotiated Contract shall govern), if a Participating Physician (or Participating Physician Group comprised of Participating Physicians or Participating Physician Organization) either (a) chooses not to participate in all of the Blue Plan's Product Networks or (b) terminates participation in some of the Blue Plan's Product Networks, then the reimbursement levels

42

(e.g., fee for service maximum allowable amount, Capitation rate or other reimbursement methodology) offered to or applied by the Blue Plan to such Participating Physician (or Participating Physician Group or Participating Physician Organization) for the Product Network(s) in which such Participating Physician (or Participating Physician Group or Participating Physician Organization) continues to participate shall not be lower than the Blue Plan's standard reimbursement levels (e.g., fee for service maximum allowable amount, Capitation rate or other reimbursement methodology) in that geographic market. Notwithstanding the foregoing, the Blue Plan may offer a higher reimbursement level (e.g., fee for service maximum allowable amount, Capitation rate or other reimbursement methodology) or other incentive to any Participating Physician (or Participating Physician Group or Participating Physician Organization) who elects to participate (or elects to continue participation) in more than one of the Blue Plan's Product Networks. Nothing in this paragraph shall obligate a Blue Plan to pay more than the lesser of the Participating Physician's billed charges or the Blue Plan's applicable fee for service amount.

(c)     **Termination Without Cause**

Unless an Individually Negotiated Contract between a Blue Plan and a Participating Physician, Participating Physician Group, or Participating Physician Organization specifies a different period of notice, or specifies that the contract may not be terminated except for cause during a defined period of time, either party to a contract between a Blue Plan and a Participating Physician, Participating Physician Group, or Participating Physician Organization shall have the right to terminate the contract without cause upon prior written notice provided to the other party which notice shall be a definite period set forth in such agreement, which period shall be no less than sixty (60) or more than one hundred and twenty (120) calendar days.

In the event of a contract termination by either party, the following obligations shall apply with respect to the continuation of care for those patients of a Participating Physician, Participating Physician Group, or Participating Physician Organization who are entitled to continuation of care as reasonably defined under the Participating Physician's, Participating Physician Group's, or Participating Physician Organization's contract with the Blue Plan or under applicable law. In the case of a continuation of care situation as defined in the preceding sentence, the Participating Physician, Participating Physician Group, or Participating Physician Organization shall continue to render necessary care to the Blue Plan's Plan Member consistent with contractual or legal

43

obligations; provided that, if, upon notice from the Participating Physician, Participating Physician Group, Participating Physician Organization, or the Blue Plan's Plan Member that a Plan Member is in a continuation of care situation, the Blue Plan does not use due diligence to make alternative care available to the Plan Member within ninety (90) days after receipt of such notice, then for continuation of care services provided after termination, the Blue Plan shall pay to the Participating Physician, Participating Physician Group, or Participating Physician Organization the standard rates paid to Non-Participating Physicians for that geographical area. Other than as specified in this § 7.13(c), the contractual provisions applicable to continuation of care shall apply.

Notwithstanding the foregoing obligations, a Blue Plan's obligations under this § 7.13(c) shall not apply to the extent that other Participating Physicians, Participating Physician Groups, or Participating Physician Organizations are not available to replace the terminating Physician, Physician Group, or Physician Organization due to: (i) geographic or travel-time barriers; or (ii) contractual provisions between the terminating Physician, Physician Group, or Physician Organization and a facility at which the Blue Plan's Plan Member receives care that limits or precludes other Participating Physicians, Participating Physician Groups, or Participating Physician Organizations from rendering replacement services to the Blue Plan's Plan Members (e.g., an exclusive services agreement between the terminating Physician, Physician Group, or Physician Organization and a facility where Plan Member receives services).

