Physician Organizations.  Upon written notice of an inaccuracy sent to a Blue Plan (pursuant to the direction as to how to give such notice that will be posted on the Blue Plan's Provider Website), if the Blue Plan does not dispute that there is an inaccuracy the Blue Plan shall take steps reasonably necessary to ensure that the Public Website is updated within twenty (20) business days after receipt of such notice and that written materials are revised before the next edition of such materials is printed (to the extent there is sufficient time to make such revisions before the next printing) to reflect any corrections in the Physician information to make it accurate.  Upon written notice that a Physician is incorrectly listed as a Participating Physician on a Blue Plan's Public Website or in printed materials prepared by a Blue Plan (pursuant to the direction as to how to give such notice that will be posted on the Blue Plan's Provider Website), if the Blue Plan does not dispute that there is an inaccuracy the Blue Plan shall take steps reasonably necessary to delete any such erroneous reference from the Public Website within twenty (20) business days after receipt of such notice and from any written materials before the next edition of such materials is printed (to the extent there is sufficient time to make such revisions before the next printing), and the Blue Plan shall make corresponding changes in systems affecting the level of payments and generation of EOBs within twenty (20) business days after receipt of such notice.  If the Blue Plan disputes that there is an inaccuracy, it will so notify the Physician within the same time periods specified above, including the basis on which it disputes that there is an inaccuracy.

**7.28    Intentionally Left Blank**

**7.29    Miscellaneous**

    **(a)    Gag Clauses**

        No Blue Plan shall include in its contracts with Participating Physicians, Participating Physician Groups, or Participating Physician Organizations any provision limiting the free, open and unrestricted exchange of information between its Physicians and its Plan Members regarding the nature of the Plan Member's medical conditions or treatment and provider options and the relative risks and benefits and costs to the Plan Member of such options, whether or not such treatment is covered under the Plan Member's Plan, and any right to appeal any adverse decision by the Blue Plan regarding coverage of treatment that has been recommended or rendered.  Each Blue Plan agrees not to penalize or sanction Participating Physicians in any way for engaging in any free, open and unrestricted communication with a Plan Member with respect to the foregoing subjects or for advocating for any service on behalf of a Plan Member.

    **(b)    Intentionally Left Blank**

(c) **Arbitration**

    (i)    With respect to any arbitration proceeding between a Blue Plan and its Participating Physician who practices individually or in a Participating Physician Group of less than six Physicians, the Blue Plan agrees that it shall refund any applicable filing fees and arbitrators' fees paid by such Physician in the event the Physician is the prevailing party with respect to such arbitration proceeding; provided, however, that this paragraph shall not apply with respect to any arbitration proceeding in which the Participating Physician purports to represent any Physician outside of his or her Physician Group.

    (ii)    Each Blue Plan agrees not to include language in any agreement with a Physician, Physician Group, or Physician Organization (A) requiring that any arbitration panel have multiple members, (B) preventing the recovery of any statutory or otherwise legally available damages or other relief in an arbitration proceeding, (C) restricting the statutory or otherwise legally available scope or standard of review, (D) completely prohibiting discovery, (E) shortening any statute of limitations, or (F) requiring that any arbitration proceeding occur more than fifty (50) miles from the principal office of the Physician, Physician Group, or Physician Organization.

(d) **Impact of this Agreement on Standard Form Agreements and Individually Negotiated Contracts.**

    (i)    Each Blue Plan's future standard form agreements with Participating Physicians shall not be inconsistent with the commitments and undertakings the Blue Plan makes in this Agreement. To the extent that a Blue Plan's existing standard form agreements with Participating Physicians contain provisions inconsistent with the terms hereof, the Blue Plan shall administer such agreements consistent with the terms set forth in this Agreement.

    (ii)    Except for those terms relating to higher or customized rates, length of term of the contract, and/or other customized payment methodologies or as otherwise permitted under §§ 7.13(b), 7.13(c), 7.14(a) and 7.29(r), this Agreement shall be deemed to modify or nullify any inconsistent terms of an Individually Negotiated Contract.

59

(iii)   With respect to Individually Negotiated Contracts executed after the Preliminary Approval Date, a Blue Plan may agree with individual Participating Physicians, Participating Physician Groups or Participating Physician Organizations on terms that deviate from the terms of this Agreement relating to higher or customized rates, length of term of the contract, and/or other customized payment methodologies or as otherwise permitted under §§ 7.13(b), 7.13(c), 7.14(a) and 7.29(r).  In addition, a Blue Plan may agree with individual Participating Physicians, Participating Physician Groups or Participating Physician Organizations on terms that deviate from any other terms of this Agreement upon request of such individual Participating Physicians, Participating Physician Groups or Participating Physician Organizations.

**(e)    Impact of this Agreement on Covered Services**

Nothing contained in this Agreement shall: (i) require a Blue Plan to pay a Participating Physician, Participating Physician Group or Participating Physician Organization at any particular amount, or (ii) prohibit a Blue Plan from utilizing a particular reimbursement methodology.  Said payments or reimbursement methodologies shall be implemented consistent with the applicable terms of this Agreement.  Notwithstanding anything to the contrary contained in this Agreement, nothing contained in this Agreement shall supersede or otherwise alter the scope of Covered Services of any Plan or require a Blue Plan or any Plan to pay for services that are not Covered Services.  In determining whether services provided to one of its Plan Members are Covered Services under a Self-Insured Plan, each Blue Plan shall apply the definition of "Medically Necessary" (or any comparable term) contained in § 7.16(a) except with respect to the limited number of large Self-Insured Plans that require a different definition of "Medically Necessary" (or any comparable term) be applied.  With respect to such Self-Insured Plans, each Blue Plan shall recommend that the definition of "Medically Necessary" (or any comparable term) contained in § 7.16(a) apply.

**(f)    Intentionally Left Blank**

**(g)    Intentionally Left Blank**

**(h)    Intentionally Left Blank**

**(i)    Pharmacy Provisions**

60

When a Blue Plan provides pharmacy coverage, the Blue Plan shall make formulary information available to its Plan Members. Each Blue Plan shall maintain the process, as reasonably amended, for covering medications not included in the formulary when Medically Necessary that is in place on the Execution Date. When a Blue Plan provides pharmacy coverage, each Blue Plan will continue to provide coverage for off-label uses of pharmaceuticals that have been approved by the FDA (but not approved for the prescribed use) provided that the drug is not contraindicated by the FDA for the off-label use prescribed, and that the drug has been proven safe, effective and accepted for the treatment of the specific medical condition for which the drug has been prescribed, as evidenced by the results of good quality controlled clinical studies published in at least two or more peer reviewed full length articles in respected national professional medical journals. In reaching a conclusion whether to provide coverage for a drug under the preceding sentence, the Blue Plan will consider supporting documentation in either the American Hospital Formulary Service Drug Information or the United States Pharmacopeia Drug Information. Blue Plans shall retain the right to Precertify coverage of specific medications for non-approved use. A Blue Plan's disclosure concerning Precertification and potential restrictions on non-approved use of prescription medications shall be similar in substance to disclosure concerning formularies, as described above.

(j)     **Restrictive Endorsements**

Where a Blue Plan's reimbursement of a Physician for services performed by that Physician is a partial payment of allowable charges, a Physician may negotiate a check with a "Payment in Full" or other restrictive endorsement without waiving the right to pursue a remedy available under this Agreement.

(k)     **Scope of Blue Parties' Responsibilities**

(i)     The obligations undertaken by each Blue Party under § 7 of this Agreement shall be applicable only to those functions or activities performed directly by the Blue Party, its employees, and third parties (other than Delegated Entities) performing functions or activities on the Blue Party's behalf. Each Blue Plan shall make a good faith effort to include in contracts entered into with Delegated Entities subsequent to the Final Order Date terms that are substantially equivalent to the terms of this Agreement; provided that no Blue Party shall be liable under this Agreement in the event any Delegated Entity acts in a manner inconsistent with the terms of this Agreement.

61

(ii)    The provisions of § 7 of this Agreement shall apply to a Blue Plan's activities in connection with the BlueCard Program or any similar national account delivery program governed by the BCBSA (including but not limited to NASCO-to-NASCO arrangements) only to the extent that the Blue Plan is solely responsible for the activity, with respect to a claim under such a program, that is subject to § 7 of this Agreement.

(iii)    The Blue Parties recognize the desirability of improving Blue Plans' business relationships with Physicians who provide Covered Services to Blue Plans' Plan Members in connection with the BlueCard Program and other similar national account delivery programs governed by BCBSA (including but not limited to NASCO-to-NASCO arrangements) (the "**Programs**"). To that end, the Blue Parties have made investments and undertaken initiatives reasonably designed to streamline and improve the overall efficiency of the claim adjudication process for the Programs. These investments and initiatives seek to improve Physician satisfaction with the Programs by, among other things, working towards the goal of processing and paying claims under these Programs within the times set forth in § 7.18(a). The Blue Parties will continue such initiatives and improvements during the Effective Period. Since 2000 and through the Effective Period, BCBSA's investments in furtherance of these initiatives will exceed $150,000,000. These investments are in addition to the investments referred to in § 7.31. Examples of those initiatives include, but are not limited to, those set forth in subparagraphs (A) through (C) below.

(A)    A multi-year information technology initiative aiming to improve the timeliness of claims processing and payment by implementing enhancements to transaction processing and renovating and upgrading the technologies used by the Blue Parties to improve their information management and web-enabled services. Improvements include the continued upgrading of BlueExchange® and the development and implementation of Blue$^2$®. BlueExchange is an electronic, inter-Blue Plan system supporting Physicians' ability to make and receive responses to eligibility benefit inquiries, claim status requests, and referral authorizations and remittance advice. Blue$^2$® is a web-based application initiated to facilitate real-time transaction transmission,

inventory management related to inter-Blue Plan claims, and inter-Blue Plan claims exception management, including the capability to enable electronic exchanges of claims attachments such as clinical records among Blue Plans.

(B) Measures to better facilitate resolution of Physician issues related to inter-Blue Plan claims through standardized claims inquiry escalation processes among Blue Plans, information technology and management systems to develop, improve and accelerate dispute resolution, such as with respect to Blue Plans' activities pertaining to claims payment and billing issues, requests for Clinical Information, "Medical Necessity" determinations, and related disclosures, and the promotion of "best practices".

(C) Measures to promote overall Physician satisfaction with the handling of inter-Blue Plan claims, including enhanced performance measurements and monitoring capabilities.

The Blue Parties may modify any specific initiatives described in subsections (A)-(C) of this § 7.29(k)(iii), or institute new initiatives to accomplish the same objectives.

(iv) BCBSA does not have and shall not adopt any requirements, rules, or regulations, or modifications thereof, that would cause any Blue Plan to be in violation of any of the requirements set forth in this Agreement or would cause any representation made herein to become untrue. Each of the Blue Plans agrees that it will not encourage or support any change in BCBSA requirements, rules or regulations that would conflict with the Blue Plan's obligations under this Agreement.

**(l) Copies of Contracts**

Each Blue Plan shall provide a copy of its contract with a particular Participating Physician (including without limitation a contract with a Physician Organization or a Physician Group in which such Participating Physician participates) to such Participating Physician, upon receipt by the Blue Plan of a written request by such Participating Physician to provide such copy, except in circumstances where the Blue Plan is restricted from providing a Participating Physician with a copy of the Blue Plan's contract with a Physician Organization or Physician Group

63

specifically because of terms contained in that contract. No Blue Plan shall require that a restriction as described in the previous sentence be included in its contracts with Physician Organizations or Physician Groups.