### 7.14    Fee Schedule Changes

### (a)    Notices Regarding Fee Schedules

Each Blue Plan agrees to establish and operate one or more standard fee schedules of fee for service payments to its Participating Physicians, Participating Physician Groups, and Participating Physician Organizations for each geographic market in which the Blue Plan maintains a Product Network. Each Blue Plan also agrees, effective January 1 of the year following the Effective Date, not to reduce the fees set forth in such fee schedules more than once per calendar year except as otherwise provided in this § 7.14(a). Each Blue Plan further agrees that it shall give notice of any such reductions in fees as a material adverse change subject to the provisions of § 7.6 hereof; provided, however, that to the extent a fee schedule is directly tied to the CMS fee schedules or state Medicaid fee schedules currently in effect, it shall adjust automatically to reflect applicable interim and

44

annual revisions made by CMS or the state Medicaid agency without notice to the Physician. If an annual revision made by CMS or a state Medicaid agency results in a reduction in the fees in a fee schedule that is directly tied to the CMS fee schedules or state Medicaid fee schedules, a Participating Physician shall have the right to terminate his or her contract with the Blue Plan by giving the Blue Plan written notice of termination within thirty (30) days of the date on which CMS or the state Medicaid agency published notice of the annual revision, which termination shall be effective ninety (90) days after the date that such notice was published, subject to the continuation of care obligations described in § 7.13(c). Notwithstanding the foregoing, the Blue Plan may increase or reduce the fees set forth in such fee schedules by updating its fee schedules at any time (i) to reflect changes in market prices for vaccines, injectibles, pharmaceuticals, durable medical supplies, other goods, and non-Physician services, (ii) to add payment rates for newly-adopted CPT® Codes, (iii) to add payment rates for new technologies and new uses of established technologies that the Blue Plan concludes are eligible for payment, and (iv) to reflect applicable interim revisions made by CMS. Nothing contained in this § 7.14(a) shall prevent the Blue Plan from maintaining, altering or expanding the use of Capitation or other compensation methodologies. If an Individually Negotiated Contract has a term greater than one (1) year and has specific provisions for compensation that substantially differ from the standard fee schedule and that do not permit reduction in the compensation more frequently than once per year, then the provisions of § 7.14(a) shall not apply to such Individually Negotiated Contract.

(b)     **Payment Rules for Injectibles, DME, Administration of Vaccines, and Review of New Technologies**

Each Blue Plan agrees to pay a fee for the administration of vaccines and injectibles by a Participating Physician. The Blue Plan also agrees to pay for the vaccines and injectibles themselves. The Blue Plan shall pay for newly recommended vaccines as of the effective date of a recommendation made by any of the following: the U.S. Preventive Services Task Force; the American Academy of Pediatrics; and the Advisory Committee on Immunization Practices. Other than as specified in the preceding sentence with respect to newly recommended vaccines, if a Physician Specialty Society recommends as an appropriate standard of care a new technology or treatment, or a new use for an established technology or treatment, the Blue Plan shall evaluate such recommendation and issue a coverage statement not later than 120 days after the Blue Plan learns of such Physician Specialty Society recommendation.

45

(c)   **Usual, Reasonable, and Customary Appeals**

At least until the Termination Date, in the event the Plan Documents require that a Blue Plan utilize a usual, reasonable and customary standard for purposes of reimbursement to a Plan Member for services rendered by Non-Participating Physicians, and if a Non-Participating Physician initiates a dispute using a Blue Plan's internal dispute resolution procedures over how the Blue Plan has determined the usual, reasonable and customary amount for a given health care service or supply, and, consequently, over how the Blue Plan has computed the amount payable for that health care service or supply, the Blue Plan shall disclose to the Non-Participating Physician initiating the dispute the general methodology, including the percentile of included charge data on which the usual, reasonable and customary amount is based, and source of data used by the Blue Plan to determine the usual, reasonable and customary amount for that service or supply.

(d)   **Usual, Reasonable and Customary Determinations**

Each Blue Plan agrees that, to the extent it uses Physician charge data to determine the usual, reasonable and customary amount to be paid for services performed by Non-Participating Physicians, it will not use any internal claims database that: (i) systematically under-reports the number of claims paid for procedures in the geographic area used by the Blue Plan to determine such amount; (ii) eliminates or excludes the highest charges for paid claims for any procedures in the geographic area used by the Blue Plan to determine such fees, provided, however, that such charges may be excluded if the Blue Plan excludes an equivalent number or percentage of the lowest charges for such procedures, or reasonably determines that any such charges are the result of erroneous data; (iii) includes charges for procedures performed in a geographic area other than the one used by the Blue Plan to determine such amount, provided, however, that such charges may be considered where the Blue Plan determines there is an insufficient number of charges in the relevant geographic area to reasonably determine a usual, reasonable and customary amount; (iv) calculates the usual, reasonable and customary amount based upon fees paid under a discounted fee schedule rather than billed charges; and (v) lacks quality controls sufficient to reasonably test the validity of the data included in the database.