(m)     **State and Federal Laws and Regulations**

Nothing contained in § 7 of this Agreement is intended to or shall, in any way, reduce, eliminate, or supersede any Party's obligation to comply with applicable provisions of relevant state and federal law and regulations. To the extent state or federal law or regulation imposes, with respect to a specific obligation created by § 7, a greater obligation than that specifically set forth in § 7, the Blue Parties shall comply with said law or regulation. The Compliance Dispute resolution procedures contained in § 12 shall apply with respect to any alleged breach of an obligation created by the preceding sentence. Nothing in this § 7.29(m) is intended to give rise to or should be construed as giving rise to any private right of action for any violation of any federal or state law or regulation (whether under a breach of contract theory, including a claim of breach of this Agreement, or any other theory) where federal or state law or regulation does not allow a Physician a right of action for such violation. The Compliance Dispute Officer shall not take any action inconsistent with any ruling, determination or directive by any court or regulatory agency. Any action taken by the Compliance Dispute Officer that is inconsistent with any subsequent ruling, determination or directive by any court or regulatory agency shall not be binding on a Blue Party as of the effective date of such subsequent ruling, determination or directive. The Compliance Dispute Officer shall not award liquidated, punitive or multiples of damages that might be available under state or federal law or regulations. Further, a Physician shall be required to elect whether to pursue a remedy under this Agreement through the process set forth in § 12, or to pursue any remedy available under such state or federal law or applicable regulations.

(n)     **Intentionally Left Blank**

(o)     **Limitations on Obligations of Non-Participating Physicians**

No affirmative obligation that § 7 imposes on Physicians shall apply to any Non-Participating Physician unless and until, and then only to the extent that, such Non-Participating Physician pursues with a Blue Plan a claim for payment on the Non-Participating Physician's own behalf or such Non-Participating Physician pursues benefits under this Agreement, in which case any affirmative obligations that § 7 imposes on Physicians shall apply

64

to such Non-Participating Physician with respect to such claim or such benefits.

**(p)** **Intentionally Left Blank**

**(q)** **Effect of Assignment of Benefits**

The existence, submission, and/or acceptance of an assignment of benefits authorization in favor of a Non-Participating Physician shall not preclude the Non-Participating Physician from collecting from a Blue Plan's Plan Member the difference between the Non-Participating Physician's full fee and the payment (if any) received by the Non-Participating Physician from the Blue Plan. Notwithstanding anything to the contrary contained in this Agreement, nothing contained in this Agreement shall otherwise require the Blue Plan to make payment directly to any Non-Participating Physician.

**(r)** **Most Favored Nations Clauses**.

The Blue Plans will not include any "most favored nations" clauses in its contracts with Participating Physicians, Participating Physician Groups and Participating Physician Organizations, except for Individually Negotiated Contracts.

**7.30** **Compliance with Applicable Law and Requirements of Government Contracts**

**(a)** The obligations undertaken in § 7 herein shall be fulfilled by each Blue Plan to the extent permissible under applicable laws and regulations, the terms and conditions of current and future government contracts, and applicable governmental directives. If, and during such time as, a Blue Plan is unable to fulfill an obligation under § 7 to the extent contemplated by this Agreement because to do so would require governmental approval or action, the Blue Plan shall perform such obligation to the extent permissible under applicable laws and regulations, the terms and conditions of current and future government contracts, and applicable governmental directives, and the Blue Plan shall continue to fulfill its other obligations under § 7 to the extent permitted under applicable laws and regulations, the terms and conditions of current and future government contracts, and applicable governmental directives. To the extent that any governmental approval is required for any Party to fulfill an obligation under § 7, such Party shall make reasonable efforts to obtain any necessary approvals from the appropriate governmental entities. For any obligation under § 7 that cannot be undertaken without governmental approval, the Effective Period as to that

obligation shall be delayed until such approval is granted. Nothing in this § 7 shall apply to a Blue Party's role as a carrier providing administrative services for Medicare Part B or to FEHBA.

**(b)**   Each Blue Party that contracts directly with the U.S. Department of Defense under the TriCare Program will present the requirements of § 7 of this Agreement to the Tricare Management Activity ("**TriCare**") for consideration of incorporating such requirements into such Blue Party's TriCare Contract pursuant to the changes clause of such contract. Unless and until such time that a Blue Party and TriCare so amend the Contract, any Blue Party's TriCare Program is exempted from the requirements of this Agreement. The TriCare Program is regulated by the United States Department of Defense. The Department of Defense provides rules, regulations and contract provisions applicable to that Program, including certain mechanisms to enforce those rules, regulations and contract. Where a Blue Party's TriCare Contract has been amended as provided in this subsection, such Blue Party will comply with the rules and regulations related to such amendments, including the mechanisms to enforce those rules and regulations.

**7.31   Estimated Value of § 7 Initiatives**

Since the inception of this Action and through the Termination Date, the Blue Parties will have spent over $250,000,000 in order to implement and carry out the initiatives described in § 7 of this Agreement and otherwise to improve relations with Physicians. Such initiatives have included automated adjudication of claims, increased internet and clearinghouse functionality, and functionality to improve responses to Physician inquiries. Taking into account these expenditures, the Parties estimate that the approximate aggregate value of the initiatives and other commitments regarding the Blue Parties' business practices set forth in § 7 of this Agreement is in excess of the amount stated above.

**7.32   Force Majeure**

No Party hereto shall be required to meet an obligation under this Agreement where the inability to meet such obligation is the result of any act of God, governmental act, act of terrorism, war, fire, flood, earthquake or other natural disaster, explosion or civil commotion ("**Force Majeure**"). The performance of a Party's obligations under this Agreement, to the extent affected by the delay, shall be suspended for the period during which the cause, or the Party's substantial inability to perform arising from the cause, persists. If the performance of any obligation under this Agreement is excused or delayed by Force Majeure and that obligation is a condition precedent for the performance of an obligation by another Party, performance of the obligation by the second

Party shall be excused or delayed to the same extent as the performance of the obligation by the first Party.

**7.33   Managed Care Issues Relating to Mental Health and Substance Abuse**

(a)   Except where any applicable law or regulation requires a different definition, each Blue Plan shall apply to its current agreements and include in its future agreements with Participating Physicians the definition of Medical Necessity in § 7.16(a) with respect to mental health services, including treatment for psychiatric illness and substance abuse, subject to the terms and conditions of the Plan of the Blue Plan's Plan Member; provided that in determining the clinical appropriateness of care, the following minimum standards relevant to mental health care must be met:

(i)   There is a diagnosis as defined by standard diagnostic nomenclatures (DSM IV or its equivalent in ICD-9-CM, or replacement thereof) and an individualized treatment plan appropriate for the Plan Member's illness or condition; and

(ii)   There is a reasonable expectation that the Plan Member's illness, condition, or level of functioning will be stabilized, improved, or maintained through ambulatory care, through treatment known to be effective for the Plan Member's illness; and

(iii)   The mental health services are not primarily for the avoidance of incarceration of the Plan Member.

(b)   Each Blue Plan agrees that its Participating Psychiatrists will be listed in the Blue Plan's provider directory, via the hard-copy directory, via the Blue Plan's Public Website, via a "hot link" on the Blue Plan's Public Website, or otherwise.  If a primary care Physician referral is required, each Blue Plan will allow its primary care Participating Physicians to make referrals to the Blue Plan's Participating Psychiatrists, provided that any such referral is subject to the same referral requirements that apply to referrals to other Participating Physicians.  Nothing in the preceding sentence shall be construed to remove or change any applicable Plan Member or Physician Precertification requirements.

(c)   Each Blue Plan agrees that, where a Psychiatrist has not entered into a different agreement with the Blue Plan or the hospital or other mental health care facility where the services are rendered, and where the Blue Plan has not entered into a different agreement with such hospital or mental health care facility, the Blue Plan will separately consider and pay for Medically Necessary Covered Services provided to one of the Blue Plan's Plan Members by the

67

Psychiatrist, in accordance with the terms and conditions of the Plan Member's Plan.

(d)    Where applicable, each Blue Plan adheres to state "prudent layperson" laws which require payment of benefits for mental health services in the event of an emergency under prudent layperson standards. An emergency department Physician can make a decision regarding admission or physical or chemical restraints. Each Blue Plan agrees that, where a Physician has not entered into a different agreement with the Blue Plan or the hospital or other mental health care facility where the services are rendered, and where the Blue Plan has not entered into a different agreement with such hospital or mental health care facility, in the event of an emergency, the Blue Plan will pay for Medically Necessary emergency care mental health Covered Services provided by such Physician in accordance with applicable prudent layperson standards, the definition of Medical Necessity in § 7.16(a), and the terms and conditions of the Plan Member's Plan, and the Blue Plan will pay for Medically Necessary mental health Covered Services provided by Physicians resulting from the admission in accordance with the definition of Medical Necessity in § 7.16(a) and the terms and conditions of the Plan Member's Plan.

(e)    Each Blue Plan will post on its Provider Website an authorization form that Physicians providing mental health services to the Blue Plan's Plan Members may print or download to obtain Plan Member consent for release of Clinical Information to the Blue Plan.

## 7.34   Intentionally Left Blank

## 7.35   Use of Third Party Intellectual Property

If and to the extent that any activity of a Blue Party in compliance with one or more provisions of this Agreement has subjected or, in a Blue Party's reasonable judgment, may subject it to an Intellectual Property Claim, including but not limited to a claim by the AMA, the Blue Party's obligation to comply with that provision or those provisions is suspended. Within ten (10) days of determining that compliance with one or more provisions may subject it to an Intellectual Property Claim, the Blue Party will notify the Class Compliance Dispute Facilitator and Class Counsel and offer to meet and confer to resolve the issue including developing one or more alternative business practices that achieve comparable results to the affected provisions at no significant increase in cost to the Blue Plan. If the parties do not resolve the issue, and Class Counsel and the Class Compliance Dispute Facilitator believe there is an alternative business practice that achieves comparable results, without a significant increase in

68

cost and without creating an Intellectual Property Claim, Class Counsel and the Class Compliance Dispute Facilitator may bring a Compliance Dispute under § 12.

**7.36   Competitive Flexibility**

    (a)    **"Negotiated Purchaser"**

        (i)    A "Negotiated Purchaser " is an entity that meets all of the following requirements: (x) the entity is an employer (including any governmental unit acting in the capacity of an employer, other than the federal government under the FEHBP), union, trust, association or other entity that sponsors a Self-Insured Plan or Fully-Insured Plan covering a group of active and/or retired employees; (y) the entity has negotiated, intends to negotiate (or otherwise has issued a request for proposals), or is negotiating a service agreement or insurance contract with the Blue Plan; and (z) as a result of the entity's size, covered lives, or strategic significance, changes made by the Blue Plan to its standard operating policies and procedures are both required by such entity and reasonably necessary in order to obtain or maintain an agreement with such entity.  There will be a limited number of such entities for each Blue Plan during the Effective Period of this Agreement.

        (ii)    Each Blue Plan will make reasonable good faith efforts to satisfy Negotiated Purchasers without any terms or conditions that differ from those contained in § 7.  A Blue Plan's agreement with a Negotiated Purchaser may have terms or conditions that differ from those contained in § 7 if reasonably necessary in order for the Blue Plan to obtain or maintain a service agreement or insurance contract with the entity.  All other terms and conditions of this Agreement shall remain in full force and effect.  The Blue Plan will promptly notify the Class Compliance Dispute Facilitator of any agreement containing any such term or condition and promptly thereafter post on its Provider Website any material differences from the provisions of § 7 that relate to the terms and conditions of payment to Participating Physicians, Participating Physician Groups or Participating Physician Organizations.  The Class Compliance Dispute Facilitator, *sua sponte* or upon receiving a complaint from a Class Member, may challenge any such term or condition through the Compliance Dispute process described in § 12.10.  Such challenge shall be brought within five (5) business days following the date on which the Blue Plan provides notice to the Class

Compliance Dispute Facilitator of any agreement containing any such term or condition. If the Class Compliance Dispute Facilitator fails within the period set forth herein to challenge the proposed term or condition of any such agreement, such failure shall be deemed a waiver to challenge any such term or condition in such agreement. A final decision of such a challenge shall preclude further challenges to the same term or condition.