**7.15   Intentionally Left Blank.**

**7.16   Application of Clinical Judgment to Patient-Specific and Policy Issues**

(a)   **Patient-specific Issues Involving Clinical Judgment**

**Medical Necessity Definition**

Except where any applicable law or regulation requires a different definition, each Blue Plan shall apply as to its current agreements and include in its future agreements with Participating Physicians the following definition of "Medically Necessary" or comparable term in each such agreement: "**Medically Necessary**" or "**Medical Necessity**" shall mean health care services that a Physician, exercising prudent clinical judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing or treating an illness, injury, disease or its symptoms, and that are: (a) in accordance with generally accepted standards of medical practice; (b) clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the patient's illness, injury or disease; and (c) not primarily for the convenience of the patient, physician, or other health care provider, and not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's illness, injury or disease. For these purposes, "generally accepted standards of medical practice" means standards that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community, Physician Specialty Society recommendations and the views of Physicians practicing in relevant clinical areas and any other relevant factors.

**Adverse Determination Denial Rate**

For the calendar year beginning after the Final Order Date, and thereafter during the Effective Period, each Blue Plan shall make an annual, aggregate disclosure of the number of Adverse Determinations sent to external review for final determination for the preceding calendar year and the percentage of such Adverse Determinations that are upheld or reversed. Each Blue Plan shall make this disclosure by means of its Provider Website or other comparable electronic medium.

(b)   **Policy Issues Involving Clinical Judgment**

In formulating and adopting medical policies with respect to Covered Services, each Blue Plan shall rely on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community, and shall continue to make such policies readily available to its Plan Members and Participating Physicians via its Public Website or by other electronic means. In formulating and adopting such policies, each

47

Blue Plan shall take into account national Physician Specialty Society recommendations and the views of prudent Physicians practicing in relevant clinical areas and any other clinically relevant factors. Promptly after adoption, each Blue Plan shall file a copy of each new policy or guideline with its Physicians' Advisory Committee.

(c)     **Future Consideration by Blue Plans of an Administrative Exemption Program**

Each Blue Plan shall consider the feasibility and desirability of exempting certain Participating Physicians from certain administrative requirements based on criteria such as the Participating Physician's delivery of quality and cost effective medical care and accuracy and appropriateness of claims submissions.  No Blue Plan shall be obliged to implement any such exemption process during the term hereof, and this § 7.16(c) is not intended and shall not be construed to limit a Blue Plan's ability to implement any such program on a pilot or experimental basis, base exemptions on any Blue Plan determined basis, or otherwise to implement one or more programs in only some markets.

**7.17   Billing and Payment**

(a)     **Time Period for Submission of Bills for Services Rendered**

No Blue Plan shall contest the timeliness of bills for Covered Services provided under a Fully-Insured Plan if such bills are received by the Blue Plan within 180 days after: (i) the date of service when the Blue Plan is the primary payor; or (ii) the date of the Physician's receipt of the EOB from the primary payor when the Blue Plan is the secondary payor.  Each Blue Plan shall propose to Self-Insured Plan sponsors that they adopt the 180 day time period referenced in the preceding sentence, in the event that a Self-Insured Plan has a more restrictive time period.  Each Blue Plan shall extend the 180 day time period for a reasonable period, on a case by case basis, in the event that a Physician provides notice to the Blue Plan, along with appropriate evidence, of circumstances reasonably beyond the Physician's control that resulted in the delayed submission.  The Blue Plan shall determine such circumstances and the reasonableness of the submission date. Nothing in this § 7.17(a) shall limit a Blue Plan's ability to provide incentives for prompt submission of bills.