**(b)     Ability of Blue Parties to Substitute Business Practices**

(i)     Each Blue Party may alter the method or means by which it makes any disclosure or otherwise transmits information as described in, and required by, this Agreement, so long as the Blue Party reasonably believes, expects and intends that the newly-adopted means or method of disclosure or transmission is as effective as or more effective than the means or method set forth in this Agreement.

(ii)     Each Blue Party may substitute for any of the business practices required of it by § 7 of this Agreement an alternative business practice so long as the alternative business practice is reasonably designed to achieve comparable results consistent with this Agreement. Prior to implementing any such alternative business practice, a Blue Party shall give notice to the Class Compliance Dispute Facilitator of such alternative business practice, and meet and confer with the Class Compliance Dispute Facilitator, if requested, within fifteen (15) business days following the date of the notice with respect thereto. If the matter is not resolved, and the Blue Party proceeds with implementation, then the Class Compliance Dispute Facilitator may bring a compliance dispute with respect to the alternative business practice within ten (10) business days following notice from the Blue Party of its implementation of such alternative business practice. Alternatively, the Blue Party may defer implementation and seek a review of the matter by the Compliance Dispute Officer. The Class Compliance Dispute Facilitator may confer with and seek the assistance of Class Counsel in connection with any such dispute. The Blue Party shall cease implementing any alternative business practice, to the extent it has done so, within sixty (60) days following the written notice to the Blue Party from the Compliance Dispute Officer that such alternative business practice is not reasonably designed to achieve comparable results consistent with this Agreement. If the Class Compliance Dispute Facilitator fails within the period set forth herein to request to meet and confer with

70

the Blue Party, such failure shall be deemed a waiver to challenge any such alternative business practice in the future. The Compliance Dispute Officer shall hold in confidence all information supplied by the Blue Party regarding such alternative business practice.

**(c)**    **Modification for Specific Circumstances**

Notwithstanding the provisions of § 7.36(a), a Blue Plan may modify any undertaking if either (i) the modification is reasonably necessary to compete in a particular geographic marketplace, or (ii) performance of one or more provisions of this Agreement would be impractical. For this purpose, performance would be "impractical" if it would place the Blue Plan at a demonstrable operational disadvantage, would be unduly burdensome, or would, on account of new technology, be inefficient or less cost-effective relative to use of the new technology. Each Blue Plan shall have an obligation to use good faith efforts to address any issue that arises under this subsection by taking action consistent with the terms of § 7 if it is reasonably practical to do so. In the event a Blue Plan intends to implement a modification under this § 7.36(c), the Blue Plan shall give notice to Class Compliance Dispute Facilitator of the terms of such modification, which notice shall be in advance of implementing the modification unless competitive circumstances prevent advance notice in which case the notice shall be as soon as practicable. Class Compliance Dispute Facilitator shall have fourteen (14) days in which to provide written notice to the Blue Plan of any objections to such modification. Failure to provide such notice shall constitute a waiver of the right to object or assert a Compliance Dispute with regard to such modification, as otherwise permitted under subsection (c) of this § 7.36. Within ten (10) business days after the Blue Plan's receipt of any notice of objections, the Blue Plan, if requested in the notice of objections, shall meet and confer with Class Compliance Dispute Facilitator with respect to the objections. If the Blue Plan and Class Compliance Dispute Facilitator are unable to resolve the matter, the Blue Plan shall promptly notify the Class Compliance Dispute Facilitator whether it intends to implement or continue to implement the modification. If the Blue Plan gives notice that it intends to implement or continue to implement the modification, then within ten (10) business days of the notice, the Class Compliance Dispute Facilitator may initiate a Compliance Dispute. If the Compliance Dispute Officer rules in favor of the Blue Plan, such final decision of such a challenge shall preclude further challenges to the

modification. If the Compliance Dispute Officer rules against the Blue Plan, any remedy shall be limited to directing the Blue Plan to submit and implement an adequate corrective action plan, and imposing on the Blue Plan the obligation to pay actual damages including interest suffered by a Class Member as a result of the implementation of any modification. Any activity conducted by a Blue Plan under a corrective action plan shall be subject to the provisions of § 13.3(a)(iii). The Class Compliance Dispute Facilitator may confer with and seek the assistance of Class Counsel in connection with any such dispute.

## 8. Other Settlement Consideration

In addition to the business initiatives set forth in § 7 of this Agreement, the settlement consideration shall include a settlement fund (the "**Settlement Fund**") for payment of claims to Class Members, which will be established and operated in accordance with the provisions of §§ 8.2 through 8.4.

## 8.1 Intentionally omitted

## 8.2 Settlement Fund

    (a)    Each Blue Plan shall pay the amount specified for it in Exhibit K to an account (the "**Settlement Administration Account**") (each such payment constituting a "**Settlement Fund Payment**"), as hereinafter provided in this § 8.2 and § 8.5. Subject to the provisions of § 8.2(e), the sum of all Settlement Fund Payments shall equal $128,315,907 (the "Settlement Fund Amount") plus interest as provided in § 8.5. Each Settlement Fund Payment shall be treated as a payment to a Qualified or Designated Settlement Fund under I.R.C. § 468B and the regulations or proposed regulations promulgated thereunder (including without limitation Treasury Reg. § 1.468B-1-5 or any successor regulation).

    (b)    By no later than ten (10) days following the Preliminary Approval Date, the Blue Parties shall cause to be established the Settlement Administration Account. The Blue Parties shall select and retain a settlement administrator (the "**Settlement Administrator**"). Under the joint supervision of the Blue Parties and Class Counsel or their designees, and subject to the supervision, direction and approval of the Court, the Settlement Administrator shall be responsible for the administration of the Settlement Administration Account.

    (c)    Each Blue Plan shall pay its Settlement Fund Payment by wire transfer of immediately available funds, not later than ten (10) days after the Effective Date

    (d)    The Settlement Fund shall consist of the total of all Settlement Fund Payments and all interest, dividends, and other income

earned on funds in the Settlement Administration Account, less any reserve for taxes.

(e)     The settlement consideration identified in §§ 7.31, 8.2(a), and 9.1 of this Agreement is premised on the participation in this Agreement by all Blue Plans. If any Blue Plan terminates its participation in this Agreement pursuant to § 14.2, (i) the Settlement Fund Amount defined in this § 8.2 shall be reduced by the amount specified in Exhibit K for the Terminating Blue Plan, as defined in § 14.2, and (ii) the Estimated Value defined in § 7.31, and the Unopposed Amount, defined in § 9.1, shall be reduced by the percentage specified in Exhibit K for the Terminating Blue Plan.

**8.3     Responsibilities of the Settlement Administrator**

In addition to the responsibilities set forth in § 8.2(b), the responsibilities of the Settlement Administrator shall expressly include without limitation: (i) the determination of the eligibility of any Class Member to receive payment from the Settlement Fund and the amount of payment to be made to each Class Member from the Settlement Administration Account, in accordance with the provisions of § 8.3 of this Agreement; (ii) the determination as to whether the election of any Class Member to contribute a settlement payment has been authorized by such Class Member, in accordance with the provisions of § 8.3(g) of this Agreement; (iii) the administration of an appropriate procedure for the adjudication of disputes that may arise with respect to the eligibility of a Class Member to receive a payment from the Settlement Fund or the amount of the payment authorized to be made to any Class Member under the provisions of this Agreement; (iv) the filing of any tax returns necessary to report any income earned by the Settlement Fund and the payment from the Settlement Administration Account, as and when legally required, of any tax payments (including interest and penalties) due on income earned by the Settlement Fund and to request refunds, when and if appropriate, with any such tax refunds that are issued to become part of the Settlement Fund; (v) the compliance with any other applicable law; and (vii) any other duties the Blue Parties and Class Counsel agree in writing to assign to the Settlement Administrator. The fees and expenses of the Settlement Administrator shall be paid by the Blue Parties; provided that neither the Blue Parties nor Class Counsel shall be responsible for any other costs, expenses or liabilities of the Settlement Fund.

(a)     The portion of the Settlement Fund that will be available in the aggregate to satisfy claims by Retired Physicians (the "Retired Physician Amount") shall be equal to the Settlement Fund multiplied by two times the quotient derived by dividing the number of Retired Physicians who file valid Claim Forms within ninety (90) days of the Notice Date by the total number of Class Members, as determined by the Settlement Administrator. Each

73

Retired Physician who files a valid Claim Form shall be entitled to receive a payment equal to the Retired Physician Amount divided by the total number of Retired Physician valid Claim Forms. A Retired Physician who retired after January 1, 2003 shall have the option of filing either as a Retired Physician or as an Active Physician pursuant to the provisions of §8.3(c).  If the claim of a Physician is unclear as to whether it is brought by a Retired Physician or as an Active Physician, the Settlement Administrator will treat the claim in the manner that will result in the largest payment to the Physician.

(b)     The amount remaining in the Settlement Fund after subtracting the Retired Physician Amount will be available to satisfy claims by Class Members other than Retired Physicians (the "Active Physician Amount").

(c)     Each Active Physician who files a valid Claim Form within ninety (90) days of the Notice Date shall be entitled to receive payment from the Settlement Fund in an amount to be determined according to whether the Active Physician's gross receipts for providing Covered Services to Plan Members during the three calendar year period of 2004, 2005 and 2006 were (x) less than $5,000, (y) at least $5,000 but less than $50,000, or (z) $50,000 or greater.  For purposes of this determination, gross receipts include amounts paid by Blue Plans or by Delegated Entities for providing Covered Services to Plan Members.  The Settlement Administrator shall determine the category for each Active Physician based upon the certification in the Claim Form and/or such independent verification, if any, that the Settlement Administrator may undertake in its sole discretion.

(d)     The Settlement Administrator shall determine the total number of Active Physicians who fall within each of the three categories set forth in § 8.3(c) and determine the total number of distribution shares (each a "Base Amount") necessary to make distributions according to the following formula: The Active Physician Amount shall be allocated among all Active Physicians who file valid Claim Forms such that each Active Physician who falls within § 8.3(c)(x) shall be entitled to receive a single Base Amount; each Active Physician whose Claim Form establishes that he or she falls within § 8.3(c)(y) shall be entitled to receive five times the Base Amount; and each such Active Physician whose Claim Form establishes that he or she falls within § 8.3(c)(z) shall be entitled to receive ten times the Base Amount.  A Class Member who files an otherwise valid Claim Form but does not specify a category of gross receipts for Covered Services to Plan Members, shall be deemed to be entitled to a single Base Amount, and the Settlement

74

Administrator has no obligation to pursue additional information about the Class Member's status or amount of receipts.

(e)    The Settlement Administrator shall establish procedures to permit an Active Physician to establish, through the submission of billing records or similar information, that he or she should fall into a category entitled to a higher payment from the Settlement Fund based on aggregate payments received for providing Covered Services to Plan Members over any other consecutive three-year period from January 1, 1997 through December 31, 2006.

(f)    If a Class Member submits a Claim Form requesting compensation under the wrong compensation category (e.g., a request under the Retired Physician Amount which should have been submitted as a request under the Active Physician Amount), the Settlement Administrator may at its sole discretion review the Claim Form under the provisions set forth herein for the correct settlement category unless the documentation submitted with said Claim Form is insufficient under those provisions.