(b)     **Claims Submission**

Each Blue Plan agrees to accept from Participating Physicians and Non-Participating Physicians properly completed paper claims

48

submitted on Form CMS-1500 or the equivalent. Each Blue Plan also agrees to accept electronic claims populated with similar information in HIPAA-compliant format using HIPAA-compliant code sets, subject to the Blue Plan's reasonable requirements pertaining to the exchange of electronic transactions. Each Blue Plan shall allow any of its Participating Physicians, at the Physician's election, to engage in any electronic transaction for which a standard transaction has been established by the HIPAA Standard Transactions and Code Sets Rule. If a Physician elects not to be compliant with the portions of HIPAA relating to the electronic submission of claims, no Blue Plan shall require such Physician to use electronic transactions or otherwise require such Physician to become compliant with HIPAA. Instead, the Blue Plan will maintain reasonable non-electronic systems to serve the information needs of such Physicians. Notwithstanding the above, a Blue Plan may continue to require submission of Clinical Information and other additional information in connection with its review of specific claims and as contemplated elsewhere in this Agreement, including without limitation §§ 7.5 and 7.8(d)(ii); provided, however, that nothing in this sentence is intended or shall be construed to alter or limit any restrictions set forth elsewhere in this Agreement concerning the Blue Plan's ability to make requests for Clinical Information in connection with adjudication of claims. Each Blue Plan shall disclose on its Provider Website and its Public Website its policies and procedures regarding (i) the appropriate format for claims submissions, and (ii) requests for Clinical Information.

**7.18    Timelines for Processing and Payment of Complete Claims**

(a)    Beginning not later than nine (9) months after the Final Order Date, each Blue Plan shall direct the issuance of a check or an electronic funds transfer in payment for Complete Claims for Covered Services within thirty (30) calendar days following the later of the Blue Plan's receipt of such claim or the date on which the Blue Plan is in receipt of all information needed and in a format required for such claim to constitute a Complete Claim and is in receipt of all documentation which may be requested by a Blue Plan consistent with this Agreement and which is reasonably needed by the Blue Plan: (i) to determine that such claim does not contain any material defect or error; or (ii) to make a payment determination. Beginning one (1) year following the Effective Date, each Blue Plan shall direct the issuance of a check or an electronic funds transfer in payment for Complete Claims for Covered Services that are submitted electronically by Physicians within fifteen (15) business days following the later of the Blue Plan's receipt of such claim or the date on which the Blue Plan is in receipt of all information needed and in a format required for

49

such claim to constitute a Complete Claim and is in receipt of all documentation which may be requested by a Blue Plan consistent with this Agreement and which is reasonably needed by the Blue Plan: (i) to determine that such claim does not contain any material defect or error; or (ii) to make a payment determination. If direction for the issuance of payment for Complete Claims for Covered Services is not made within the time periods specified in this § 7.18(a), the Blue Plan shall pay interest pursuant to § 7.18(b). For purposes of this § 7.18, where a state provides a definition of "clean claim" or "complete claim" which varies from the definition of Complete Claim provided herein, such definition shall be substituted for the definition of "Complete Claim" herein.

(b)     For each Complete Claim with respect to which a Blue Plan has directed the issuance of a check or the electronic funds transfer later than the applicable period specified in § 7.18(a), the Blue Plan shall pay interest at the rate of eight percent (8%) per annum on the balance due on each such claim computed from the sixteenth (16th) business day or the thirty-first (31st) calendar day (as appropriate based on the circumstances described in § 7.18(a)) up to the date on which the Blue Plan directs the issuance of the check or the electronic funds transfer for payment of such Complete Claim; provided that to the extent that payment is made later than the period specified by applicable law or regulation, the Blue Plan shall pay interest at any rate specified by such law or regulation in lieu of the interest payment otherwise contemplated by this sentence. Interest paid pursuant to this § 7.18(b) shall, at the Blue Plan's election, either be included in the claim payment check or wire transfer or be remitted periodically (but at least quarterly) in a separate check or wire transfer along with a report detailing the claims for which interest is being paid.