(g)    Each Class Member who files a valid Claim Form may elect either to receive the payment from the Settlement Fund or to direct that such amount be contributed on his, her or its behalf to the Physicians' Foundation for Health Systems Innovations, Inc. ("Foundation") or to a charitable organization set forth on Exhibit L. The Foundation and the charitable organizations set forth on Exhibit L shall be identified on a list attached to the Claim Form.

(h)    An eligible Class Member must submit a timely claim form (the "Claim Form") to the Settlement Administrator using the Claim Form attached as Exhibit A hereto and in accordance with the Claim Form Instructions attached as Exhibit B and included in the Notice and in the Claim Form in order for such Class Member to have a valid right to receive payment from the Settlement Fund. Promptly after receipt of all timely Claim Forms, the Settlement Administrator shall calculate the amount that is payable to, or on behalf of, each Class Member pursuant to the provisions of § 8.3. Reasonably promptly upon completion by the Settlement Administrator of the calculations of the amounts that are payable and after all Settlement Fund Payments have been made, reserved for tax liabilities or as otherwise agreed by the Parties, the Settlement Administrator shall cause the Settlement Administration Account to disburse payment to Class Members in each category who or which submitted valid Claim Forms in accordance with § 8.3 or to the Foundation or to a charitable organization set forth on Exhibit L as directed by such Class Members. Any Class Member submitting a Claim Form shall, through the act of submitting that Claim Form, be subject to the jurisdiction of the Court for any related proceedings. Physician

75

Groups and Physician Organizations shall be allowed to file Claim Forms on behalf of Physicians employed by or otherwise working with them at the time that the claims are made, without the necessity of individual signatures from the individual Physicians, but only if the Physician does not submit an individual claim on his/her own behalf. Notwithstanding the provisions in this § 8.3, an Active Physician Class Member against whom a Blue Plan has obtained a final finding of "fraud and/or abuse" from a judicial, arbitral, or governmental administrative proceeding and against whom that Blue Plan has obtained a corresponding final judgment for damages arising from a claim (or claims) for payment, during the same period for which claims may be asserted under § 8, shall not be entitled to receive payment from the Settlement Fund. For purposes of this § 8.3(h) only, the phrase "fraud and/or abuse" shall mean that the Active Physician Class Member engaged in any activities which are prohibited under 42 U.S.C. §§ 1320a-7, 1320a-7a, 1320a-7b, 1395nn, 1396b, 31 U.S.C. §§ 3729-3733, the federal CHAMPUS/TRICARE statute or other federal, state or local statutes or regulations related to the filing of false or fraudulent claims for payment for Covered Services or the making of false statements regarding the provision or payment of Covered Services. The prohibitions contained in these statutes or regulations include, but are not limited to, the following: (a) knowingly and willfully making or causing to be made a false statement or representation of a fact in any application for any benefit or payment; (b) knowingly and willfully making or causing to be made any false statement or representation of a fact for use in determining rights to any benefit or payment; (c) failing to disclose knowledge by a claimant of the occurrence of any event affecting the initial or continued right to any benefit or payment on its own behalf or on behalf of another, with intent to fraudulently secure such benefit or payment; and (d) knowingly and willfully soliciting or receiving any remuneration (including any kickback, bribe or rebate), directly or indirectly, overtly or covertly, in cash or in kind or offering to pay or receive such remuneration, including, but not limited to holding any financial interest in a provider of medical services that is prohibited under the federal law commonly referred to as the "Stark Law" (i) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part by Medicare or Medicaid, or (ii) in return for purchasing, leasing, or ordering or arranging for or recommending purchasing, leasing, or ordering any good, facility, service or item for which payment may be made in whole or in part by Medicare or Medicaid. Each Blue Plan shall provide to the Settlement Administrator within ninety (90) days of the Notice Date the (i) name and tax identification number for each Class Member against whom the Blue Plan has obtained a finding of fraud and/or abuse from a

judicial or administrative proceeding and (ii) the amount of the corresponding judgment for damages. A Blue Plan's failure to provide such information to the Settlement Administrator may be deemed a waiver of its right to object to the payment from the Settlement Fund for those Class Member(s) for whom the Blue Plan failed to timely provide the requisite information. The foregoing limitation shall not act to reduce the aggregate amount of the Settlement Fund.

### 8.4   Reversion to Charitable Organizations of Unclaimed Amounts

At a reasonable time determined by the Settlement Administrator, but not less than 120 days after all payments have been disbursed to Class Members or contributed at the direction of Class Members, in each case pursuant to § 8.3 of this Agreement, the Settlement Administrator shall determine, with respect to Class Members within each state, the amount of unclaimed funds remaining in the Settlement Fund including un-cashed checks and interest earned on such funds, but excluding taxes owed on such earnings (the "Reversion Amounts"). The Settlement Administrator shall provide written notice of the Reversion Amounts to the Blue Parties and Class Counsel and, no later than twenty (20) business days after providing such written notice, the Settlement Administrator shall cause the Settlement Fund to remit the Reversion Amounts to one or more of the charitable organizations listed on Exhibit L within the applicable state or if there is none to the Foundation. Following the Settlement Administrator's determination of the Reversion Amounts, stop payment orders may be placed on all unclaimed funds, and no Class Member shall have any claim on the Settlement Fund.

### 8.5   Payments of Interest

Each Settlement Fund Payment shall include interest at the Interest Rate accruing from the thirtieth (30th) day after the Preliminary Approval Date to the Effective Date, with no compounding.

### 8.6   Other Settlement Administration Provisions

(a)   The Parties and their respective counsel shall not have any responsibility for, interest in, or liability whatsoever with respect to: (i) the investment of or distribution of the Settlement Fund, (ii) the determination, administration, calculation, or payment of Claim Forms from the Settlement Fund, or (iii) any losses incurred in connection therewith.

(b)   No Person shall have any cause of action against the Representative Plaintiffs, Class Counsel, the Settlement Administrator, the Blue Parties, the Released Parties, or the Blue Parties' counsel, based on the administration or implementation of the Agreement or orders of the Court or based on the distribution

77

of monies under the Agreement, and the Person's sole remedy (other than those provided pursuant to the terms of the Agreement), shall be by an application to the Court for enforcement of the Agreement pursuant to § 12.

(c)     The Settlement Administrator shall make appropriate reports on Internal Revenue Code Form 1099 with respect to all payments it makes to Class Members under this Agreement. The Settlement Administrator shall file any tax returns necessary with respect to any income earned by the Settlement Fund and shall pay, as and when legally required to do so, any tax payments (including interest and penalties) due on income earned by such Fund, and shall request refunds, when and if appropriate, and shall apply any such refunds that are issued to the Settlement Fund to become a part thereof (or, if refunds are received after distribution, to the Foundation).

(d)     If the Final Order and Judgment is set aside or reversed, in whole or in part, for any reason, then at such time as the time for any appeal from the final order of set aside or reversal has elapsed (including without limitation any extension of time for the filing of any appeal that may result by operation of law or order of the Court) with no notice of appeal having been filed, all funds in the Settlement Administration Account, including interest accrued thereon, shall be released forthwith to the Blue Plans in proportion to their respective payments.

9.     **Attorneys' Fees, Representative Plaintiffs' Fees and Fees for Representative Plaintiffs in Other Actions**

9.1     **The Blue Plans Shall Pay Attorneys' Fees**

Class Counsel intend to apply to the Court for an award of Attorneys' Fees in an amount not to exceed $49,061,965, (the "**Unopposed Amount**") which application the Blue Plans agree not to oppose. Each Blue Plan shall pay a portion of the amount of the Attorneys' Fees awarded by the Court ("**Attorneys' Fees**") in proportion to the percentage assigned to the Blue Plan in Exhibit K. The Blue Plans' total payments of Attorneys' Fees shall not exceed the Unopposed Amount and shall be made in accordance with § 9.3 of this Agreement. If any Blue Plan terminates its participation in this Agreement pursuant to §14.2, the Unopposed Amount shall be reduced by the percentage assigned to the Blue Plan in Exhibit K. If the Court awards Attorneys' Fees in excess of the Unopposed Amount, Class Counsel, on behalf of themselves and the Class, hereby covenant and agree to waive, release and forever discharge the amount of any such excess award and to make no effort of any kind or description ever to collect same. The Attorneys' Fees agreed to be paid pursuant to this provision are in addition to and separate from all other consideration and remedies paid to and available to the Class Members. The Blue Plans

78

shall not be obligated to pay any attorneys' fees or expenses incurred by or on behalf of any Releasing Party in connection with the Action, other than the payment of Attorneys' Fees in accordance with this § 9.1.

**9.2     The Blue Parties Shall Pay Representative Plaintiffs' Fees**

In addition to Attorney's Fees, Class Counsel intends to apply to the Court for an award of fees for each Representative Plaintiff in the amount of $7,500, which application the Blue Parties agree not to oppose. The Blue Parties shall pay such fees, not later than ten (10) days after the Effective Date to Representative Plaintiffs in the amount awarded by the Court up to but not exceeding such unopposed amount. If the Court awards fees to Representative Plaintiffs in excess of $7,500 each, Representative Plaintiffs, on behalf of themselves and the Class, hereby covenant and agree to waive, release and forever discharge the amount of any such excess award and to make no effort of any kind or description ever to collect same. The fees to Representative Plaintiffs agreed to be paid pursuant to this § 9.2 are in addition to the other consideration afforded the Class Members. The Blue Parties shall support the award of fees to Representative Plaintiffs up to $7,500 as reasonable and appropriate and shall not object to such request nor appeal an award up to that amount. The fees set forth in §§ 9.1 and 9.2 are the only consideration that Released Parties shall be obligated to give Class Counsel and the Representative Plaintiffs as a result of prosecuting and settling this Action, other than the additional express agreements made herein.

**9.3     Timing of Fee Payments**

Each Blue Plan shall wire transfer its portion of Attorneys' Fees to the trust account of Archie Lamb, PC, not later than ten (10) days after the Effective Date, with interest at the Interest Rate accruing from the thirtieth (30th) day following the Final Order Date to the Effective Date, with no compounding.

**9.4     Fees to Representative Plaintiffs in Other Actions.**

In addition to Attorney's Fees, Class Counsel intends to apply to the Court for an award of fees for each of the Representative Plaintiffs in Other Actions in the amount of $7,500, which application the Blue Parties agree not to oppose. Those Blue Parties listed on Exhibit M shall pay such fees to the Representative Plaintiffs in Other Actions as designated on Exhibit M, not later than ten (10) days after the Effective Date in the amount awarded by the Court up to but not exceeding such unopposed amount. If the Court awards fees to Representative Plaintiffs in Other Actions in excess of $7,500 each, Representative Plaintiffs in Other Actions, on behalf of themselves and the Class, shall covenant and agree to waive, release and forever discharge the amount of any such excess award and to make no effort of any kind or description ever to collect same. The fees to Representative Plaintiffs in Other Actions agreed to be paid pursuant to

79

this § 9.4 are in addition to the other consideration afforded the Class Members. The Blue Parties shall support the award of fees to Representative Plaintiffs in Other Actions up to $7,500 as reasonable and appropriate and shall not object to such request nor appeal an award up to that amount. Such fees are the only consideration that Released Parties shall be obligated to give Representative Plaintiffs in Other Actions, other than the additional express agreements made herein.

10. **Application to Fully-Insured Plans and Self-Insured Plans**

Section 7 of this Agreement applies to each Blue Plan's conduct with respect to both Fully-Insured Plans and Self-Insured Plans, except: (i) as otherwise specified in this Agreement, or (ii) as provided by applicable law, including, without limitation, fulfillment of a Blue Plan's obligations as a plan fiduciary in connection with any Plan subject to the requirements of ERISA.