(c)     No Blue Plan shall have an obligation to make any interest payment pursuant to § 7.18(b) (i) with respect to any Complete Claim if, within thirty (30) days of the submission of an original claim, a duplicate claim is submitted while adjudication of the original claim is still in process; (ii) to any Participating Physician who balance bills a Plan Member in violation of such Participating Physician's agreement(s) with the Blue Plan; (iii) with respect to any time period during which a Force Majeure, as defined in § 7.32 of this Agreement, prevents adjudication of claims; or (iv) where payment is made to a Plan Member.

(d)     Each Blue Plan shall affix to or on paper claims for Covered Services, or otherwise maintain a system for determining, the date such claims are received by the Blue Plan. Each Blue Plan shall send an electronic acknowledgement of claims for Covered Services submitted electronically identifying the date such claims

50

are received by the Blue Plan. If a Blue Plan determines that there is any defect or error in a claim that prevents the claim from entering the Blue Plan's adjudication system, it shall provide notice within ten (10) days of receipt of such claim. Nothing contained in this § 7.18 is intended or shall be construed to alter a Blue Plan's ability to request Clinical Information consistent with the provisions of § 7.8(d)(ii) or any other provision of this Agreement.

(e)     Notwithstanding anything in the Agreement to the contrary, the requirements of § 7.18 shall not apply to (i) claims for Covered Services that are processed under the BlueCard Program or any similar national account delivery program governed by the BCBSA (including but not limited to NASCO-to-NASCO arrangements) in which the Blue Plan participates but is not solely responsible for the processing and payment of the claim, and/or (ii) claims for Covered Services under a program offered or sponsored by any state or federal governmental entity other than in its capacity as an employer.

(f)     A claim relating to § 7.18(a), where the claim and any interest payment required under § 7.18(b) has been made, shall not be the basis for a Compliance Dispute.

**7.19    No Automatic Downcoding of Evaluation and Management Claims**

As of the Final Order Date, no Blue Plan shall automatically reassign or reduce the code level of evaluation and management codes billed for Covered Services ("**Downcoding**"), except that a Blue Plan may reassign a new patient visit code to an established patient visit code based solely on CPT® Codes, CPT® Guidelines, and CPT® Conventions. Notwithstanding the foregoing sentence, Blue Plans shall continue to have the right to deny, pend or adjust such claims for Covered Services on other bases and shall have the right to reassign or reduce the code level for selected claims for Covered Services (or claims for Covered Services submitted by selected Physicians or Physician Groups or Physician Organizations) based on a review of the information in the Clinical Information at the time the service was rendered for the particular claims or a review of information derived from a Blue Plan's fraud or abuse billing detection programs that create a reasonable belief of fraudulent or abusive (whether intentional or unintentional) billing practices; provided that the decision to reassign or reduce is based primarily on a review of Clinical Information.

**7.20    Bundling and Other Computerized Claim Editing**

Each Blue Plan agrees to take actions necessary on the Blue Plan's part to cause the claim-editing software program it uses to continue to produce

editing results consistent with the standards set forth in this § 7.20 and, if the Blue Plan has actual knowledge of non-conformity with such standards, to take reasonable actions necessary on its part to promptly modify such software to any extent necessary to conform to such standards; provided that nothing in this paragraph is intended or shall be construed to require a Blue Plan to pay for anything other than Covered Services for its Plan Members, to make payment at any particular rates, to limit a Blue Plan's right to deny, pend or adjust claims based on a reasonable belief of fraudulent or abusive (whether intentional or unintentional) billing practices (so long as the Physician has been given the opportunity to provide Clinical Information and the Blue Plan has reviewed any Clinical Information so provided before denying or adjusting the claims). For purposes of this § 7.20 only, if any change to CPT® affects a Blue Plan's obligations hereunder, the Blue Plan will promptly develop plans to cause its Physician payment practices to be consistent with the commitments set forth in this § 7.20. The obligations set forth below in this § 7.20 shall take effect on the dates set forth in Exhibit I.