11. **Limited Liability**

    11.1 **Settlement Implementation**

    The Billing Dispute External Reviewer, the Independent Review Organization or Organizations (and members and agents, if any), the Class Compliance Dispute Facilitator (and agents, if any), the Blue Compliance Dispute Facilitators (and agents, if any), and the Compliance Dispute Officer (and agents, if any) (including, in the case of individual Compliance Dispute Facilitators and/or Compliance Dispute Officers, selected in accordance with § 12.7) do not owe a fiduciary duty to the Parties, and the Parties shall ask the Court to grant such persons limited immunity from liability for their actions under this Agreement, except for any willful misconduct or gross negligence.

    11.2 **Blue Parties**

    The liability of each Blue Party under this Agreement shall be several. No breach of a several obligation by a Blue Party shall result in any liability to any other Blue Party or provide any basis for any compliance action or other remedy against any other Blue Party.

12. **Compliance Disputes Arising Under This Agreement**

    12.1 **Jurisdiction, Coordination and Costs**

        (a) **Compliance Dispute Facilitators**

        Class Counsel shall appoint a Class Compliance Dispute Facilitator (the "**Class Compliance Dispute Facilitator**") to facilitate any disputes initiated by a Class Member within sixty (60) days after the Final Order Date. The Blue Parties shall appoint a Blue

80

Compliance Dispute Facilitator (the "**Blue Compliance Dispute Facilitator"**) to facilitate the resolution of any disputes within sixty (60) days after the Final Order Date; provided, however, that the Parties agree to hold any Compliance Dispute in abeyance until such time as each of the Parties' respective Compliance Dispute Facilitator and/or Compliance Dispute Officer has/have been appointed. All compliance dispute resolutions without full review under § 12.5 below shall be addressed by the Class Compliance Dispute Facilitator and the Blue Compliance Dispute Facilitator.

**(b)**   **Compliance Dispute Officer.**

Class Counsel and the Blue Parties shall agree upon a Compliance Dispute Officer ( the "**Compliance Dispute Officer"**) within sixty (60) days after the Final Order Date.

All Compliance Dispute resolutions with full review under § 12.6 below shall be directed to the Compliance Dispute Officer. Compliance Disputes shall not be directed to the Court nor to any other state court, federal court, arbitration panel or any other binding or non-binding dispute resolution mechanism, except as provided in this Agreement.

One year after any Compliance Dispute Officer is appointed, either of Class Counsel or the Blue Parties may request the appointment of a new Compliance Dispute Officer. Class Counsel and the Blue Parties will agree upon a new Compliance Dispute Officer within thirty (30) days of any such request.

**(c)**   **Program Title**

The compliance dispute program set forth in § 12.1 through § 12.6 shall be referred to as the "Joint Compliance Dispute Program".

**(d)**   **Fees and Costs**

The Blue Parties shall pay the reasonable fees and expenses of the Compliance Dispute Officer, the Class Compliance Dispute Facilitator and the Blue Compliance Dispute Facilitator.

**12.2**   **Who May Petition the Compliance Dispute Officer**

Class Compliance Dispute Facilitator may petition the Compliance Dispute Officer on behalf of any Class Member or Signatory Medical Society.

**12.3**   **Procedure for Initiating Compliance Disputes**

81

To initiate a Compliance Dispute, a Class Member or Signatory Medical Society shall submit a completed Compliance Dispute Claim Form, attached hereto as Exhibit C, to the Class Compliance Dispute Facilitator. The Class Compliance Dispute Facilitator shall provide a copy of the completed Compliance Dispute Claim Form to the Blue Party's Compliance Dispute Facilitator.

**12.4    Intentionally Left Blank**

**12.5    Dispute Resolution Without Full Review**

    **(a)**    If the Class Compliance Dispute Facilitator, in its sole judgment, determines that a dispute initiated by a Class Member or Signatory Medical Society is frivolous or the actual harm suffered is de minimis, it shall notify the Class Member or Signatory Medical Society and notify the affected Blue Compliance Dispute Facilitator that there will be no further proceedings on such dispute.

    **(b)**    If the Class Compliance Dispute Facilitator, in its sole judgment, determines a dispute initiated by a Class Member or Signatory Medical Society requires full review (without any other attempt at resolution), it shall immediately refer the dispute to the Compliance Dispute Officer for full review and shall notify the Class Member or Signatory Medical Society and the Blue Compliance Dispute Facilitator of this referral.

    **(c)**    If the Class Compliance Dispute Facilitator, in its sole judgment, determines a dispute initiated by a Class Member or Signatory Medical Society may be resolved without full review,  the Class Compliance Dispute Facilitator and the Blue Compliance Dispute Facilitator shall assist in an attempt to achieve a resolution of the dispute agreed to by the Class Member or Signatory Medical Society and the affected Blue Party.  All parties to such dispute agree to assist the Class Compliance Dispute Facilitator and the Blue Compliance Dispute Facilitator in such efforts.  If such efforts do not achieve resolution of the dispute within sixty (60) days after submission of the Compliance Dispute Claim Form, the Class Compliance Dispute Facilitator shall refer the dispute to the Compliance Dispute Officer for full review and shall notify the Class Member or Signatory Medical Society and the Blue Compliance Dispute Facilitator of this referral.

**12.6    Dispute Resolution With Full Review**

    **(a)**    **Requirements for a Compliance Dispute With Full Review.**

Following the procedure set forth in § 12.5, to receive full review, a Compliance Dispute must meet the following requirements:

(i)      A Class Member or Signatory Medical Society submitted a properly completed Compliance Dispute Claim Form to the applicable Compliance Dispute Facilitator not later than ninety (90) days after such Compliance Dispute arose or reasonably could be known, whichever is later; and

(ii)     The Compliance Dispute Officer, in its sole judgment, determines that the Compliance Dispute:

      (1)     alleges a failure by a Blue Party to comply with an obligation under Section 7 of this Agreement; and

      (2)     is not properly the subject of a proceeding under §§ 7.10 or 7.11 of this Agreement;

**(b)**    **Memoranda to Compliance Dispute Officer.**

(i)      The Compliance Dispute Officer shall in writing request memoranda from the parties to the Compliance Dispute regarding the merits of the dispute and appropriate remedies. The complaining Class Member or Signatory Medical Society shall have fifteen (15) days from the date of such request to submit its memorandum, and the other party shall submit its memorandum in response within fifteen (15) days after receipt of the complaining Class Member's or Signatory Medical Society's memorandum.

(ii)     In the event that the Compliance Dispute relates to the Blue Plan's compliance with § 7.8(d)(ii) of this Agreement, the Blue Plan may present directly to the Compliance Dispute Officer *ex parte* and in camera the Blue Plan's arguments in support of the Clinical Information submission request, including, where applicable, arguments that the Blue Plan is invoking its right to obtain Clinical Information pursuant to § 7.8(d)(ii) because the Blue Plan has a reasonable basis for believing that an investigation of fraudulent or abusive (whether intentional or unintentional) billing practices is warranted. The Compliance Dispute Officer shall not disclose any information designated as "Confidential" by the Blue Plan.

**(c)**    **Oral Argument of Compliance Dispute.**

The Compliance Dispute Officer, at its sole option, may request the parties to the Compliance Dispute to present oral argument of

the Compliance Dispute at a time and place agreed to by the parties to the Compliance Dispute and the Compliance Dispute Officer.

**(d)** **Decisions by the Compliance Dispute Officer.**

    (i)    In resolving a Compliance Dispute, the Compliance Dispute Officer shall provide a written decision, made in its sole judgment and based only on the Compliance Dispute Claim Form with supporting documents and testimony by affidavit, memoranda, and any oral argument, determining whether the affected Blue Party has failed to comply with its obligations under § 7 of this Agreement, and if so, directing what actions are to be taken by the affected Blue Party to fulfill its obligations under § 7 of this Agreement.

    (ii)    In the event that the Compliance Dispute relates to the Blue Plan's compliance with § 7.8(d)(ii), the Compliance Dispute Officer's written decision to the parties to the Compliance Dispute shall state only that (a) the Blue Plan has complied with § 7.8(d)(ii) and the matter is thus closed, or (b) that the Blue Plan has not complied with § 7.8(d)(ii) and the requirement for submission of Clinical Information is to cease, as to that dispute. This limitation on the content of the Compliance Dispute's written opinion applies to all Compliance Disputes relating to the Blue Plan's compliance with § 7.8(d)(ii), regardless of whether the Compliance Dispute involves a Clinical Information submission request in connection with a Blue Plan's investigation of fraudulent or abusive billing practices. In the event that the Blue Plan has invoked its right to obtain Clinical Information, pursuant to § 7.8(d)(ii), because the Blue Plan has a reasonable basis for believing that an investigation of fraudulent or abusive (whether intentional or unintentional) billing practices is warranted, the Compliance Dispute Officer's sole responsibility in these circumstances shall be to make a determination as to whether the Blue Plan has a reasonable basis for its belief.

**(e)** **Intentionally left blank**

**(f)** **Systemic Remedy**

If the Compliance Dispute Officer determines, after adequate notice and a reasonable opportunity to respond consistent with this § 12, that the affected Blue Party has not fulfilled its obligations under § 7 of this Agreement with respect to other Class Members beyond the complaining Class Member or Signatory Medical Society in the Compliance Dispute, the Compliance Dispute

84

Officer may order appropriate remedies only as necessary and designed to obtain compliance with the terms of this Agreement.

**(g)**     **Finality of the Compliance Dispute Officer's Decision.**

The Parties agree that the decision of the Compliance Dispute Officer shall be final unless appealed to the Court. The Parties further agree that the scope of review by the Court shall be limited to whether the Compliance Dispute Officer's final decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," as defined by 5 U.S.C. § 706(2)(A). If the Court finds such final decision was "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law", the Court may remand the Compliance Dispute to the Compliance Dispute Officer for further proceedings.

**(h)**     **Enforcement by the Court.**

If the Compliance Dispute Officer determines that the affected Blue Party has not complied with its final decision, it shall provide written notice of such noncompliance to the affected Blue Party. If the affected Blue Party does not comply within thirty (30) days from the date of such notice, the Compliance Dispute Officer shall provide written notice to the Class Member or Signatory Medical Society in the Compliance Dispute, and the Class Member or Signatory Medical Society may petition the Court for enforcement.

**12.7**    **Individual Plan Compliance Dispute Program**

The Blue Parties listed on Exhibit P will use an individual plan compliance dispute program that follows the requirements set out in §§12.1 through 12.6 above, except each listed Blue Party and Class Counsel shall agree upon an individual Compliance Dispute Officer and each will select an individual Compliance Dispute Facilitator in accordance with the requirements in section 12.1. The Blue Parties that use an individual plan compliance dispute program may not use the Joint Compliance Dispute Program, unless agreed to in writing by Class Counsel.