For purposes of §§ 7.19 and 7.20, all references to the AMA CPT® book and to CPT® Codes in this Agreement refer to the AMA CPT® book and the CPT® Codes listed in the AMA CPT® book in effect at the time the services were provided; however, notwithstanding anything to the contrary contained in this Agreement, if there is any amendment, modification, or superseding change to the CPT® Codes, CPT® Conventions or CPT® Guidelines, which constitutes a departure from the procedures, criteria or scope of activities historically employed or undertaken by the AMA's CPT Editorial Panel and which materially expands the commitments of a Blue Plan in this Agreement or has a material adverse effect on the Blue Plan, then the Blue Plan may communicate to Physicians its decision not to recognize such modification by posting a notification on its website, or by other form of written or electronic communication to Physicians, and by notifying Class Counsel.

(a)     Each Blue Plan will process and separately reimburse those codes listed in the AMA CPT® book as modifier 51 exempt CPT® Codes without reducing payment under the Blue Plan's Multiple Procedure Logic, provided that the AMA CPT® book provides that such services are appropriately reported together.

(b)     Each Blue Plan will process and separately reimburse codes listed in the AMA CPT® book as add-on billing codes without reducing payment under the Blue Plan's Multiple Procedure Logic; provided that the AMA CPT® book provides that such add-on CPT® Codes are appropriately billed with proper primary procedure codes.

(c)     (i)     No Blue Plan shall require a Physician to submit Clinical Information of their patient encounters solely because the

52

Physician seeks payment for both surgical procedures and CPT® evaluation and management services for the same patient on the same date of service, provided that the correct CPT® evaluation and management code, surgical code and modifier (e.g., CPT® modifiers 25 or 57) are included on the initial claim submission.

(ii)     If a bill contains a CPT® Code for an evaluation and management service, appended with a CPT® modifier 25 and a CPT® Code for performance of a non-evaluation and management service procedure code, both codes shall be recognized and separately eligible for payment, unless the Clinical Information indicates that use of the CPT® modifier 25 was inappropriate or the Blue Plan has disclosed pursuant to § 7.8(d)(iii) the limited number of finite code combinations that are not appropriately reported together. Payment shall only be made for one evaluation and management service for any single day unless payment for more than one is appropriate pursuant to the AMA CPT® book and is supported by appropriate diagnoses in the Clinical Information.

(iii)    Each Blue Plan will remove from its claim review and payment systems any Edits that generally deny payment for CPT® evaluation and management codes with a CPT® modifier 25 appended when submitted with surgical or other procedure codes for the same patient on the same date of service except for a limited number of exceptions, consistent with § 7.20(c)(ii) above, which will be disclosed on the Blue Plan's Provider Website.

(iv)    Nothing in this Agreement shall (A) prohibit a Blue Plan from requiring use of the appropriate CPT® Code modifiers for evaluation and management billing codes (e.g., CPT® modifiers 25 or 57) on their original claim forms, or (B) preclude a Blue Plan from requiring a Physician, Physician Group or Physician Organization to submit to an audit of claims submitted by such Physician, Physician Group or Physician Organization for payment directly to such Physician, Physician Group or Physician Organization (including, but not limited to, claims for surgical procedures and evaluation and management services on the same date of service submitted with the appropriate modifier), and to provide their Clinical Information in connection with such an audit.

(d)    A CPT® Code for supervision and interpretation or radiologic guidance (e.g., fluoroscopic, ultrasound or mammographic) shall be separately recognized and eligible for payment to the extent that

53

the associated procedure code is recognized and eligible for payment; provided that, (i) the associated procedure code does not include supervision and interpretation or radiologic guidance according to the AMA CPT® book, and (ii) for each such procedure (e.g., review of x-ray or biopsy analysis or ultrasound guidance), no Blue Plan shall be required to pay for supervision or interpretation or radiologic guidance by more than one qualified health care professional.

(e) With respect to indented codes, no Blue Plan shall reassign any CPT® Code into any other CPT® Code or deem a CPT® Code ineligible for payment based solely on the format of the published CPT® descriptions.