**12.8**    **Compliance Reporting.**

**(a)**     During the Effective Period, each Blue Party shall provide to a designated Blue Compliance Reporting Officer at BCBSA information regarding its compliance with the obligations set forth in § 7 of this Agreement. Each Blue Plan will take steps reasonably necessary to monitor and certify its compliance with this Agreement and will designate an appropriate representative to be responsible for this activity. Within thirty (30) days after the end

85

of each calendar year beginning in 2008, during the applicable Effective Period, the Blue Compliance Reporting Officer shall provide a written summary report of such information to the Compliance Dispute Officer. A copy of this report shall be provided by the Compliance Dispute Officer to any Party upon request. The summary report will contain the following information from each Blue Plan:

| 7.5 | Blue Plan's standard Precertification lists |
|---|---|
| 7.6 | Blue Plan's list of material adverse changes |
| 7.8(b) | Blue Plan's list of efforts to cause its claims payment systems to be consistent within each state in which the Blue Plan operates |
| 7.8(d) | Blue Plan's list of Significant Edits |
| 7.8(d)(i) | Blue Plan's list of customized Edits added to any standard claims editing software product at Blue Plan's request |
| 7.8(d)(ii) | Blue Plan's list of categories of claims for which there is routine review of Clinical Information |
| 7.8(d)(iii) | Blue Plan's list of any circumstances where particular services or procedures, relative to modifiers 25 and 59, are not appropriately reported together with those modifiers |
| 7.9(b) | Blue Plan's list of the dates of meetings of the Physician Advisory Committee and the members of the Physician Advisory Committee |
| 7.10(f) | Blue Plan's list of decisions issued by the Billing Dispute External Reviewer which required payment by the Blue Plan |
| 7.16(a) | Blue Plan's list of the number of Adverse Determinations sent to External Review for final determination for the preceding calendar year and the percentage of such Adverse Determinations that are reversed. |
| 7.23 | Blue Plan's list of actions to improve accuracy of information about eligibility of Plan Members |

86

| 7.31 | Blue Parties' approximate aggregate amount spent as provided in § 7.31 to be filed no later than thirty (30) days prior to the Termination Date. |
|------|--------------------------------------------------------------------------------------------------------------------------------------------------|

**(b)**     A Blue Party may elect not to participate in the joint compliance reporting program set out in § 12.8(a) above, and instead establish its own individual plan compliance reporting program, except for the reporting of information relating to compliance with § 7.31, which shall be included in the report filed under § 12.8(a). All Blue Parties electing to have an individual plan compliance reporting program are on the list attached as Exhibit Q. Each Blue Party electing to use an individual plan compliance reporting program will designate a local compliance reporting officer who will follow the requirements and procedures as set out for the joint compliance reporting program in § 12.8(a) above.

## 12.9   Compliance Monitoring

For purposes of monitoring compliance with this Agreement, each Blue Plan shall allow the Compliance Dispute Officer and the Class Compliance Dispute Facilitator access to its Provider Website; provided, however, that such access shall not include access to Physician fee schedules and protected health information as defined by HIPAA.

## 12.10   Compliance Dispute/Negotiated Purchaser Designation

**(a)**     In the event that a Compliance Dispute is brought by the Class Compliance Dispute Facilitator, regarding a term or condition subject to § 7.36(a), the matter shall be submitted directly to the Compliance Dispute Officer. The Blue Plan may present directly to the Compliance Dispute Officer with a copy to the Class Compliance Dispute Facilitator, on a confidential basis, the Blue Plan's reasons for its action, including that the purchaser qualifies as a Negotiated Purchaser as defined in § 7.36(a)(i) and that the term or condition was reasonably necessary to obtain or maintain the service agreement or insurance contract. The Class Compliance Dispute Facilitator may respond to the submission of the Blue Plan within five (5) business days of receipt of a copy of the submission. The Compliance Dispute Officer's decision shall be limited to whether the purchaser is a Negotiated Purchaser, whether the term or condition was reasonably necessary, and, as a result, whether the term or condition is permitted under § 7.36. The Compliance Dispute Officer and the Class Compliance Dispute Facilitator shall not disclose any information that the Blue Plan has submitted as confidential. The Class Compliance Dispute Facilitator may confer with one or more of Class Counsel in connection with the dispute if the Class Compliance Dispute

87

Facilitator does not disclose any confidential information, or if the Class Counsel involved agrees to keep the information confidential.

**(b)** The Compliance Dispute Officer shall render a final decision within ten (10) days following submission of information required by the Blue Plan under § 7.36(a). If the Compliance Dispute Officer rules against the Blue Plan, any remedy shall be limited to directing the Blue Plan to submit and implement an adequate corrective action plan, and imposing on the Blue Plan the obligation to pay actual damages including interest suffered by a Class Member as a result of the implementation of any modification. Any activity conducted by a Blue Plan under a corrective action plan shall be subject to the provisions of §13.3(a)(iii). The Class Compliance Dispute Facilitator may confer with and seek the assistance of Class Counsel in connection with any such dispute.

## 13. Release, Covenant Not to Sue, and Bar Order

### 13.1 Discharge of All Released Claims

**(a)** Upon the Effective Date, the **"Released Parties,"** which shall include the Blue Parties and each of their present and former parents, divisions and Affiliates and each of their respective current or former officers, directors, employees, agents, insurers and attorneys (and the predecessors, heirs, executors, administrators, legal representatives, successors and assigns of each of the foregoing), and all Persons who provided claims processing services, software, proprietary guidelines or technology to the Blue Parties, their subsidiaries or Affiliates, and those contracted agents processing claims on their behalf (including, without limitation, NASCO), together with each such Person's predecessors or successors (but only to the extent of such Person's services and work was done pursuant to contract with the Blue Parties or their subsidiaries or Affiliates), but excluding all Delegated Entities, shall be released and forever discharged by the Signatory Medical Societies and all Class Members, and by their respective current and former officers, directors, employees, attorneys, heirs, executors, administrators, agents, legal representatives, professional corporations, partnerships, assigns and successors, but only to the extent claims are derived by contract or operation of law from the claims of Class Members, (collectively, the **"Releasing Parties"**) from any and all causes of action, judgments, liens, indebtedness, costs, damages, obligations, attorneys' fees, losses, claims, liabilities and demands of whatever kind, source or character whether arising under any federal or state law, which (consistent with the Parties' understanding of the settlements in <u>Shane)</u> includes, but is not limited to, the Racketeer

88

Influenced and Corrupt Organizations Act, antitrust and other statutory and common law claims, intentional or non-intentional, (each a **"Claim"**), arising on or before the Effective Date, that are, were or could have been asserted against any of the Released Parties by reason of, arising out of, or in any way related to any of the facts, acts, events, transactions, occurrences, courses of conduct, business practices, representations, omissions, circumstances or other matters referenced in the Action, or addressed in this Agreement, whether any such Claim was or could have been asserted by any Releasing Party on its own behalf or on behalf of other Persons, or to the business practices that are the subject of § 7. This includes, without limitation and as to Released Parties only, any aspect of any fee for service claim submitted by any Class Member to a Blue Plan, and any claims of any Class Member related to or based upon any Capitation agreement between a Blue Plan and any Class Member or other Person or entity, or the delay, nonpayment or amount of any Capitation payments by a Blue Plan, and any allegation that any Blue Party has conspired with, aided and abetted, or otherwise acted in concert with other managed care organizations, other health insurance companies, Delegated Entities and/or other third parties with regard to any of the facts, acts, events, transactions, occurrences, courses of conduct, business practices, representations, omissions, circumstances or other matters related to the Action, or with regard to any Blue Party's liability for any other demands for payment submitted by any Class Member to such other managed care organizations, health insurance companies, Delegated Entities and/or other third parties.

(b) Except for Claims for damages against defendants in the Action that are not Parties relating to providing Covered Services to Blue Plans' Plan Members in connection with the BlueCard Program and other similar national account delivery programs governed by BCBSA (including but not limited to NASCO-to-NASCO arrangements), the Releasing Parties further agree to forever abandon and discharge any and all Claims that exist now or that might arise in the future against any other Persons which Claims arise from, or are based on, conduct by any of the Released Parties that occurred on or before the Effective Date and are, or could have been, alleged in the Complaint, whether any such Claim was or could have been asserted by any Releasing Party on its own behalf or on behalf of other Persons. Nothing in this Agreement is intended to relieve any Person or entity that is not a Released Party from responsibility for its own conduct or conduct of other Persons who are not Released Parties, or to preclude any Representative Plaintiff from introducing any competent and admissible evidence to the extent consistent with §§ 14 and 16.

89

(c)    Any Claims released or discharged pursuant to §§ 13.1(a) or 13.1(b), subject to the exception regarding Retained Claims contained in § 13.6, shall be referred to as "**Released Claims**."

**13.2    Covenant Not to Sue**

(a)    The Releasing Parties and each of them agree and covenant not to sue or prosecute, institute or cooperate in the institution, commencement, filing, or prosecution of any suit or proceeding in any forum based upon or related to any Released Claims against any Released Party.

(b)    Notwithstanding any other provision of this Agreement (including, without limitation, this § 13.2), nothing in this Agreement shall be deemed to in any way impair, limit, or preclude the Releasing Parties' rights to enforce any provision of this Agreement, or any court order implementing this Agreement, in a manner consistent with the terms of the Agreement.

**13.3    Bar Order**

It is an essential element of the Agreement that the Released Parties obtain the fullest possible release from further liability to anyone relating to the Released Claims, and it is the intention of the Parties to this Agreement that the Agreement eliminate all further risk and liability of the Released Parties relating to the Released Claims. Accordingly, the Parties agree that the Court shall include in the Final Approval Order a Bar Order provision that meets all of the following requirements:

(a)    The Releasing Parties are permanently enjoined from: (i) filing, commencing, prosecuting, intervening in, participating in (as class members or otherwise) or receiving any benefits from any lawsuit, arbitration, administrative or regulatory proceeding or order in any jurisdiction based on any or all Released Claims against one or more Released Parties; (ii) instituting, organizing class members in, joining with class members in, amending a pleading in or soliciting the participation of class members in, any action or arbitration, including but not limited to a purported class action, in any jurisdiction against one or more Released Parties based on, involving, or incorporating, directly or indirectly, any or all Released Claims; and (iii) filing, commencing, prosecuting, intervening in, participating in (as class members or otherwise) or receiving any benefits from any lawsuit, arbitration, administrative or regulatory proceeding or order in any jurisdiction based on an allegation that an action of the Blue Parties, which is in compliance with the provisions of the Settlement Agreement, violates any legal right of any Class Member.

90

**(b)** All Persons who are, have been, could be, or could have been alleged to be joint tortfeasors, co-tortfeasors, co-conspirators, or co-obligors with the Released Parties or any of them respecting the Released Claims or any of them, are hereby, to the maximum extent permitted by law, barred and permanently enjoined from making, instituting, commencing, prosecuting, participating in or continuing any Claim, claim-over, cross-claim, action, or proceeding, however denominated, regardless of the allegations, facts, law, theories or principles on which they are based, in this Court or in any other court or tribunal, against the Released Parties or any of them with respect to the Released Claims, including without limitation equitable, partial, comparative, or complete contribution, set-off, indemnity, or otherwise, whether by contract, common law or statute, arising out of or relating in any way to the Released Claims. All such claims are hereby fully and finally barred, released, extinguished, discharged, satisfied and made unenforceable to the maximum extent permitted by law, and no such claim may be commenced, maintained, or prosecuted against any Released Party. Any judgment or award obtained by a Class Member against any such Person shall be reduced by the amount or percentage, if any, necessary under applicable law to relieve any Released Party of all liability to such Person on such barred claims. Such judgment reduction, partial or complete release, settlement credit, relief, or setoff, if any, shall be in an amount or percentage sufficient under applicable law as determined by the Court to compensate such Person for the loss of any such barred claims against any Released Party. Where the claims of a Person who is, has been, could be, or could have been alleged to be a joint tortfeasor, co-tortfeasor, co-conspirator or co-obligor with a Released Party respecting the Released Claims have been barred and permanently enjoined by this § 13.3, the claims of Released Parties against that Person respecting those Released Claims are similarly fully and finally barred, released, extinguished, discharged, satisfied and made unenforceable to the maximum extent permitted by law.