(f) CPT® Codes submitted with a modifier 59 attached will be eligible for payment to the extent they follow the AMA CPT® book and they designate a distinct or independent procedure performed on the same day by the same Physician, but only to the extent that: (i) although such procedures or services are not normally reported together they are appropriately reported together under the particular presenting circumstances; and (ii) it would not be more appropriate to append any other CPT® recognized modifier to such CPT® Codes.

(g) No global periods for surgical procedures shall be longer than the period then designated by CMS; provided that this limitation shall not restrict a Blue Plan from establishing a global period for surgical procedures (except where CMS has determined a global period is not appropriate or has identified a global period not associated with a specific number of days).

(h) No Blue Plan shall automatically change a CPT® Code to one reflecting a reduced intensity of the service when such CPT® Code is one among or across a series that includes without limitation CPT® Codes that differentiate among simple, intermediate and complex, complete or limited, and/or size.

(i) Not later than six (6) months after the Final Order Date, or as soon thereafter as is reasonably practicable, each Blue Plan shall update its claims editing software at least once each year to (A) cause its claim processing systems to recognize any new CPT® Codes or any reclassifications of existing CPT® Codes as modifier 51 exempt since the previous annual update, and (B) cause its claim processing personnel to recognize any additions to HCPCS Level II Codes promulgated by CMS since the prior annual update. As to both clauses (A) and (B) above, no Blue Plan shall be obligated to take any action prior to the effective date of the additions or reclassifications. Nothing in this subparagraph shall be interpreted to require a Blue Plan to recognize any such new or reclassified

54

CPT® Codes or HCPCS Level II Codes as Covered Services under any Plan Member's Plan, and nothing in this subparagraph shall be interpreted to require that the updates contemplated in (A) and (B) be completed at the same time; provided that (A) and (B) are each completed once each year.

(j)     Nothing contained in this § 7.20 shall be construed to limit a Blue Plan's recognition of CPT® modifiers to those CPT® modifiers specifically addressed in this § 7.20.

**7.21    EOB and Remittance Advice Content**

(a)     Not later than six (6) months after the Final Order Date or as soon thereafter as practicable, each Blue Plan's EOB forms for its Plan Members shall contain at least the following information: (i) the name of and a number identifying the Blue Plan's Plan Member; (ii) the date of service; (iii) the amount of payment for services provided; (iv) any adjustment to the invoice submitted; and (v) a generic explanation of any adjustment to the invoice submitted. Each such EOB form, or documents provided by the Blue Plan to its Plan Member along with each such EOB form, also shall specify an address and phone number for questions regarding the claim described on such EOB form. EOB contents must include the total amount originally billed by the Blue Plan's Participating Physician. Consistent with the desire that the Blue Plan's Plan Members receive accurate communications that do not disparage Non-Participating Physicians, each such EOB form shall indicate the amount, if any, for which the Physician may bill the Blue Plan's Plan Member and shall state the Physician's name, and a statement that the "Physician may bill you" such amount, if any, or contain substantially similar language, and shall not characterize disallowed amounts, if any, as unreasonable. In connection with a payment by a Blue Plan to a Plan Member for Covered Services rendered by a Non-Participating Physician, the EOB form or other Blue Plan document that accompanies the payment shall notify the Plan Member of his or her responsibility to apply such payment to the applicable claim received by the Plan Member from such Non-Participating Physician.

Not later than six (6) months after the Final Order Date or as soon thereafter as practicable, the Physician Remittance Advice or similar forms that each Blue Plan sends to its Participating Physicians communicating the results of claims adjudications shall contain at least: (i) the name of and a number identifying the Blue Plan's Plan Member; (ii) the date of service; (iii) the amount of payment per line item; (iv) the procedure code(s); (v) the amount of payment; (vi) any adjustment to the invoice submitted; (vii) a generic explanation of any adjustment of the invoice submitted that

55

complies with HIPAA requirements; and (viii) any adjustment or change in any code on a line-by-line basis. Each such Physician Remittance Advice or similar form, or documents provided by the Blue Plan to its Participating Physician along with each such Physician Remittance Advice or similar form, also shall specify an address and phone number for questions by the Participating Physician regarding the claim described on such Physician Remittance Advice or similar form. This paragraph is not intended and shall not be construed to limit the Blue Plan's right to replace Physician Remittance Advice or similar forms with electronic Remittance Advices or the equivalent, to the extent such electronic Remittance Advices or the equivalent provide similar information so long as the Blue Plan complies with § 7.17(b).