**13.4    Dismissal With Prejudice**

The Releasing Parties shall dismiss the Action with prejudice as to Released Parties. It is the Parties' intention that such dismissal shall constitute a final judgment on the merits to which the principles of *res judicata* shall apply to the fullest extent of the law as to the Released Parties.

**13.5    Waiver of California Civil Code § 1542 and Similar Provisions**

91

With respect to all Released Claims, the Releasing Parties and each of them agree that they are expressly and unconditionally waiving and relinquishing to the fullest extent permitted by law:

(a)     the provisions, rights and benefits conferred by § 1542 of the California Civil Code, which provides:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR", and

(b)     any law of any state or territory of the United States, federal law or principle of common law, or of international or foreign law, which is similar, comparable or equivalent to § 1542 of the California Civil Code. Each Class Member and each Signatory Medical Society may hereafter discover facts other than or different from those which he, she or it knows or believes to be true with respect to the Claims which are the subject matter of the provisions of § 13, but each such Class Member and each Signatory Medical Society hereby expressly and unconditionally waives and fully, finally and forever settles and releases, upon the entry of Final Order and Judgment, any known or unknown, suspected or unsuspected, contingent or non contingent Claim, with respect to the subject matter of the provisions of § 13, whether or not concealed or hidden, without regard to the discovery or existence of such different or additional facts.

## 13.6   Retained Claims

Notwithstanding the foregoing, the Releasing Parties are not releasing claims for payment (each a "**Retained Claim**" and, collectively, the "**Retained Claims**") for Covered Services provided to Plan Members prior to or on the Effective Date as to which, as of the Effective Date: (i) no claim with respect to such Covered Services has been submitted to a Blue Plan, provided that the applicable period for filing such claim has not elapsed; or (ii) a claim with respect to such Covered Services has been filed with a Blue Plan but such claim has not been finally adjudicated by the Blue Plan. For purposes of clause (ii), above, final adjudication shall mean completion of the Blue Plan's internal appeals process. In the event that a claim referred to in clause (ii) is finally adjudicated less than thirty (30) days prior to the Effective Date, such claim shall constitute a Retained Claim if a Physician seeks relief under § 7.10 not later than ninety (90) days after notice of such final adjudication, but otherwise such claim shall constitute a Released Claim. Disputes relating to Retained

92

Claims shall be resolved exclusively pursuant to the appropriate remedial provisions of this Agreement.

**13.7    Covenant Not to Sue on Retained Claims and Compliance Disputes**

Upon the Effective Date and through the Termination Date, the Releasing Parties and each of them agree and covenant not to sue or prosecute, institute or cooperate in the institution, commencement, filing, or prosecution of any suit or proceeding against any Released Party, in any forum (i) any Retained Claim or (ii) any Compliance Dispute (whether or not asserted), which respectively shall be asserted and pursued only pursuant to Sections 12 and 13.6 of this Agreement. This § 13.7 shall not apply to: (i) any claims that arise within twenty (20) days before the Termination Date that could not reasonably be presented or resolved pursuant to the procedures set forth in this Agreement; provided that any such claim shall be prosecuted on an individual basis only and not otherwise; or (ii) any remedy under a state or federal law or applicable regulation elected by a Physician pursuant to § 7.29(m).

**13.8    Non-Released Persons and Non-Released Claims**

**(a)**    Nothing in this Agreement is intended to relieve any Person that is not a Released Party from responsibility for its own conduct or conduct of other Persons who are not Released Parties for claims that are not Released Claims. Nothing in this Agreement is intended to preclude any Representative Plaintiffs from introducing any competent and admissible evidence to the extent consistent with §§ 14 and 16.

**(b)**    Except as provided in § 13.1, nothing in this Agreement prevents the Representative Plaintiffs and the Class from pursuing claims to hold any Person that is not a Released Party liable for damages caused by that Person's conduct in a conspiracy involving any Released Party.

**13.9    Irreparable Harm**

The Parties agree that the Blue Parties shall suffer irreparable harm if a Releasing Party takes action inconsistent with §§ 13.1, 13.2, 13.3, 13.4 and/or 13.7, and that in that event the Blue Parties may seek an injunction from the Court as to such action without further showing of irreparable harm.

**13.10    Legislative Changes**

Nothing contained in this Agreement is intended, or shall be construed, to preclude any Party from seeking legislative or regulatory changes as to matters addressed herein or from seeking to enforce any such changes using any available legal remedy.

93

14.    **Stay of Discovery, Termination, and Effective Date of Agreement**

   14.1    **Suspension of Discovery and Other Proceedings**

      (a)    Except as set forth in Exhibit O with respect to BCBSA, upon execution of this Agreement, the Releasing Parties and Class Counsel shall discontinue all discovery activity or related proceedings in the Action against the Released Parties, provided that if this Agreement is terminated pursuant to § 14.2 as to a Blue Party, the Releasing Parties and Class Counsel may pursue discovery or related proceedings solely against the Blue Party as to which the Agreement is terminated and any defendant in this Action that has not settled. Where a Blue Plan provides or has provided claims processing services for a non-settling defendant or a Terminating Blue Plan, and such Blue Plan is in the possession of that non-settling defendant's or Terminating Blue Plan's claims data pursuant to the provision of those services, the foregoing sentence shall not prevent the Releasing Parties or Class Counsel from obtaining discovery of those claims data pursuant to a discovery request issued to the non-settling defendant or Terminating Blue Plan. Notwithstanding the foregoing, nothing herein shall require a Blue Plan to provide any data concerning any of its claims, including, but not limited to, claims under the BlueCard Program or any similar national account delivery program governed by BCBSA (including but not limited to NASCO-to-NASCO arrangements).

      (b)    Upon entry of the Preliminary Approval Order, the Releasing Parties and Class Counsel agree to suspend and stay all proceedings in the Action against the Released Parties, other than proceedings as may be necessary to carry out the terms and conditions of the Agreement. The Preliminary Approval Order shall also bar and enjoin all Class Members from commencing or prosecuting any action asserting any Released Claims, and stay any other actions or proceedings brought by any Class Members asserting any Released Claims. If, and only to the extent that, this Agreement terminates pursuant to § 14.2 of this Agreement, the Parties shall not be deemed to have waived any rights as a result of such suspension or stay of proceedings.

      (c)    Upon the Effective Date, and notwithstanding any of the other provisions in this Agreement, the Released Parties shall have no obligation to preserve documents and evidence with respect to Released Claims, including any obligations under the Agreed Order for Preservation of Records, and the Releasing Parties and Class Counsel shall not pursue any spoliation claims or other

94

actions or sanctions against a Released Person with respect to documents or evidence related to the Released Claims.

**14.2    Right to Terminate this Agreement**

(a)    If, at the Preliminary Approval Hearing or within thirty (30) days thereafter, the Court does not enter the Preliminary Approval Order and approve the Claim Form, Claim Form Instructions, Mailed Notice, and the Published Notice submitted to the Court pursuant to § 4 of this Agreement, in each case in substantially the same form as Exhibits A, B, E, and G, any Party shall have the right, in the sole and absolute discretion of such Party, to terminate its participation in this Agreement by delivering a notice of termination to the other Parties within forty-five (45) days following the Preliminary Approval Hearing.

(b)    If the Court does not grant the stay and injunctions as provided in § 14.1(b) and the interim injunction with respect to the Tag Along Actions, as provided in § 15.1, each in the form contained in the Preliminary Approval Order (Exhibit F), each Blue Party may in its sole and absolute discretion terminate its participation in this Agreement by delivering a notice of termination to the other Parties within forty-five (45) days following the Preliminary Approval Hearing.

(c)    If the number of putative Class Members submitting Opt-Out requests exceeds five percent (5%) of the total number of putative Class Members in the United States, each Blue Party may in its sole and absolute discretion terminate its participation in this Agreement by delivering a notice of termination to the other Parties within thirty (30) days of receipt of the complete list of Opt-Out requests from the Notice Administrator referred to in § 6.

(d)    If the number of putative Class Members in any Blue Plan's service area within a state submitting Opt-Out requests exceeds five percent (5%) of the total number of putative Class Members in that Blue Plan's service area within that state, except as provided in Exhibit H, the affected Blue Plan may in its sole and absolute discretion terminate its participation in this Agreement by delivering a notice of termination to the other Parties within thirty (30) days of receipt of the complete list of Opt-Out requests from the Notice Administrator referred to in § 6.

(e)    If the putative Class Members in any Blue Plan's service area submitting Opt-Out requests received, in the aggregate, at least five percent (5%) of the total dollar payments that such Blue Plan made to putative Class Members in calendar year 2006, the affected Blue Plan may in its sole and absolute discretion terminate

95

its participation in this Agreement by delivering a notice of termination to the other Parties within thirty (30) days of receipt of the complete list of Opt-Out requests from the Notice Administrator referred to in § 6.

**(f)**    If the Court has not entered the Final Order and Judgment substantially in the forms attached hereto as Exhibit D by the date that is 180 days after the Preliminary Approval Date, any Party may, in its sole and absolute discretion, terminate its participation in this Agreement by delivering a notice of termination to the other Parties within 200 days after the Preliminary Approval Date.

**(g)**    If more than twenty-five percent (25%) of the total number of Blue Parties validly terminate their participation in this Agreement pursuant to this § 14.2, Class Counsel and each of the remaining Blue Parties may in its sole and absolute discretion terminate its participation in this Agreement by delivering a notice of termination to the other Parties, within thirty (30) days following the last date on which a termination notice may be provided under §§ 14.2(a)-(f) of this Agreement.

**(h)**    In the event of any termination of the Agreement in its entirety by Class Counsel or all Blue Parties collectively pursuant to the terms of this § 14.2, the Parties shall be restored to their original positions, except as expressly provided herein.  In the event of any termination of individual participation in the Agreement by any Blue Plan (a "**Terminating Blue Plan**"), the Terminating Blue Plan, the Releasing Parties and Class Counsel shall be restored to their original positions, except as expressly provided herein.

**14.3**    **Intentionally Left Blank**

**14.4**    **Effective Date**

If the Final Order and Judgment is entered by the Court and the time for appeal from all of such orders and judgment has elapsed (including without limitation any extension of time for the filing of any appeal that may result by operation of law or order of the Court) with no notice of appeal having been filed, the "**Effective Date**" shall be the next business day after the last date on which notice of appeal could have been timely filed.  If the Final Order and Judgment is entered and an appeal is filed as to any of them, the "**Effective Date**" shall be the next business day after the Final Order and Judgment is affirmed, all appeals are dismissed, and no further appeal to, or discretionary review in, any court remains. Notwithstanding the foregoing, at any time after the Final Order and Judgment is entered by the Court but before the Effective Date would otherwise occur, any Blue Party may in its sole and absolute discretion elect to declare that the Effective Date for its participation in this

96

Agreement has occurred by providing notice to the Parties, and thereafter that electing Blue Party, Class Counsel and the Releasing Parties shall be bound by this Agreement and shall perform their respective obligations hereunder as if the Final Order and Judgment had been affirmed in its entirety.