**(b)**     This Agreement is not intended to alter or change rights of a Non-Participating Physician to balance bill or bill a Blue Plan's Plan Member at rates and on terms that are agreed to between the Non-Participating Physician and that Plan Member.

### 7.22    Overpayment Recovery Procedures

As of the Final Order Date, each Blue Plan shall initiate or continue to take actions reasonably designed to reduce Overpayments. Such actions may include, without limitation, system enhancements to identify duplicate invoices prior to payment and construction and maintenance of one or more common Physician databases for use in connection with payment of Physician invoices. Each Blue Plan shall publish on its Public Website and its Provider Website an address and procedures for Physicians to return Overpayments. In addition, other than for recovery of duplicate payments or other similar adjustments including those relating to (i) claims where a Participating Physician has received payment for the same services from another payor whose obligation is primary, or (ii) timing or sequence of claims for the same Plan Member that are received by the Blue Plan out of chronological order in which the services were performed, each Blue Plan shall initiate Overpayment recovery efforts by providing Physicians with at least thirty (30) days written notice before engaging in additional Overpayment recovery efforts. Such notice shall include (i) the patient's name, (ii) the service date, (iii) the payment amount received by Physician, and (iv) a reasonably specific explanation of the proposed change (including, without limitation, procedure code where appropriate). No Blue Plan shall initiate Overpayment recovery efforts more than eighteen (18) months after the payment was received by Physician; provided, however, that no time limit shall apply to the initiation of Overpayment recovery efforts (a) based on a reasonable belief of fraud or other intentional misconduct, or (b) required by a Self-Insured Plan, or (c) required by a state or federal government program. Notwithstanding the above, in the event that a Physician asserts a claim of underpayment, a Blue Plan may defend or set off such claim based on

Overpayments going back in time as far as the claimed underpayment. If a Physician requests an appeal within thirty (30) days of receipt of a request for repayment of an Overpayment, no Blue Plan shall require such Physician to repay the alleged Overpayment before such appeal is concluded. Nothing in this Agreement, including but not limited to the provisions of § 13, shall be deemed to limit a Blue Plan's right to pursue recovery of Overpayments that occurred prior to the Final Order Date where the Blue Plan has provided the Physician with notice of such recovery efforts prior to the Final Order Date.

**7.23   Efforts to Improve Accuracy of Information about Eligibility of Plan Members**

Commencing on the Final Order Date, each Blue Plan shall initiate or continue to take actions reasonably designed to reduce Overpayments and claim denials resulting from inaccurate information about the eligibility of its Plan Members. The Blue Plan may reduce, discontinue, or expand such activities commensurate with their demonstrated effectiveness.

**7.24   Intentionally Left Blank**

**7.25   Effect of Blue Plan Confirmation of Patient Procedure/Medical Necessity**

If the Blue Plan certifies or Precertifies (or approves or pre-approves) that a proposed service is medically necessary for one of its Plan Members, the Blue Plan shall not subsequently revoke that medical necessity determination absent evidence of fraud, evidence that the information submitted was materially erroneous or incomplete, or evidence of material change in that Plan Member's health condition between the date that the certification or Precertification was provided and the date of the service that makes the proposed service no longer medically necessary for such Plan Member. In the event that a Blue Plan certifies or Precertifies the medical necessity of a course of treatment limited by number, time period or otherwise, then a request for services beyond the certified course of treatment shall be deemed to be a new request and that Blue Plan's denial of such request shall not be deemed to be inconsistent with the preceding sentence.

**7.26   Intentionally Left Blank**

**7.27   Information about Physicians Provided by Blue Parties**

Information currently posted on each Blue Plan's Public Website about individual Physicians or contained in printed materials prepared by the Blue Plan is derived from data supplied by those Physicians and from applicable agreements between the Blue Plan and its Participating Physicians or their Participating Physician Groups or Participating