**14.5    Intentionally Left Blank**

**14.6    Termination Date of Agreement**

(a)    This Agreement shall terminate (the "**Termination Date**") upon the earliest to occur of (i) as to a Party, that Party's termination of this Agreement pursuant to § 14.2, above, (ii) the date on which the appellate court rejects, in whole or in part, the Final Order and Judgment, upon any appeal or discretionary review thereof, and no further appeal to, or discretionary review in, any court remains, or (iii) the four year anniversary of the Preliminary Approval Date. As of the Termination Date, the provisions of this Agreement shall immediately become void and of no further force and effect and there shall be no liability under this Agreement on the part of any of the Parties, except for willful or knowing breaches of this Agreement prior to the Termination Date; provided that in the event of a termination of this Agreement under clause (iii) of this § 14.6(a), (x) the provisions of §§ 13.1, 13.2, 13.3, 13.4, 13.5, 13.7, 13.8, 14.1, 15 and 16, shall survive such termination indefinitely, (y) the provisions of § 7.10 and § 7.11 shall survive such termination only with respect to, and only for so long as is necessary to resolve, any Billing Disputes that are in the process of being resolved as of the Termination Date and any disputes described in § 7.11 as of the Termination Date, and (z) the provisions of §§ 12.1 through 12.6 shall survive such termination only with respect to, and only for so long as is necessary to resolve, any Compliance Disputes involving a Blue Plan that are in the process of being resolved by the Compliance Dispute Officer as of the Termination Date.

(b)    On the Termination Date, all of a Blue Party's obligations under this Agreement shall be deemed satisfied except as and only to the extent that a term of § 7 of this Agreement has been extended by the Blue Party as provided in this § 14.6(b) as to that Blue Party only. No decision or ruling of the Compliance Dispute Officer shall have any force on the Parties after the Termination Date, and the Blue Parties shall be under no obligation to continue performance of any kind under this Agreement. A Blue Party may, in its sole and absolute discretion, elect to continue after the Termination Date, the implementation of various business practices described in this Agreement. A Blue Party also may,

97

where it has a good faith basis, and notwithstanding any Implementation Date in § 7 of this Agreement or in Exhibit I hereto, delay the implementation, in whole or in part, of any provision of this Agreement upon notice to Class Counsel. Whether or not the foregoing notice is provided, in the event that implementation is delayed other than as provided in § 7, the term of the Agreement shall be extended solely with respect to the delayed provision for a period of time equal to the length of the delay.

## 15.   Related Actions

### 15.1   Ordered Stays and Dismissals in Tag-Along Actions

As to any action brought by or on behalf of Class Members that asserts any claim that as of the Effective Date would constitute a Released Claim against any Blue Parties, other than the Action, that has been, or will in the future, be designated as a tag-along action or consolidated with the Provider Track actions under MDL Docket No. 1334 (the "**Tag-Along Actions**" (a list of such pending Tag-Along Actions is attached hereto as Exhibit N to this Agreement)), Class Counsel and relevant Parties shall cooperate to obtain an order of the Court, to be included in the Preliminary Approval Order, providing for the interim stay of all proceedings as to any Blue Parties in each such action pending entry of the Final Order and Judgment. In addition, no later than ten (10) business days after the Effective Date, Class Counsel and relevant Parties will submit an order of dismissal with prejudice as to any Blue Parties for each such pending Tag-Along Action on Exhibit N; provided that no such dismissal order shall be sought with respect to any Tag-Along Action with respect to any named plaintiff that has submitted a valid and timely Opt-Out request.

### 15.2   Certain Related State Court Actions

As to any action that is now pending in, or hereafter may be filed in or remanded to, any state court that asserts any Released Claim against any Blue Party on behalf of any Releasing Party, Class Counsel and the relevant Parties agree that they will cooperate with the Blue Party and file all documents necessary (a) to obtain an interim stay of all proceedings against the Blue Party and (b) on or promptly after the Effective Date, to obtain the dismissal with prejudice of any such action, other than with respect to any named plaintiff in such action that has submitted a valid and timely Opt-Out request.

### 15.3   Other Related Actions

As to any action not referred to in §§ 15.1 or 15.2 that is now pending or hereafter may be filed in any court that asserts any of the Released Claims against any Blue Parties on behalf of any Releasing Party, Class Counsel and the relevant Parties agree that they will cooperate with the Blue Party,

98

to the extent reasonably practicable, in the Blue Party's efforts to seek relief from the Court or the forum court to obtain the interim stay and dismissal with prejudice of such action as to any Blue Parties to the extent necessary to effectuate the other provisions of this Agreement.

**16.    Not Evidence; No Admission of Liability**

In no event shall this Agreement, in whole or in part, whether effective, terminated, or otherwise, or any of its provisions or any negotiations, statements, or proceedings relating to it in any way be construed as, offered as, received as, used as or deemed to be evidence of any kind in the Action, in any other action, or in any judicial, administrative, regulatory or other proceeding, except the Agreement may be used in a proceeding to enforce this Agreement. Without limiting the foregoing, neither this Agreement nor any related negotiations, statements or proceedings shall be construed as, offered as, received as, used as or deemed to be evidence, or an admission or concession of liability or wrongdoing whatsoever or breach of any duty on the part of the Blue Parties, the Representative Plaintiffs, or the Signatory Medical Societies, or as a waiver by the Blue Parties, the Representative Plaintiffs or the Signatory Medical Societies of any applicable defense, including without limitation any applicable statute of limitations. None of the Parties waives or intends to waive any applicable attorney-client privilege or work product protection or other privilege for any negotiations, statements or proceedings relating to this Agreement. This provision shall indefinitely survive the termination of this Agreement.

**17.    Entire Agreement; Amendment**

**17.1    Entire Agreement**

This Agreement, including its Exhibits, contains an entire, complete, and integrated statement of each and every term and provision agreed to by and among the Parties; it is not subject to any condition not provided for herein. This Agreement supersedes any prior agreements or understandings, whether written or oral, between and among Representative Plaintiffs, Class Members, Class Counsel, Blue Parties and the Signatory Medical Societies regarding the subject matter of the Action or this Agreement. This Agreement shall not be modified in any respect except by a writing executed by Class Counsel and each of the Blue Parties, except as provided in § 17.2.

**17.2    Modification Generally**

This Agreement may be amended or modified with respect to a particular Blue Party only as provided in a written instrument signed by or on behalf of that Blue Party and Class Counsel (or their successors in interest), or as set forth in § 7.36.

**17.3    Intentionally Left Blank**

18.    **No Presumption Against Drafter**

None of the Parties shall be considered to be the drafter of this Agreement or any provision hereof for the purpose of any statute, case law, or rule of interpretation or construction that would or might cause any provision to be construed against the drafter hereof.  This Agreement was drafted with substantial input by all Parties and their counsel, and no reliance was placed on any representations other than those contained herein.  The Parties agree that this fully integrated Agreement shall be construed by its own terms and not by referring to, or considering, the terms of any other settlement agreement between plaintiffs and another defendant in the Action or Shane.

19.    **Captions and Headings**

The use of captions and headings in this Agreement is solely for convenience and shall have no legal effect in construing the provisions of this Agreement.

20.    **Continuing Jurisdiction and Exclusive Venue**

**20.1    Continuing Jurisdiction**

Except as otherwise provided in this Agreement, it is expressly agreed and stipulated that the United States District Court for the Southern District of Florida shall have exclusive jurisdiction and authority to consider, rule upon, and issue a final order with respect to proceedings, whether judicial, administrative or otherwise, which may be instituted by any Person, individually or derivatively, with respect to this Agreement.  This reservation of jurisdiction does not limit any other reservation of jurisdiction in this Agreement nor do any other such reservations limit the reservation in this subsection.  Except as otherwise provided in this Agreement, each of the Blue Parties, each Signatory Medical Society and each Class Member hereby irrevocably submits to the exclusive jurisdiction and venue of the United States District Court for the Southern District of Florida for any suit, action, proceeding, case, controversy, or dispute relating to this Agreement and/or Exhibits hereto and negotiation, performance or breach of same.

**20.2    Parties Shall Not Contest Jurisdiction**

In the event of any case, controversy, or dispute arising out of the negotiation of, approval of, performance of, or breach of this Agreement, and solely for purposes of such case, controversy, or dispute, to the fullest extent that they may effectively do so under applicable law, the Parties irrevocably agree that they are and shall be subject to the jurisdiction of the Court, and that the Court is a proper venue and convenient forum.

100

Furthermore, the parties shall jointly urge the Court to include the provisions of this § 20 in its Final Order and Judgment approving this Agreement.

21. **Cooperation**

Representative Plaintiffs, the Signatory Medical Societies, Class Counsel and the Blue Parties agree to move that the Court enter an order to the effect that should any Person desire any discovery incident to (or which the Person contends is necessary to) the approval of this Agreement, the Person must first obtain an order from the Court that permits such discovery.

22. **Counterparts**

This Agreement may be executed in counterparts, each of which shall constitute an original. Facsimile signatures shall be considered valid signatures as of the date hereof, although the original signature pages shall thereafter be appended to this Agreement.

23. **Additional Signatory Medical Societies**

The Parties agree that, from and after the date of this Agreement, additional medical societies may elect to execute a signature page to this Agreement and thereby agree to be bound by the provisions of this Agreement that are applicable to Signatory Medical Societies. Upon such execution of a signature page, each such additional medical society shall be deemed to be a Signatory Medical Society for all purposes of this Agreement and shall be bound by all of the provisions of this Agreement that are applicable to Signatory Medical Societies.

24. **Successors and Assigns**

The provisions of this Agreement shall be binding upon and inure to the benefit of each Blue Party and its respective successors and assigns; provided that no Blue Party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement to a third party that is not a successor or affiliate without the consent of Class Counsel. The provisions of this Agreement shall not apply with respect to any corporation, business, or other entity acquired by a Blue Party after the Preliminary Approval Date, and a Blue Party shall have no obligations under this Agreement with respect to such corporation, business, or entity or the business operations of such corporation, business or entity after the Preliminary Approval Date. The provisions of this Agreement shall not apply with respect to any activities related to FEHBA.

25. **Governing Law**

This Agreement and all agreements, exhibits, and documents relating to this Agreement shall be construed under the laws of the State of Florida, excluding its choice of law rules.

101

26. **Contacts for Communications Between Class Counsel and The Blue Parties**

At all times during the term of this Agreement, Class Counsel, on the one hand, and the Blue Parties, on the other, shall each designate a representative to facilitate communications between or among the Parties, and provide written notification to the other of the person so designated.

27. **Severable Agreement**

The provisions of this Agreement are intended to be severable. Should any of the provisions be found illegal, invalid or unenforceable by any court of competent jurisdiction for any reason, it shall be severable from the remainder of this Agreement, and the remainder of this Agreement shall be unchanged and shall be read as if it did not contain the illegal or invalid provision.

28. **Effect of Other Settlements**

The Representative Plaintiffs and the Signatory Medical Societies will not reach a settlement with any defendant in this Action which is not a Party which settlement includes a provision containing relief to the Class Members which is also relief to the Class Members set forth in this Agreement if: (i) such relief to the Class Members is applicable to Self-Insured Plans under this Agreement, but is not made applicable to Self-Insured Plans in the proposed settlement agreement; (ii) such relief is made applicable to Class Members who are Non-Participating Physicians under this Agreement, but is not made applicable to Non-Participating Physicians in the proposed settlement agreement, or (iii) such relief to Class Members is applicable to programs offered or sponsored by any state or federal governmental entity other than in its capacity as an employer under this Agreement, but is not made applicable to programs offered or sponsored by any state or federal governmental entity other than in its capacity as an employer in the proposed settlement. The Representative Plaintiffs and Signatory Medical Societies further agree that they will not reach a settlement with any defendant in this Action which is not a Party (or which does not become a Party in the future to this Agreement) which settlement imposes a less burdensome obligation on such other defendant regarding the obligations set forth in any of § 7.18, § 7.19 or § 7.20, unless such less burdensome obligation is a result of good faith negotiation between such defendant and the Medical Society in the state where it does business and is an exception similar to those exceptions set forth in Exhibit H. A settlement agreement involving only a financial payment obligation and no prospective relief shall be construed as a less burdensome obligation under this provision.

DELIVERED on April 27, 2007.

102