UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division

CASE NO.  03-21296-CIV-MORENO

RICK LOVE, M.D.; JOE FRANK SMITH, M.D.; SCOTT
ELLEDGE, M.D; and THEODORE MAZER, MD, on behalf of
themselves and all others similarly situated,

       Plaintiffs,

v.

BLUE CROSS AND BLUE SHIELD OF ARIZONA, INC.;
ARKANSAS BLUE CROSS AND BLUE SHIELD; BLUE
SHIELD OF CALIFORNIA;  BCBSD, INC.; BLUE CROSS
OF IDAHO HEALTH SERVICE, INC.; BLUE CROSS AND
BLUE SHIELD OF KANSAS, INC.; PREMIER HEALTH
INC.;  BLUE CROSS AND BLUE SHIELD OF KANSAS
CITY; BLUE CROSS AND BLUE SHIELD OF NEBRASKA;
HEALTHNOW NEW YORK, INC.; BLUE CROSS BLUE
SHIELD OF NORTH DAKOTA; NORIDIAN MUTUAL
INSURANCE COMPANY; BLUE CROSS & BLUE SHIELD
OF WYOMING,

       Defendants.

## PLAINTIFFS' SIXTH AMENDED CLASS ACTION COMPLAINT

    Pursuant to this Court's Order Allowing the Filing of a Sixth Amended Complaint, [D.E.

No. 1418] Plaintiffs, by and through their undersigned attorneys, submit the their Sixth Amended

Class Action Complaint (the "Complaint").

## NATURE OF THE CASE

    1.    Plaintiffs (hereinafter referred to as "Individual Plaintiffs") bring this action

pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§

1961, *et seq.*, on behalf of themselves and a class defined as:

> All physicians who, from May 22, 1999 through the date of certification, provided
> covered services to any patient insured by, or to any individual enrolled in or
> covered by, any licensee of the Blue Cross Blue Shield Association or by any of
> the respective current or former subsidiaries or affiliates of any licensee where the

claims were processed through the Blue Card System and/or all physicians who, from May 22, 1999 through the date of certification provided covered services to any patient insured by or to any individual enrolled in or covered by Blue Cross and Blue Shield of Arizona, Inc. ("BCBS-AZ"); Arkansas Blue Cross and Blue Shield ("BCBS-AR"); Blue Shield of California ("BSC"); BCBSD, Inc. ("Blue Cross Blue Shield of Delaware" or "BCBSD"); HealthNow New York, Inc. ("HealthNow"); Blue Cross of Idaho Health Service, Inc. "Blue Cross of Idaho" or "BC-ID"); Blue Cross and Blue Shield of Kansas, Inc. ("BCBS-KS"); Blue Cross and Blue Shield of Kansas City ("BCBS-KC"); Blue Cross and Blue Shield of Nebraska ("Blue Cross and Blue Shield of Nebraska"); Blue Cross Blue Shield of North Dakota, Noridian Mutual Insurance Company (collectively "Blue Cross and Blue Shield of North Dakota" or "Noridian"); Premier Health, Inc. ("Premier"); Blue Cross and Blue Shield of Wyoming ("BCBS-WY") or by any of their respective current or former subsidiaries or affiliates.

2.     Plaintiffs bring this action seeking redress for the illegal acts of Defendants which have resulted in a loss of Plaintiffs' property and a detriment to their businesses, and for declaratory and injunctive relief to end those practices and prevent further losses.  This action does not seek benefits or other remedies under the Federal Employee Health Benefits Act ("FEHBA"), nor does it arise under or relate to that act.

3.     While this action is based upon the relationships that exist between physicians and insurers rather than the relationship between patients and insurers, Plaintiffs are also motivated by their belief that Defendants' scheme is detrimental to the health of their patients and to the welfare of the general public.  By taking funds that have been rightfully earned by physicians and diverting them to their own use, Defendants deprive physicians of the adequate and timely payments they need to maintain their practices.

4.     As set forth below, the fundamental premise of the relationship between Defendants and the physicians who treat their Members, either pursuant to or without a contract, is that the physicians will be paid, in a timely manner, for the covered, medically necessary services they render in accordance with the rules established by CPT.  "Members" is not limited to persons with traditional indemnity insurance.  The term includes those persons as well as

participants and beneficiaries of health plans administered by Defendants, including but not limited to self-insured and ERISA-covered health plans administered by Defendants.

5.      Defendants deprive physicians of adequate and timely payment by covertly denying payments to physicians based on financially expedient cost and actuarial criteria rather than medical necessity, processing physicians' bills using automated programs which manipulate standard coding practices to artificially reduce the amount the physicians are paid, and by systematically delaying payments to gain extended use of the physicians' funds.

6.      Specifically, as described in detail below, Plaintiffs and class members provide medical services to Defendants' members on a fee-for-service basis, both pursuant to and without contracts.  These services are provided based upon the fundamental premise that, if the services are covered by Defendants and are medically necessary, Plaintiffs and class members will be compensated in a timely manner for rendering those services in accordance with CPT.

7.      Each fee-for-service contract Defendants enter into, as well as the accompanying materials they provide, represents that physicians will be paid in a timely manner for rendering covered, medically necessary services to Defendants' members in accordance with standard medical coding procedures.

8.      Defendants also represent to the medical profession at large that they will pay physicians in a timely manner for rendering covered, medically necessary services to their members in accordance with standard medical coding procedures.  These representations are made in numerous ways, including: (a) providing in their Members' plans or policies that physicians both within and without defined networks will be compensated for rendering covered, medically necessary services; (b) providing insurance cards to their Members to show treating physicians; (c) disseminating billing information to the profession at large; (d) confirming

coverage for medically necessary services when contacted by physicians prior to treatment; (e) insisting that payment requests describe the covered, medically necessary services rendered in a standard coded fashion; (f) explaining payments so as to make it appear that physicians are being paid for the covered, medically necessary services they render; and (g) operating in jurisdictions that require timely payment by law.

9.      In addition, although it goes to the heart of the relationship, and is necessary to prevent physicians from being misled by actions and statements, Defendants fail to disclose that the automated processing schemes described below will be used to deny, diminish and delay payment for covered, medically necessary services.  At best, Defendants state only that automated programs will be used to ensure compliance with CPT coding standards or "correct" improper coding and payment requests – yet another misrepresentation.

10.     With each payment request, all Defendants and co-conspirator Blue Plans required Plaintiffs and class members to submit a standard coded claim form, the HCFA-1500, which was developed by the Health Care Financing Administration ("HCFA") in conjunction with the American Medical Association ("AMA") for use in the Medicare and Medicaid programs.  This form requires that services performed and which compensation is sought be described by a CPT code, constitutes a further representation that physicians will be paid for rendering covered medically necessary services in accordance with standard medical coding practices.

11.     The HCFA/CMS-1500 form incorporates the AMA's Current Procedural Terminology, or CPT coding procedure, and includes a code identifying the diagnosis and procedure performed as well as modifiers for the degree of difficulty, complexity and multiplicity.

12.     The purpose of the coded information contained on the HCFA/CMS-1500 and other standard claim forms is to provide a uniform language that accurately describes the medical, surgical and diagnostic services a physician has rendered and for which he/she is to be paid, and to give Defendants or their designated payors the information they need to process a claim for payment.

13.     While Plaintiffs have submitted claims using proper CPT coding, Defendants have cheated Plaintiffs and other doctors by improperly changing the codes submitted to codes that pay less, without reference to any of the underlying facts behind the submitted claims, purely for the purpose of saving money for Defendants at the expense of doctors.

14.     As detailed below, each Plaintiff and Class Member has been injured as they have submitted claims, either directly to one of the Defendants or through the Blue Card Program, that have been improperly denied and/or reduced by Defendants.

15.     Each Plaintiff and class member has been injured in his or her business or property as a result of Defendants' scheme and conspiracy because each has received lesser amounts than they would have otherwise received.  In addition, Plaintiffs and Class members have relied upon Defendants' and/or their co-conspirators' representations, both express and implied, that they will be paid for rendering covered, medically necessary services as well as Defendants' and/or their co-conspirators omissions by, *inter alia,* providing those services and by requesting payment for those services from the Defendants or a designated payor in the manner required by the Defendants, *i.e.*, using the HCFA/CMS-1500 or other prescribed standard claims form and standardized coding and by not billing Defendants' members for such services.

16.     The uniform coding process embodied in these forms allows automated logic to be applied to physician payment requests, and rather than paying Plaintiffs and class members for covered, medically necessary services in accordance with standard coding practices, Defendants engage in a common fraudulent scheme designed to systematically deny, delay and diminish payments to Plaintiffs and class members using the devices and techniques set forth below.  Each of the Plaintiffs and class members has been victimized by one or more of the specific improper practices described below.

17.     Defendants, as part of a common scheme with their co-conspirators have agreed to deny, delay and reduce payments for medically necessary, covered services rendered by Plaintiffs and the Class.  Defendants' agreement benefits themselves as well as their co-conspirators as it allows them to share the cost-savings benefits of their wrongful payment practices, to maximize both their own profits and those of other Blue Plans at the expense Plaintiffs and the Class.

18.     Specifically, Defendants' agreement is evidenced by their creation and development of and participation in the Blue Card Program as well as through their creation and participation in NASCO.  The Blue Card and Program and NASCO allow Defendants and the Blues Plans to process claims centrally, utilizing their improper editing practices, and compete with other national insurance companies for those accounts at the expense of physicians.  It also allows them to share their improper practices which have been developed for use both nationally and locally in each Blue Plan's geographic territory, as well.  Defendants' fraudulent scheme is evidenced by each Defendant's and Blue Plan's agreement to share and use the same improper edits through NASCO and the NASCO claims processing system as well as by their agreement to utilize each other's improper editing practices through the Blue Card Program.

19.     Each Defendant, the Blue Cross Blue Shield Association ("BCBSA" or "Association") and every co-conspirator Blue Plan licensee is required to participate in the Blue Card Program Blue Card Program.  The BlueCard Program (discussed in detail below), allows enrollees in a given Blue Plan to have access to the services of physicians who participate in another Blue Plan.  The BlueCard Program also allows Defendants and each Blue Plan to compete for employers who have national or multi-state business or whose employees require healthcare services while they are out of state.

20.     Defendants, BCBSA and the co-conspirator Blue Plans have created and established rules governing the BlueCard Program that are set forth in the BlueCard Manual. The BlueCard Manual describes the requirements and agreements to allow each Defendant and Blue Plan to utilize each other's provider networks and claims processing systems to jointly adjudicate claims submitted by physicians.  BCBSA monitors compliance with the BlueCard Program rules can enforce fines and penalties if a plan does not adhere to such rules.

21.     As described more fully below, the BlueCard Program enables Defendants and every Blue Cross licensee a single electronic network to process and adjudicate provider. Through the Blue Card Program, which is run by Defendants, BCBSA and the co-conspirator Blue Plans, a Blue Cross member is able to receive care outside of his or her home licensee area. When care is rendered to a member through the BlueCard program, the provider submits the claim to his locally-contracted plan (the "Host" plan).  The Host plan receives the claim, determines the price to the provider based on the provider's contract and then submits the claim to the member's (the employer's) contracted plan (the "Home" plan).  The Home plan then adjudicates the provider's claim utilizes its edits or the edits established by Defendants, BCBSA and the Blue Plans through the National Account Service Company LLC ("NASCO").

22.     The Host plan then pays the provider according the provider's discounted fee schedule and the Home plan reimburses the Host plan and pays an access fee to the Host plan for the use of its provider network.

23.     Participation by Defendants and co-conspirators in the BlueCard Program – and the sharing of each other's discounts – is a *mandatory* for all Blue Cross licensees.  Moreover, there is direct evidence that Defendants and their co-conspirators, through participation in the Association and specific committees and organizations within the Association, have agreed to use specific, wrongful edits in the processing of their claims through BlueCard and NASCO and have discussed physician reimbursement issues, including their scheme to deny, delay and reduce reimbursement to physicians in contravention of their contracts, their representations to physicians and the CPT rules.

24.     The majority of the claims from the BlueCard program are processed by NASCO.  NASCO is a for-profit company created by the Blues to exclusively processes their national and/or BlueCard claims.  NASCO and the Blue Plans developed the NASCO Claims Processing System ("NPS") to process such claims.  NPS uses ClaimCheck as the automated claims processing software for all NASCO claims.

25.     Every Blue Plan that remains as a Defendant or that settled their claims either currently participates or has previously participated in NASCO and has had their claims processed and adjudicated using NPS.  Thus, every BCBS Plan agreed to have some portion of its claims processed through NASCO, using ClaimCheck software and an agreed-upon list of edits that is specific to NASCO members.  It is significant that Defendants and the Blue Plans are the only entities that belong to NASCO use the same NPS edits.  It is also significant that

NASCO members actually *jointly decide* which edits, including the improper edits that will be used, added, and changed in the ClaimCheck software.

26.     Moreover NASCO members have formed their own committee with McKesson, the entity that owns and licenses ClaimCheck and other similar claims adjudication software such as CodeReview.  During the Class Period, NASCO members and McKesson formed the NASCO ClaimCheck Advisory Committee to discuss the edits and share information concerning their claims practices.  Specifically, NASCO members vote on the edits that are used on NPS.  Based on such votes, as reflected in actual written ballots produced to Plaintiffs by NASCO, whatever decision the majority reaches is implemented through changes in ClaimCheck's edits.  This constitutes *direct evidence* that Defendants and their co-conspirators collectively decide what improper claims processing edits they will use and also which violate the American Medical Association's Current Procedural Terminology ("CPT").

27.     However, Defendants and their co-conspirator Blue Plans agreed to use improper edits to cheat doctors not only in their national business through NASCO and the Blue Card Program, but also agree to utilize such edits in their local business as well.  The Blue Plans, including Defendants, benefit from their agreement because the scheme allows them to compete more effectively in their local markets, which in turn strengthens the Blue Cross Blue Shield brand and accordingly strengthens the ability of the Blue Plans to collectively compete with national competitors.

28.     According to the Blue Cross Blue Shield Association, Defendants and their co-conspirator Blue Plans collectively insure over 100 million patients, or about one in three Americans.  Because this is such a large pool of patients, they are able to perpetuate this scheme through their combined economic power and market dominance.

## JURISDICTION AND VENUE

29.     This Court has jurisdiction over the subject matter of this action pursuant to 18 U.S.C. §§ 1961, 1962, 1964 and 28 U.S.C. §§ 1331 and 1367.   The Court has personal jurisdiction over the Defendants pursuant to 18 U.S.C. §§ 1965(b) and (d).

30.     Venue is proper in this district pursuant to 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b).

## PARTIES

## PLAINTIFFS

31.     Plaintiff Rick Love, M.D., an otolaryngologist, is a resident of Alabama and a citizen of the Untied States.   During the relevant time period Dr. Love has provided covered, medically necessary services to members of Blue Cross and Blue Shield of Alabama, and billed for same, pursuant to contract, and has been injured by Defendants' conduct as a result thereof. Dr. Love has also provided covered, medically necessary services to other Blue Cross and Blue Shield Plan members through the Blue Card Program and/or NASCO Program and has billed for same.   As set forth herein, Dr. Love has been injured in his business or property as a result of Defendants' fraudulent scheme and conspiracy.   Further detail of the specific claims Dr. Love has against Defendants will be provided in the Civil RICO Case Statement.

32.     Plaintiff Joe Frank Smith, M.D., an otolaryngologist, is a resident of Alabama and a citizen of the Untied States.   During the relevant time period Dr. Smith has provided covered, medically necessary services to members of Blue Cross and Blue Shield of Alabama, and billed for same, pursuant to contract, and has been injured by Defendants' conduct as a result thereof. Dr. Smith has also provided covered, medically necessary services to other Blue Cross and Blue Shield Plan members through the Blue Card Program and/or NASCO Program and has billed for same.   As set forth herein, Dr. Smith has been injured in his business or property as a result of

Defendants' fraudulent scheme and conspiracy, and has been injured by Defendants' conduct as a result thereof.  Further detail of the specific claims Dr. Smith has against Defendants will be provided in the Civil RICO Case Statement.

33.     Plaintiff Scott Elledge, M.D., an otolaryngologist, is a resident of Alabama and a citizen of the Untied States.  During the relevant time period Dr. Elledge has provided covered, medically necessary services to members of Blue Cross and Blue Shield of Alabama, and billed for same, pursuant to contract, and has been injured by Defendants' conduct as a result thereof.  Dr. Elledge has also provided covered, medically necessary medical services to other Blue Cross and Blue Shield Plan members through the Blue Card Program and/or NASCO Program and has billed for same.  As set forth herein, Dr. Elledge has been injured in his business or property as a result of Defendants' fraudulent scheme and conspiracy, and has been injured by Defendants' conduct as a result thereof.  Further detail of the specific claims Dr. Elledge has against Defendants will be provided in the Civil RICO Case Statement.

34.     Plaintiff Theodore Mazer, M.D., an otolaryngologist, is a resident of California and a citizen of the Untied States.  During the relevant time period Dr. Mazer has provided covered, medically necessary services to members of Blue Shield of California, and billed for same, pursuant to contract, and has been injured by Defendants' conduct as a result thereof.  Dr. Mazer has also provided covered, medically necessary medical services to other Blue Cross and Blue Shield Plan members through the Blue Card Program and/or NASCO Program and has billed for same.  As set forth herein, Dr. Mazer has been injured in his business or property as a result of Defendants' fraudulent scheme and conspiracy, and has been injured by Defendants' conduct as a result thereof.   Further detail of the specific claims Dr. Mazer has against Defendants will be provided in the Civil RICO Case Statement.

**DEFENDANTS**

35.     All of the substantive practices, policies and procedures of Defendants' health plans are established, implemented, monitored and ratified by Defendants themselves and their co-conspirators.  Local subsidiaries or affiliates of the named Defendants do not function as independent corporate entities but rather have an alter-ego relationship with the named Defendants and function as agents under Defendants' direction and control with respect to the practices at issue in this case.

36.     Whenever this Complaint alleges that any Defendant did any act or thing, it is meant that it, its directors, officers, agents or employees, or the directors, officers, agents or employees of its subsidiaries or affiliates performed or participated in such act or thing, and in each instance that such act or thing was authorized or ratified by, and done on behalf of, that Defendant.

**BLUE CROSS AND BLUE SHIELD OF ARIZONA, INC.**

37.     Defendant Blue Cross and Blue Shield of Arizona, Inc. is an Arizona corporation with its corporate headquarters located at 2444 W. Las Palmaritas Drive, Phoenix, Arizona.  It provides health care services to approximately 1 million enrollees in various health care plans statewide.  Blue Cross and Blue Shield of Arizona, Inc., its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Arizona" , "BCBSAZ" or "Arizona" in this Complaint.

38.     Defendant Blue Cross and Blue Shield of Arizona provides health services to the public on a statewide basis by offering and operating health care plans.

39.     At all relevant times all Blue Cross and Blue Shield of Arizona entities and the Blue Cross and Blue Shield of Arizona health care plans were the agents of the other Blue Cross and Blue Shield of Arizona entities and health care plans, and in committing the acts alleged

herein they acted within the scope of their agency, with the consent, permission, authorization and knowledge of the others, and in furtherance of both their interest and the interests of other Defendants they aided and abetted, and with whom they conspired, as set forth below.   In addition, the actions alleged herein were ratified and approved by the other Blue Cross and Blue Shield of Arizona entities and plans even though they may have been contrary to corporate policy.

## ARKANSAS BLUE CROSS AND BLUE SHIELD

40.     Defendant Arkansas Blue Cross and Blue Shield ("Arkansas BCBS" or "Arkansas") is an Arkansas corporation with its corporate headquarters located at 601 South Gaines Street, Little Rock, Arkansas.  It is the parent corporation of a number of subsidiaries that provide health care services to approximately 860,000 enrollees in various health care plans statewide.  Arkansas Blue Cross and Blue Shield, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Arkansas" in this Complaint.

41.     Defendant Blue Cross and Blue Shield of Arkansas provides health services to the public on a statewide basis by offering and operating health care plans.

42.     At all relevant times all Blue Cross and Blue Shield of Arkansas entities and the Blue Cross and Blue Shield of Arkansas health care plans were the agents of the other Blue Cross and Blue Shield of Arkansas entities and health care plans, and in committing the acts alleged herein they acted within the scope of their agency, with the consent, permission, authorization and knowledge of the others, and in furtherance of both their interest and the interests of other Defendants they aided and abetted, and with whom they conspired, as set forth below.  In addition, the actions alleged herein were ratified and approved by the other Blue Cross and Blue Shield of Arkansas entities and plans even though they may have been contrary to corporate policy.

## BLUE SHIELD OF CALIFORNIA

43.     Defendant Blue Shield of California is a California corporation with its corporate headquarters located at 50 Beale Street, San Francisco, California.  It is the parent corporation of a number of subsidiaries that provide health care services to approximately 3.2 million enrollees in various health care plans statewide.

44.     Blue Shield of California Life & Health Insurance Company is a California corporation with its headquarters located at 50 Beale Street, San Francisco, California.

45.     Blue Shield of California and Blue Shield of California Life & Health Insurance Company and their subsidiaries and health care plans are collectively referred to as "Blue Shield of California" in this Complaint.

46.     Defendant Blue Shield of California provides health services to the public on a statewide basis by offering and operating health care plans.

47.     At all relevant times all Blue Shield of California entities and the Blue Shield of California health care plans were the agents of the other Blue Shield of California entities and plans, and in committing the acts alleged herein they acted within the scope of their agency, with the consent, permission, authorization and knowledge of the others, and in furtherance of both their interest and the interests of other Defendants they aided and abetted, and with whom they conspired, as set forth below.  In addition, the actions alleged herein were ratified and approved by the other Blue Shield of California entities and plans even though they may have been contrary to corporate policy.

## BCBSD, INC.

48.     Defendant BCBSD, Inc., doing business as "Blue Cross and Blue Shield of Delaware," is a Delaware corporation with its corporate headquarters located at One Brandywine Gateway, Wilmington, Delaware.  BCBSD, Inc. is a wholly-owned subsidiary of CareFirst, Inc.

that provides health care services to enrollees in various health care plans. BCBSD, Inc., its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Delaware" or "BCBSD" in this Complaint.

49.     Defendant Blue Cross and Blue Shield of Delaware provides health services to the public on a statewide basis by offering and operating health care plans in the State of Delaware.

50.     At all relevant times all Blue Cross and Blue Shield of Delaware entities and the Blue Cross and Blue Shield of Delaware health care plans were the agents of the other Blue Cross and Blue Shield of Delaware entities and plans, and in committing the acts alleged herein they acted within the scope of their agency, with the consent, permission, authorization and knowledge of the others, and in furtherance of both their interest and the interests of other Defendants they aided and abetted, and with whom they conspired, as set forth below. In addition, the actions alleged herein were ratified and approved by the other Blue Cross and Blue Shield of Delaware entities and plans even though they may have been contrary to corporate policy.

## BLUE CROSS AND BLUE SHIELD OF KANSAS, INC.

51.     Defendant Blue Cross and Blue Shield of Kansas, Inc. is a Kansas corporation with its corporate headquarters located at 1133 SW Topeka Boulevard, Topeka, Kansas. Blue Cross and Blue Shield of Kansas, Inc. provides health care services to approximately 897,000 enrollees in various health care plans statewide. Blue Cross and Blue Shield of Kansas, Inc., its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Kansas" or "Kansas" in this Complaint.

52.     Defendant Blue Cross and Blue Shield of Kansas provides health services to the public on a statewide basis by offering and operating health care plans.

53.     At all relevant times all Blue Cross and Blue Shield of Kansas entities and the Blue Cross and Blue Shield of Kansas health care plans were the agents of the other Blue Cross and Blue Shield of Kansas entities and plans, and in committing the acts alleged herein they acted within the scope of their agency, with the consent, permission, authorization and knowledge of the others, and in furtherance of both their interest and the interests of other Defendants they aided and abetted, and with whom they conspired, as set forth below.   In addition, the actions alleged herein were ratified and approved by the other Blue Cross and Blue Shield of Kansas entities and plans even though they may have been contrary to corporate policy.

## PREMIER HEALTH INC.

54.     Defendant Premier Health Inc. is a Kansas corporation with its corporate headquarters located at 1133 SW Topeka Boulevard, Topeka, Kansas.  Premier Health Inc. is a subsidiary of Blue Cross Blue Shield of Kansas and provides health care services to approximately 700,000 enrollees in various health care plans statewide.  Blue Cross Blue Shield of Kansas and Premier Health Inc., their subsidiaries and health care plans are collectively referred to as "Blue Cross Blue Shield of Kansas", "Premier Health Inc." or "Premier" in this Complaint.

55.     Defendant Premier Health Inc. provides health services to the public on a statewide basis by offering and operating health care plans.

56.     At all relevant times all Premier Health Inc. entities and the Premier Health Inc. health care plans were the agents of the other Premier Health entities and plans, and in committing the acts alleged herein they acted within the scope of their agency, with the consent, permission, authorization and knowledge of the others, and in furtherance of both their interest and the interests of other Defendants they aided and abetted, and with whom they conspired, as

set forth below.  In addition, the actions alleged herein were ratified and approved by the other Premier Health entities and plans even though they may have been contrary to corporate policy.

## BLUE CROSS AND BLUE SHIELD OF KANSAS CITY

57.     Defendant Blue Cross and Blue Shield of Kansas City ("BCBSKC") is a Missouri corporation with its corporate headquarters located at 2301 Main Street, One Pershing Square, Kansas City, Missouri. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 880,000 enrollees in various health care plans statewide.  Blue Cross and Blue Shield of Kansas City, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Kansas City" in this Complaint.

58.     Defendant Blue Cross and Blue Shield of Kansas City provides health services to the public on a statewide basis by offering and operating health care plans.

59.     At all relevant times all Blue Cross and Blue Shield of Kansas City entities and the Blue Cross and Blue Shield of Kansas City health care plans were the agents of the other Blue Cross and Blue Shield of Kansas entities and plans, and in committing the acts alleged herein they acted within the scope of their agency, with the consent, permission, authorization and knowledge of the others, and in furtherance of both their interest and the interests of other Defendants they aided and abetted, and with whom they conspired, as set forth below.  In addition, the actions alleged herein were ratified and approved by the other Blue Cross and Blue Shield of Kansas City entities and plans even though they may have been contrary to corporate policy.

## BLUE CROSS AND BLUE SHIELD OF NEBRASKA

60.     Defendant Blue Cross and Blue Shield of Nebraska is a Nebraska corporation with its corporate headquarters located at 7261 Mercy Road, Omaha, Nebraska.  Blue Cross and Blue Shield of Nebraska provides health care services to approximately 717,000 enrollees in

various health care plans statewide.  Blue Cross and Blue Shield of Nebraska, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Nebraska" or "Nebraska" in this Complaint.

61.     Defendant Blue Cross and Blue Shield of Nebraska provides health services to the public on a statewide basis by offering and operating health care plans.

62.     At all relevant times all Blue Cross and Blue Shield of Nebraska entities and the Blue Cross and Blue Shield of Nebraska health care plans were the agents of the other Blue Cross and Blue Shield of Nebraska entities and plans, and in committing the acts alleged herein they acted within the scope of their agency, with the consent, permission, authorization and knowledge of the others, and in furtherance of both their interest and the interests of other Defendants they aided and abetted, and with whom they conspired, as set forth below.   In addition, the actions alleged herein were ratified and approved by the other Blue Cross and Blue Shield of Nebraska entities and plans even though they may have been contrary to corporate policy.

## HEALTHNOW NEW YORK, INC.

63.     Defendant HealthNow New York, Inc. is a New York corporation with its corporate headquarters located at 257 West Genesee Street, Buffalo, New York.  HealthNow New York, Inc. provides health care services to approximately 815,000 enrollees in various health care plans statewide.  HealthNow New York, Inc., its subsidiaries and health care plans are collectively referred to as "HealthNow New York" in this Complaint.

64.     Defendant HealthNow New York provides health services to the public on a statewide basis by offering and operating health care plans.

65.     Defendant HealthNow also does business through two subsidiaries, BlueCross BlueShield of Western New York and BlueShield of Northeastern New York.

66.     HealthNow d/b/a BlueCross BlueShield of Western New York is a New York corporation with its corporate headquarters located at 257 West Genesee Street, New York. BlueCross BlueShield of Western New York provides health care services to more than 571,000 enrollees in various health care plans across the Buffalo-Niagara region. BlueCross BlueShield of Western New York provides health services to the public on a regional basis by offering and operating health care plans in the Buffalo-Niagara region.

67.     HealthNow d/b/a BlueShield of Northeastern New York is a New York corporation with its corporate headquarters located at 30 Century Hill Drive, Latham, New York. BlueShield of Northeastern New York provides health care services to more than 170,000 enrollees in various health care plans across the Capital region. BlueShield of Northeastern New York provides health services to the public on a regional basis by offering and operating health care plans in the Capital region.

68.     At all relevant times all HealthNow New York entities and the HealthNow New York health care plans, including Blue Cross of Western New York and Blue Cross of Northeastern New York, were the agents of the other HealthNow New York entities and plans, and in committing the acts alleged herein they acted within the scope of their agency, with the consent, permission, authorization and knowledge of the others, and in furtherance of both their interest and the interests of other Defendants they aided and abetted, and with whom they conspired, as set forth below. In addition, the actions alleged herein were ratified and approved by the other HealthNow New York entities and plans even though they may have been contrary to corporate policy.

**BLUE CROSS OF IDAHO HEALTH SERVICE, INC.**

69.     Defendant Blue Cross of Idaho Health Service, Inc. is an Idaho corporation with its corporate headquarters located at 3000 E. Pine Avenue, Meridian, Idaho. Blue Cross of Idaho

Health Service, Inc. provides health care services to approximately 300,000 enrollees in various health care plans statewide.  Blue Cross of Idaho Health Service Inc., its subsidiaries and health care plans are collectively referred to as "Blue Cross of Idaho" or "Idaho" in this Complaint.

70.     Defendant Blue Cross of Idaho provides health services to the public on a statewide basis by offering and operating health care plans.

71.     At all relevant times all Blue Cross of Idaho entities and the Blue Cross of Idaho health care plans were the agents of the other Blue Cross of Idaho entities and plans, and in committing the acts alleged herein they acted within the scope of their agency, with the consent, permission, authorization and knowledge of the others, and in furtherance of both their interest and the interests of other Defendants they aided and abetted, and with whom they conspired, as set forth below.  In addition, the actions alleged herein were ratified and approved by the other Blue Cross of Idaho entities and plans even though they may have been contrary to corporate policy.

**BLUE CROSS BLUE SHIELD OF NORTH DAKOTA**

72.     Defendant Blue Cross Blue Shield of North Dakota is a North Dakota corporation with its corporate headquarters located at 4510 13th Avenue South, Fargo, North Dakota.  Blue Cross Blue Shield of North Dakota provides health care services to approximately 400,000 enrollees in various health care plans statewide.

73.     Defendant Blue Cross and Blue Shield of North Dakota provides health services to the public on a statewide basis by offering and operating health care plans.

74.     At all relevant times all Blue Cross and Blue Shield of North Dakota and entities and the Blue Cross and Blue Shield of North Dakota health care plans were the agents of the other Blue Cross and Blue Shield of North Dakota entities and plans, and in committing the acts alleged herein they acted within the scope of their agency, with the consent, permission,

authorization and knowledge of the others, and in furtherance of both their interest and the interests of other Defendants they aided and abetted, and with whom they conspired, as set forth below.  In addition, the actions alleged herein were ratified and approved by the other Blue Cross and Blue Shield of North Dakota entities and plans even though they may have been contrary to corporate policy.

## NORIDIAN MUTUAL INSURANCE COMPANY

75.     Defendant Noridian Mutual Insurance Company is a North Dakota corporation with its corporate headquarters located at 4510 13th Avenue South, Fargo, North Dakota. Noridian Mutual Insurance Company is a subsidiary of Blue Cross Blue Shield of North Dakota and provides health care services to approximately 400,000 enrollees in various health care plans statewide.  Blue Cross Blue Shield of North Dakota and Noridian Mutual Insurance Company, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of North Dakota" or "North Dakota" in this Complaint.

76.     Defendant Blue Cross and Blue Shield of North Dakota provides health services to the public on a statewide basis by offering and operating health care plans.

77.     At all relevant times all Blue Cross and Blue Shield of North Dakota entities and the Blue Cross and Blue Shield of North Dakota health care plans were the agents of the other Blue Cross and Blue Shield of North Dakota entities and plans, and in committing the acts alleged herein they acted within the scope of their agency, with the consent, permission, authorization and knowledge of the others, and in furtherance of both their interest and the interests of other Defendants they aided and abetted, and with whom they conspired, as set forth below.  In addition, the actions alleged herein were ratified and approved by the other Blue Cross

and Blue Shield of North Dakota entities and plans even though they may have been contrary to corporate policy.

## BLUE CROSS & BLUE SHIELD OF WYOMING

78.    Defendant Blue Cross & Blue Shield of Wyoming is a Wyoming corporation with its corporate headquarters located at 4000 House Avenue, Cheyenne, Wyoming.  Blue Cross & Blue Shield of Wyoming provides health care services to approximately 100,000 enrollees in various health care plans statewide.  Blue Cross & Blue Shield of Wyoming, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Wyoming" or "Wyoming" in this Complaint.

79.    Defendant Blue Cross and Blue Shield of Wyoming provides health services to the public on a statewide basis by offering and operating health care plans.

80.    At all relevant times all Blue Cross and Blue Shield of Wyoming entities and the Blue Cross and Blue Shield of Wyoming health care plans were the agents of the other Blue Cross and Blue Shield of Wyoming entities and plans, and in committing the acts alleged herein they acted within the scope of their agency, with the consent, permission, authorization and knowledge of the others, and in furtherance of both their interest and the interests of other Defendants they aided and abetted, and with whom they conspired, as set forth below.  In addition, the actions alleged herein were ratified and approved by the other Blue Cross and Blue Shield of Wyoming entities and plans even though they may have been contrary to corporate policy.

## FACTUAL ALLEGATIONS AGAINST ALL DEFENDANTS

### STANDARDIZED TERMS

81.    Defendants and their co-conspirators consistently represent in their provider agreements, their standard physicians' manuals, and other standard brochures and materials

provided to class members that physicians will be paid in a timely manner for rendering covered, medically necessary services to enrollees in Defendants' and health plans and other Blue Plans, in accordance with CPT standards.

82.     Arkansas BCBS corporate designees have testified that Arkansas utilizes a standard form contract with its providers.  Arkansas contract contains standardized terms and conditions and Arkansas does not allow physicians to negotiate the terms and conditions contained in the agreement.  During the Class Period, Arkansas participated in BCBSA communications and surveys concerning provider contracts.

83.     Blue Cross and Blue Shield of Arizona corporate designees have testified that BCBSAZ utilizes a standard form contract with its providers.  The Arizona contract contains standardized terms and definitions, is used across various lines of business and the form contract is reviewed by Arizona's network operations department.  Arizona does not allow physicians to negotiate the terms and conditions contained in the agreement.  During the Class Period, Arizona participated in BCBSA communications and surveys concerning provider contracts.

84.     Blue Shield of California utilizes a standard form contract.  Blue Shield of California does not allow physicians to negotiate the terms and conditions contained in the agreement.  During the Class Period, Blue Shield of California participated in BCBSA communications and surveys concerning provider contracts.  Indeed, Blue Shield, the other Defendants and their co-conspirators have been actively involved in the BCBSA's Provider Contracting Work Group and strategy sessions.  A February, 2003 meeting of Defendant Blue Shield of California and other co-conspirator Blue Cross plans, including, Illinois, Rhode Island, Massachusetts, Minnesota, Florida, New Mexico, Michigan, Texas, Horizon and BCBSA specifically evidence Defendants' and the Blue Plans agreement to utilize standardizes their

provider contracts as well as their efforts to ensure consistency amongst the Blue Plans concerning contracting and negotiating with physicians.  Specifically, the presentation at this meeting states that the "Provider Strategy and Physician Negotiation Process and Approach: Individual/ Small Physician Groups – Boilerplate Agreement – No Negotiated Changes… Large Physician Groups (IPA/PHO) – Handled By Provider Contracting – Boilerplate Agreement – Minor Changes May Be Negotiated."

85.     BCBSD corporate designees have testified that BCBSD utilizes a standard form contract that contains uniform terms and conditions.  During the Class Period, BCBSD participated in BCBSA communications and surveys concerning provider contracts.  Although BSBSD claims to allow certain  physicians to negotiate specific terms and conditions or "special deals", the terms at issue in this lawsuit are not subject to negotiation and the percentage of physicians who BCBSD actually allows to negotiate terms and conditions is minute percentage of providers.  Indeed, the overwhelming majority of providers are provided with the form provider contract though the mail which they complete and return to BCBSD.

86.     HealthNow utilizes three basic form standard contracts; a physician agreement, a medical group agreement and an IPA agreement.  HealthNow does not allow physicians to negotiate the terms and conditions contained in any of these agreements.  During the Class Period, HealthNow participated in BCBSA communications and surveys concerning provider contracts.

87.     Blue Cross of Idaho utilizes a standard form contract.  Idaho does not allow physicians to negotiate the terms and conditions contained in the agreement.  During the Class Period, Idaho participated in BCBSA communications and surveys concerning provider contracts.

88.     Kansas/ Premier utilizes a "form" or "template" contract.  Kansas does not allow physicians to negotiate the terms contained in the agreement.  During the Class Period, Kansas/ Premier participated in BCBSA communications and surveys concerning provider contracts.

89.     BCBSKC likewise utilizes standardized contracts with its physicians.  During the Class Period, BCBSKC participated in BCBSA communications and surveys concerning provider contracts.

90.     Blue Cross of Nebraska utilizes a standard form contract.  Nebraska does not allow physicians to negotiate the terms and conditions contained in the agreement.   During the Class Period, Nebraska participated in BCBSA communications and surveys concerning provider contracts.

91.     Blue Cross of North Dakota utilizes a standard form contract.  North Dakota not allow physicians to negotiate the terms and conditions contained in the agreement.  During the Class Period, North Dakota participated in BCBSA communications and surveys concerning provider contracts.

92.     In creating its contracts, Blue Cross Wyoming specifically relied upon contracts from other Blue Plans as well as certain "form" provisions that were required from the BCBSA.  Blue Cross Wyoming does not allow participating physicians to negotiate their standard form contracts.   During the Class Period, Wyoming participated in BCBSA communications and surveys concerning provider contracts.

93.     Likewise, Defendants uniformly represent to physicians that they will be paid for rendering medically necessary, covered services to enrollees in Blue Plans.  For example, Arizona's provider contracts state that physicians are only to bill BCBSAZ for medically-necessary, covered services.  Blue Shield of California's contracts define "covered services" as

"medically necessary healthcare services…," and Blue Shield of California's Policy Manual states "Providers agree to accept Blue Shield allowances as payment in full for covered services on all plans…"  HealthNow's standard form provider agreements define covered services as "all Medically Necessary service available to a Covered Person…".  Noridian has a uniform fee schedule and its provider contracts all define "medically necessary" the same.  Likewise, BCBSKC's contracts state that its "policy is to adjudicate claims consistent with CPT coding procedures."

94.     Defendants and co-conspirator Blue Plans all uniformly require Plaintiffs and other class members to use a HCFA-1500 (also referred to as the CMS-1500) form in submitting paper claims, and also uniformly require that electronic claims be submitted using a format known as ANSI.  Physicians are required to submit claims using "CPT procedure codes" and "ICD-9 diagnosis codes."  Blue Cross Arizona, BCBSD, HealthNow, Nebraska, North Dakota BCBSKC, Wyoming, Kansas and Arkansas, produced documentary evidence or have testified to the requiring the use of CPT codes with a HCFA 1500.  The use of CPT codes for billing is standardized across all Defendants and all the Blue Plans.  The CPT code indicates to the insurer the services provided by the physician.  CPT codes are standard descriptors for terminology produced by the AMA, and the use of CPT codes for claims processing is a common, industry-wide practice.  It is this uniform coding process which allows automated edits to be applied to physicians across-the-board.  Moreover, Blue Plans' uniform requirement that physicians bill for services using CPT coding procedures misleads physicians into believing that they will accordingly be paid for what they billed and in a manner that is consistent with CPT coding.

95.     As is discussed below, physicians' compliance with this requirement, continuing to treat enrollees in Blue Plans' and continuing to attempt to be paid for them in accordance with

CPT standards by billing for those services using CPT codes is circumstantial evidence that physicians rely upon Blue Plans' uniform misrepresentations that they will be paid in accordance with CPT.

96.     CPT procedure codes include codes for, among other things, office visits, that vary based on the complexity or length of the office visit. These "evaluation and management" codes are commonly called "E/M codes." The data contained on a HCFA-1500 form are simply code numbers and do not contain anything that would allow a benefit analyst or claims processor to make a distinction between the a "5", a "3", a "2" or a "1" E/M code, or to determine whether the service that was provided was medically necessary, or, for that matter, to determine whether the service that is reported on the claim form to have been performed was or was not performed, or at what level of complexity. Thus, the "medical review" based upon the HCFA-1500 form is illusory.

97.     CPT is the industry-wide accepted standard for provider reimbursement, and the Plans' uniform requirement that physicians bill for services using CPT coding procedures, also discussed below, further misleads physicians into believing that they will be paid in a manner that is consistent with CPT protocols. The Blues fail to disclose that, to the contrary, physician claims are in fact paid in a manner that is inconsistent with CPT.

98.     Documents and testimony demonstrate that CPT is the industry-wide accepted standard for provider reimbursement. In fact, in 1998, David J. Rullo, M.D., Medical Director for HBO & Company (also known as HBOC, now known as McKesson, the manufacturer of the claims processing program ClaimCheck) prepared a document in which he expressly stated that "[t]he CPT Manual and its guidelines are not *just for reporting codes, rather they are the standard in the industry for procedural coding on which providers' reimbursement is based*."

In this document, which discussed the need for McKesson's claims adjudication software products to support one code editing policy, Dr. Rullo endorsed compliance with CPT guidelines, in part based on the fact that CPT was the industry standard. Thus, the requirement that physicians bill in accordance with CPT carries with it the representation that physicians will, in turn, be *paid* in accordance with CPT.

99.    Indeed, a witness from a co-conspirator Blue Plan, Richard J. Maiorisi, stated he is familiar with the term "industry standard contract," a term which he defined as meaning that "we're paying according to CPT codes. We use AMA guidelines for correct coding. That a standard contract – industry standard – is there'd be termination clauses. You put out in the contract how you are going to compensate physicians."

## DEFENDANTS' WRONGFUL PAYMENT PRACTICES

### Plaintiffs Are Denied Rightful Payment Through Improper Bundling, Downcoding, and Failure to Recognize Modifiers.

100.    Despite the representations they make to physicians, which are central to the physicians' provision of care and expectations regarding reimbursement, Defendants and co-conspirator Blue Plans agreed and have knowingly and systematically implemented practices and procedures which are designed to ensure that payment decisions are based on criteria unrelated to medical necessity and that payments and reimbursements are reduced, delayed and denied in a manner that is inconsistent with CPT standards. Defendants on their own and as part of a common scheme with the co-conspirator Blue Plans, also systematically deny, delay, and diminish the payments due to physicians so that they are not paid in a timely manner for the covered, medically necessary services they render. Defendants and the Blue Plans likewise fail to disclose that they have implemented systematic claims processes to manipulate the codes

submitted by Individual Plaintiffs and class members by 'downcoding' or 'bundling' claims in violation of CPT.

101.    Defendants and their co-conspirators have conspired to reimburse Plaintiffs and class members in a manner inconsistent with AMA guidelines and CPT standards, and not based on medical necessity or the codes providers have submitted, using automatic edits created for the purpose of increasing Defendants' and co-conspirator Blue Plans' financial bottom line rather than ensuring CPT compliance.  As detailed below, Defendants and co-conspirator Blue Plans fail to disclose the truth about their payment policies and practices to physicians.

**Defendants' Automated Downcoding and Bundling**

102.    During the Class Period, Defendants and co-conspirator Blue Plans agreed to implement certain systematic claims processes to manipulate the CPT codes contained in the claims forms submitted by Individual Plaintiffs and class members by "downcoding" or "bundling" claims.  To accomplish their scheme, Defendants purchased and/or licensed software sold and licensed by McKesson HBOC, or other comparable software programs that were capable of modifying CPT code protocols set by the American Medical Association and improperly adjudicated physician claims which injured plaintiffs and the Class.

103.    Blue Cross Blue Shield Arkansas utilizes McKesson's CodeReview as the claims processing system to auto-adjudicate provider claims.   Documents produced by Arkansas evidence that CodeReview auto-adjudicates claims and is programmed so that it can bundle claims submitted by physicians.

104.    Blue Cross Arizona ("BCBSAZ") utilizes McKesson's ClaimCheck as the claims processing system to auto-adjudicate provider claims and has used it continually since the early 1990s.   Arizona witnesses have testified that ClaimCheck auto-adjudicates claims and is programmed so that it can downcode and bundle claims submitted by physicians.   Arizona's

2000 provider manual specifically states that with respect to claims coding, BCBSAZ's edit capabilities are designed to detect primary types of coding manipulations – procedure unbundling, separate billing for incidental services, mutually exclusive procedures, and, most notably patient's age and sex edits *correct use of the CPT-4 coding rules*.  Arizona further represents in its provider manuals and in other documents that coding rules have been set up by the AMA for the correct use of CPT-4 coding structure, further implying that BCBSAZ follows CPT in adjudicating provider claims.  However, contrary to such representations, Arizona does not adjudicate claims consistent with the CPT coding rules, the CPT Manual or the CPT Codes, Guidelines and Conventions.

105.    Blue Shield of California ("Blue Shield") uses McKesson's Claimcheck for its processing system to auto-adjudicate provider claims.  Blue Shield witnesses have testified that ClaimCheck auto-adjudicates claims and is programmed so that it can downcode and bundle claims submitted by physicians. Moreover, Blue Shield utilizes McKesson's Claimcheck for "home" Blue Card claims and NASCO's Claimcheck for host Blue Card processing.  Blue Shield has represented that it recognizes and follows CPT Codes, Guidelines and Conventions in adjudicating physician claims.  Blue Shield's 2001 Provider Manual specifically states the purported purpose of its prepayment claim review as follows: Blue Shield Providers are expected to follow professionally accepted, ethical billing practices.  … Our monitoring program is designed to detect billing irregularities, *including 'unbundling' of services and procedure coding inconsistent with current CPT guidelines.*" (Emphasis Added).  However, contrary to such representations, Blue Shield does not adjudicate claims consistent with the CPT coding rules, the CPT Manual or the CPT Codes, Guidelines and Conventions.  Blue Shield's national

account claims are processed using the Blue Card Program and NASCO and participates in Blue Card meetings.

106.    BCBSD, Inc. ("BCBSD") utilizes McKesson's CodeReview as the claims processing system to auto-adjudicate provider claims.  CodeReview auto-adjudicates claims and is programmed so that it can downcode and bundle claims submitted by physicians.  Indeed, a document produced by BCBSD from McKesson dated May 30, 2001 describes McKesson's Code Review Policy Manual relied upon by BCBSD.  The Code Review Policy Manual represents that the Code Review software is designed to identify and correct inappropriate CPT coding submitted by physicians.  The Code Review Policy Manual further represents that the policies set forth in the software are based on the CPT Manual.  Contrary to such representations, BCBSD does not adjudicate claims consistent with the CPT Manual or CPT Codes, Guidelines and Conventions.    BCBSD's national account claims are processed using the Blue Card Program, and BCBSD participates in Blue Card meetings.

107.    Healthnow utilizes Trizetto's Facets as its claims processing system to auto-adjudicate provider claims.  Documents demonstrate that Facets auto-adjudicates claims and is programmed so that it can downcode and bundle claims submitted by physicians.  HealthNow's national account claims are processed using the Blue Card Program and NASCO, and HealthNow participates in Blue Card meetings.

108.    Blue Cross Idaho utilized Trizetto's Facets and McKesson's Claimcheck to auto-adjudicate provider claims.  Facets auto-adjudicates claims and is programmed so that it can downcode and bundle claims submitted by physicians.  Blue Cross Idaho's national account claims are processed using the Blue Card Program and NASCO and participates in Blue Card meetings.

109.    Blue Cross of Kansas ("Kansas") corporate representatives have testified that Kansas utilizes McKesson's Claimcheck software as the claims processing system to auto-adjudicate provider claims.  ClaimCheck auto-adjudicates claims and is programmed so that it can downcode and bundle claims submitted by physicians.  Kansas auto-adjudicates its claims and automatically downcodes and bundles claims submitted by physicians using ClaimCheck. Kansas's national account claims are processed using the Blue Card Program and NASCO, and Kansas participates in Blue Card meetings.

110.    Blue Cross Kansas City utilized McKesson ClaimCheck and Trizetto Facets software for their claims processing system to auto-adjudicate provider claims.  Kansas City's software auto-adjudicates claims and is programmed so that it can downcode and bundle claims submitted by physicians.  Blue Cross Kansas City's national account claims are processed using the Blue Card Program and NASCO, and Blue Cross Kansas City participates in Blue Card meetings. Moreover, BCBSKC's contracts state that its "policy is to adjudicate claims consistent with CPT coding procedures.  BCBSKC's contracts state that its "policy is to adjudicate claims consistent with CPT coding procedures."  Contrary to such representations, BCBSKC does not adjudicate claims consistent with the CPT Manual or CPT Codes, Guidelines and Conventions.

111.    Blue Cross Nebraska utilized McKesson's Code Review as its claims processing system to auto-adjudicate provider claims.  CodeReview auto-adjudicates claims and is programmed so that it can downcode and bundle claims submitted by physicians.  Blue Cross Nebraska's national account claims are processed using the Blue Card Program and NASCO, and Blue Cross Nebraska participates in Blue Card meetings.

112.    Blue Cross North Dakota utilizes a home grown system as its claims processing system to auto-adjudicate provider claims.  North Dakota's software auto-adjudicates claims and

is programmed so that it can downcode and bundle claims submitted by physicians. Blue Cross North Dakota's national account claims are processed using the Blue Card Program and NASCO, and Blue Cross North Dakota participates in Blue Card meetings.

113.    Blue Cross Wyoming utilizes Defendant Blue Cross Blue Shield of North Dakota's claims processing system to auto-adjudicate its claims. North Dakota's software used for Wyoming claims auto-adjudicates claims and is programmed so that it can downcode and bundle claims submitted by physicians. Blue Cross of Wyoming's national account claims are processed using the Blue Card Program, and Blue Cross of Wyoming participates in Blue Card Executive meetings, annual meetings and Blue Card user group meetings.

114.    "Downcoding" is a process by which an automated claims processing program denies or diminishes the payment of claims submitted by physicians by arbitrarily, and without prior notice, changing the code assigned to a particular service to a less expensive one.

115.    "Bundling" is a process by which an automated claims processing program denies or diminishes the payment of claims submitted by physicians by arbitrarily, and without prior notice, combining the codes of two or more procedures into one.

116.    These processes are not used, as Defendants would have it, to correct improper coding, but to cheat physicians out of payment for services rendered.

**Refusal To Recognize Modifiers**

117.    Defendants' automated processing systems also manipulate the data contained on HCFA/CMS-1500 or other standard claims forms by refusing to recognize "modifiers" – codes that indicate the degree of multiplicity, complexity or difficulty of the evaluation or procedure at issue.

118.    Rather than compensate Individual Plaintiffs and class members for the enhanced level of service reflected by these enhancement codes, or inquire into the appropriateness of such codes on the basis of medical necessity, Defendants simply ignore them.

119.    Nothing in standard coding guidelines requires the submission of additional documentation when modifiers are used, or permits them to be ignored without justification.

### Intentional Delay of Payments

120.    In addition to denying and diminishing payments to Individual Plaintiffs and class members, Defendants and their co-conspirators also intentionally delay them and do not pay interest on such claims.

121.    Defendants, directly on their own claims systems as well as through the Blue Card Program and NASCO delay payments and fail to pay interest on such claims.

122.    Defendants employ automated programs that "pend" claims, *i.e.*, put them in a state of suspense before they are processed, even though no additional information is needed or requested from Individual Plaintiffs and class members.

123.    The end result is that average payment times exceed by multiples the time provided for by law in most states, as well as the time set by contract and industry practice.  This provides the Defendants with a significant "float" - a valuable extended time of use of such funds - and deprives Individual Plaintiffs and class members of the time value of their money as well as one of the incentives to treat patients at reduced rates in a managed care context.

### Denial of Payment Requests Based
### Upon Cost Criteria

124.    Defendants secretly do not use "medical necessity" as the criteria for making payment decisions.  Instead, they use cost-based or other actuarial criteria unrelated to medical necessity to approve or deny claims submitted by Individual Plaintiffs and the class.  For

example, the Plans routinely and automatically deny payment for certain CPT codes without any inquiry into or analysis of medical necessity. These undisclosed, cost-based criteria include Defendants' own guidelines and criteria as well as guidelines developed in concert with third parties, including but not limited to Consortium, Milliman & Robertson and InterQual.

125.    Defendants systematically deny valid claims submitted for payment by Individual Plaintiffs and class members on this basis.

### Defendants and Co-Conspirator Blue Plans Further the Goals of the Conspiracy By Requiring Physicians to Provide Services to Other Blue Plans

126.    Plaintiffs and Class Members are required to provide services to Defendants' members as well as those members of other Blue Plans. Again, this policy is implemented and enforced by for the purpose of strengthening the Blue Cross and Blue Shield brand at the expense of physicians, by increasing the competitiveness of every Blue Plan across the country within their own markets (by ignoring their own bottom line by cheating doctors) and by enabling Blue Plans to provide services and compete for the business of employers who themselves have national business or require their employees to travel out of state by saving monies through improper practices.

127.    National Accounts are those Blue Cross and Blue Shield accounts with employers who are based in one state but have employees in other states. As set forth above, A "Home" plan is a Blue Cross plan where the health benefits for the particular member originate. This is also the plan that contracts with the employer regarding the coverage for its employees. The "Host" plan is the Blue Cross plan who contracts with the provider in the state where the provider is located and where the member obtains the provider's services. As part of the Blue Card process, the "Home" plan utilizes its edits or the NASCO edits and adjudicates the provider's claim. The "Host" plan then prices the claim based on its provider agreements and

discounts with the physician.  The "Host" plan will then pay the provider and the "Home" plan will then reimburse the "Host" plan.

128.    The Association requires each Blues Plan to participate in the Blue Card Program and each provider contracts require that each Plaintiff and Class Member provide services pursuant to the Blue Card Program

129.    For example, Dr. Love's provider agreement with Blue Cross Blue Shield of Alabama defines "Members" as Subscribers, including, but not limited to, to subscribers of any physician program within the Blue Cross Blue Shield Association network…"  The other named plaintiffs have similar terms in their contracts.

130.    Likewise, Defendants' contracts contain similar provisions concerning the provision of healthcare services to members in other Blue plans.  For example, BCBSAZ's standard provider agreement states that BCBSAZ contracts with the other Blue Cross plans and the BCBSA for access to its provider network, including the provider's participation in the Blue Card Program.

131.    Blue Shield of California's provider manual contains an appendix concerning the requirements of the Blue Card Program.  The Blue Shield Manual on Blue Card states that the Blue Card Program links participating health care providers and the independent Blue Plans across the country through a single electronic network for claims processing and reimbursement. The Manual also states that the Blue Card program enables providers to submit claims for members from other Blue Plans directly to Blue Shield of California.

132.    Healthnow's provider contracts specifically states that "Participating Physician shall provide its services to members of other Blue Cross and/or Blue Shield Plans, their affiliates and subsidiaries ("Other Plans")… [and] Participating Physician shall be compensated

for such health care services provided Other Plan's members are participating members in the Blue Cross Blue Shield Association ("BCBSA") administered Blue Card Program and/or HMO Blue Program ("BCBSA Members")…".

133.    Blue Cross Kansas City's standard form provider agreement defines "Affiliates" to whom contracted providers are required to provide services to include: "any other Blue Cross Blue Shield Plan with which BCBSKC ahs a participating or reciprocal agreement covering the administration of benefits and/or adjudication of claims (e.g. the national BlueCard program in which all Blue Cross and Blue Shield plans participate through their individual licensee agreements with the Blue Cross Blue Shield Association.")

134.    Blue Cross of Idaho's standard form HMO provider agreement defines "Member" as any person who is "[e]ntitled to Covered Services under a managed care program or administrative services agreement of any Blue Cross of Blue Shield Plan…"

135.    Blue Cross North Dakota likewise defines "Member" in its standard form provider agreement as "those subscribers and members of any of the Association of Independent Blue Cross Blue Shield Plans."

**Coercive Use of Economic Power**

136.    Defendants control a large percentage of the subscribers and providers in the managed care market in most states and in some local areas.  As stated above, BCBSA states that over 100 million individuals are enrolled with Defendants and co-conspirator Blue Plans, approximately one in three individuals nationwide.

137.    For example, in 1999, Blue Cross of Alabama, with whom Drs. Love, Smith and Elledge have contracted, controlled over 65% of the combined HMO/PPO market share in

Alabama.[1]  Defendant BCBSAZ controlled over 20% of the combined HMO/PPO market share in Arizona.  Defendant Arkansas Blue Cross controlled over 45% of the combined HMO/PPO market share in Arkansas.  Defendant Blue Shield of California who Dr. Mazer has contracted with, controlled over 7% of the combined HMO/PPO market share California. Defendant BCBSD controlled approximately 35% of the combined HMO/PPO market share in Delaware. Defendant Blue Cross of Idaho controlled approximately 55% of the combined HMO/PPO market share in Idaho.  Defendant Blue Cross Kansas controlled in excess of 15% of the combined HMO/PPO market share in Kansas and in excess of 50% of the Kansas City, Missouri market.  Defendant Blue Cross Kansas City controlled in excess of 25% of the Missouri market. Defendant Blue Cross Nebraska controlled 25% of the Nebraska market.  Defendant HealthNow controlled in excess of 25% of the Buffalo, New York market.  Blue Cross North Dakota controlled in excess of 85% of the North Dakota market.

138.    In order to perpetuate their scheme, Defendants use their overwhelming economic power and market dominance to coerce Individual Plaintiffs and the class, at the risk of being denied patient referrals and/or "black-listed" altogether, into providing care under Defendants' policies and practices on a "take it or leave it" basis and pursuant to "all products" requirements.

139.    Defendants further wield their economic power and market dominance by refusing to allow individual Plaintiffs and other members of the Class to negotiate specific terms and provisions of their contracts, reserving the right to unilaterally amend contracts with physicians, refusing to provide information concerning pricing or fee structures to Individual Plaintiffs or class members, and failing to provide any feasible mechanism for review of the automated payment reductions – all in furtherance of the scheme described above.

---

[1] Competition in Health Insurance, American Medical Association.

140.    Defendants' fraudulent conduct is made more effective by, and enforced through, the conspiracy and RICO enterprise described below, as well as Defendants' and their co-conspirators' efforts to aid and abet each other in confiscating Individual Plaintiffs' and class members' property.

## DEFENDANTS' MISREPRESENTATIONS AND OMISSIONS

**Defendants and Co-Conspirator Blue Plans Have Made Misrepresentations and Omissions To Physicians Concealing The Truth About Their Claims Payment Policies and Practices, and Have Disseminated These Communications By Mail Or Wire**

141.    Defendants routinely use mail and wire communications to send provider materials, explanations of benefits, and payment to providers. Use of mail or wire communications is thus incident to an essential part of their scheme to defraud physicians by denying, delaying, and diminishing payment to physicians.

142.    Defendants and their co-conspirator Blue Plans have systematically misrepresented and concealed the true facts regarding their claims handling practices. Documents and testimony show that during the Class Period, Defendants and co-conspirator Blue Plans used the mails and/or wires to send provider agreements, manuals and handbooks, as well as remittance advices that disseminate and perpetuate their misrepresentations to providers

143.    During the Class Period Defendant Arkansas BCBS disseminated its provider news and remittance forms through the mail. Those documents contained misrepresentations as well as omissions concealing Defendants' actual claims payment practices.

144.    During the Class Period BCBSAZ disseminated its Provider Operating Guide, medical policies and newsletters via mail and email.   Those documents contained misrepresentations as well as omissions concealing Defendants' actual claims payment practices.

145.    During the Class Period Defendant BCBSD sent providers provider packets, newsletters as well as physicians' explanation of benefits via mail. Those documents contained misrepresentations as well as omissions concealing Defendants' actual claims payment practices.

146.    During the Class Period Blue Shield of California disseminated provider contracts, newsletters, manuals and physicians' explanation of benefits through the mail and offers its providers a website to access information concerning provider claims.   Those documents contained misrepresentations as well as omissions concealing Defendants' actual claims payment practices.

147.    During the Class Period HealthNow has disseminated provider contracts, manuals and physicians' explanation of benefits through the mail.   Those documents contained misrepresentations as well as omissions concealing Defendants' actual claims payment practices.

148.    During the Class Period Blue Cross Idaho disseminated remittance advice, provider communications, bulletins and physicians' explanation of benefits via mail and email. Those documents contained misrepresentations as well as omissions concealing Defendants' actual claims payment practices.

149.    During the Class Period Kansas Blue Cross disseminated physicians' explanation of benefits, remittance advice communications, provider contracts, newsletters, charges through the mail and via email.  Those documents contained misrepresentations as well as omissions concealing Defendants' actual claims payment practices.

150.    During the Class Period Blue Cross Blue Shield of Kansas City disseminated physicians' explanation of benefits, provider contracts, newsletters, through the mail and via email.   Those documents contained misrepresentations as well as omissions concealing Defendants' actual claims payment practices.

151.    Likewise, During the Class Period Blue Cross Nebraska disseminated prospective providers application forms which include the standard agreement, policies and procedures, and BCBSNE's fee schedules via the mail.  BCBSNE also communicated updates and changes in their provider contract through email and in their monthly newsletter.  Those documents contained misrepresentations as well as omissions concealing Defendants' actual claims payment practices.

152.    Wyoming Blue Cross disseminated explanations of benefits, payment listings or remittance advices through the mail.  Those documents contained misrepresentations as well as omissions concealing Defendants' actual claims payment practices.

153.    A further example of the Defendants and their co-conspirator Blue Plans' efforts to conceal the truth about the edits they use in processing provider claims is contained in a memorandum from BCBSAZ, summarizing a conference call with the "Plan Focus Group on Code Bundling Software," held on August 17, 2000.  Participants included attendees of Defendants, including Adamson from Arizona Blue Cross, Apgar from Blue Shield of California and Single from HealthNow.  These notes reveal that the discussions included the specific bundling software used by participants, the logic used in bundling software, the policies for sharing bundling logic with physicians and feedback from the participants on whether their bundling software was consistent with CPT and CCI.

154.    Additionally, the memorandum discusses "next steps" which included developing networking opportunities for Defendants' and Blue Plans' coding professionals to decrease any inconsistencies between the local and national claims processing systems.

155.    Furthermore, the Focus Group discussed the fact that Plans could not disclose complete sets of ClaimCheck edits with physicians, and determined that Plans instead should

work with McKesson HBOC to come up with palatable explanations for bundling edits that providers will accept, as opposed to sharing the actual reasons for the edits' being created and implemented.  The document specifically goes on to state that "[f]or queries from physicians regarding particular edits, Plans can work with HBOC to provide an explanation," and suggests that BCBSA request that McKesson HBOC "[p]rovide Plans with basic bundling logic that they could share with physicians."

156.    Defendants and their co-conspirators expressly agreed that they *will not disclose* the very edits that they claim they to disclose.  For example, McKesson does not allow users to "explicitly share McKesson policies" regarding edits.  According to a McKesson document, produced by BCBSA, "[t]he ClaimCheck database is proprietary McKesson information and requires that [the payor] *keep the edits confidential*."  In addition, the standard license for ClaimCheck specifically states that unauthorized copyright and "disclosure, reproduction, modification, [or] distribution" is prohibited.

### Explanations of Benefits

157.    Once Individual Plaintiffs' and class members' payment requests have been improperly denied or diminished, Defendants provide Individual Plaintiffs and class members with an explanation of benefits ("EOB"). The sending of EOBs through the mail or wire is incident to an essential part of Defendants' scheme to defraud physicians by denying, delaying, and diminishing payment to physicians.  To accomplish the scheme to defraud physicians, Defendants must send physicians paperwork denying their claims or documenting the adjudication and payment of their claims, however improperly, and the sending of EOBs through the mail or wire is an essential part of Defendants' scheme to defraud physicians.  In addition, many EOBs constitute misrepresentations or omissions communicated through the mail or wire.

158.     Through coded explanations, the EOBs misrepresent or conceal the actual manner in which Individual Plaintiffs' and the class members' payment requests were processed, and the purely cost-based reasons why they were denied, so as to induce physicians to accept reduced payments in reliance thereon.

159.     Defendants also conceal the manner in which they actually process requests for payment by refusing to disclose it, by taking affirmative steps to keep it secret, and by depriving Individual Plaintiffs and class members of information that might enable them to discover Defendants' processing techniques, including such basic information as the schedule of fees in effect for various procedures.

160.     When physicians contest a specific claim, Defendants also fail to disclose the claims processing techniques used to reduce or deny payment, proceeding instead as if it were an individualized medical necessity determination, and sometimes retroactively paying the claim so as to foreclose further inquiry and maintain their ongoing scheme.

161.     When direct inquiry is made concerning their claims processing procedures, Defendants also refuse to disclose them.

## CONSPIRACY

162.     Defendants have not undertaken the above practices and activities in isolation, but instead have done so as part of a common scheme and conspiracy.

163.     The Defendants' co-conspirators include the Association and other Blue Plans who are not Defendants in this Action.

164.     The Defendants and the other Blue Plans are not competitors; rather they are all licensees of the Association who operate in distinct geographical regions.  The Blues have engaged in a pattern of racketeering activity and have undertaken a common course of illegal conduct. The Blues have implemented a common scheme using fraud, deception, and other

illegal means to increase their profits at the expense of medical providers and to the detriment of patients and the patient-physician relationship.

165.    Each Defendant and member of the conspiracy, with knowledge and intent, agreed to the overall objective of the conspiracy, agreed to commit acts of fraud to relieve Individual Plaintiffs of their rightful compensation, and actually committed such acts.

166.    As is set forth above, the object of the conspiracy is to deny, delay and reduce payments for medically necessary, covered services rendered by Plaintiffs and the Class. Defendants' agreement allows them to share the cost-savings benefits of their wrongful payment practices, both to maximize their own profits and those of other Blue Plans.   Defendants' agreement is evidenced by their creation and development of the Blue Card Program as well as through their development and participation in NASCO.  Uniformity in claims processing in the Blue Plan's national accounts, through NASCO, is necessary in order for the Blues Plans to compete with other national insurance companies for those accounts.  The need for such uniformity resulted in each Blue Plan agreeing to the edits to be utilized through the Blue Card Program and NASCO.  The BlueCard Program (discussed in detail below), by which enrollees in a given Blue Plan have access to the services of physicians who participate in other Blue Plans allows Blue Plans to compete for employers who have national or multi-state business or who require their employees to travel out of state.  Participation in the BlueCard Program – and the sharing of each Blue Plan's discounts – is prerequisite to be a licensee and is *mandatory* for all Blue Plans.

167.    Moreover, there is direct evidence that Defendants and their co-conspirators, through participation in the Association and specific committees and organizations within the Association, have agreed to use specific, wrongful edits in the processing of their claims through

NASCO, also discussed in detail below, and have discussed physician reimbursement issues, including their scheme to deny, delay and reduce reimbursement to physicians in contravention of their contracts, their representations to physicians and the rules established by the American Medical Association's Current Procedural Terminology ("CPT").

168.   Defendants and their co-conspirator Blue Plans not only agreed to use improper edits to cheat doctors in their national business through NASCO and the BlueCard program, but also in their local business as well.  The Blues Plans including Defendant benefit from this agreement  to utilize improper edits locally because the scheme allows them to compete in their individual markets, which in turn strengthens the Blue Cross Blue Shield brand and accordingly strengthens the ability of the Blue Plans collectively to compete with national competitors within their own markets.

169.   In addition to direct evidence of concerted action, numerous common facts and similar activities, also imply the existence of a conspiracy, among all of the Defendants and other members of the conspiracy, including:

- Common automated processes used in manipulating CPT codes, including downcoding and bundling;

- Common provisions in contracts with physicians;

- Common claims procedures, including the data physicians are required to provide in submitting claims, the forms they must submit the data on, and the coding they must use to submit the data; medical necessity criteria, and Defendants' use of guidelines developed in concert with third parties;

- Common use of software systems that do not recognize modifiers and that downcode and/or bundle claims; and

- • Common institutionalized techniques to delay payment of claims.

170.    The Association provides the hub for the Blue Plans' conspiracy, allowing for coordinated decision-making and implementation.

171.    All Defendants and all co-conspirator Blue Plans are members of the Association and are required to participate in the organization.  All Defendants and co-conspirator Blue Plans are required to be licensees of the Association, their CEOs have seats on the BCBSA board of directors, and each Defendant and co-conspirator Blue Plan also funds the Association.

172.    The roots of the conspiracy can be traced back as least as early as the 1990s.  An example can be seen in the March 25, 1991 seminar exclusively for Blue Plans entitled "How to Successfully Solve the Unbundling Problem," which was jointly sponsored by Blue Cross of South Carolina and McKesson.  Notably, the seminar included presentations entitled "How to Improve Your Competitive Position Through Your Claims Processing Operations," "Why Your Plan Can Realize a 10:1 Return on Investment," "Minimizing Physician Appeal Through Provider Relations Tactics," and, significantly, "Why Your Plan Should Implement a Nationally Accepted Claims Auditing Database."

173.    The purpose of the seminar was to provide a forum *exclusively* for Blues executives to speak with other Blues on these issues and to promote the idea of an "exclusive and executive level gathering."  In addition to being a co-sponsor of the seminar, BCBS South Carolina, along with BCBS of Missouri, made presentations to other Blue Plans.  At the time of the meeting, Defendants Blue Cross Idaho, Blue Cross Kansas City were already ClaimCheck users.

174.    The conspiracy has developed over the years and grown, through various meetings, developments and strategic moves, whereby the scheme increased in complexity and more participants joined.

175.    By 1993, ClaimCheck became the exclusive claims processing software used for all claims processed by NASCO (The National Account Services Company LLC®, a for-profit entity formed in 1987 by a number of Blue Plans to be the Blues' claims processing company for their national accounts).  Thus, with every Plan participating in NASCO in some capacity, as set forth below, Defendants and every co-conspirator have had some portion of their claims processed through NASCO using the identical ClaimCheck software.

176.    In 1994, the Blue Plans implemented the BlueCard® Program, a mandatory, nationwide program in which all BCBS licensees are required to participate, and which is designed to allow Blue Plans to share discounts when traveling or living in another Blue Plan's service area receive healthcare service benefits out of state.  The BlueCard Program is described in detail below.

177.    Additionally, at least since the early 1990s, Defendants and their co-conspirators have engaged in concerted action in furtherance of their conspiracy through their work with the manufacturers of the claims processing software they use.  During the Class period, Defendants, other Blue Plans and the BCBSA have worked particularly closely with McKesson, both directly as well as through NASCO, and TriZetto, manufacturer of Facets, both directly and through the BCBSA committee Blue Strategy Group on Trizetto ("BSGT"), in furtherance of the Blues' fraudulent scheme and conspiracy.

178.    Since the beginning of the Class Period, clients of McKesson have included NASCO and the following Defendants: Arkansas, Arizona, BCBS Central New York, Blue

Shield of California, BCBS Delaware, BCBS Idaho, Kansas, Kansas City, BC of Western NY (part of HealthNow), Nebraska, as well as other Blue Plans such as: BCBS Alabama, Empire Blue Cross, Excellus, Florida, Hawaii Medical Service Association, Highmark, Horizon BCBS of New Jersey, Independence Blue Cross, BCBS Illinois (part of HCSC), Louisiana, Massachusetts, Michigan, Minnesota, Missouri, Mississippi, Montana, Mountain State, NE Pennsylvania, New Mexico, North Carolina, Ohio, Oklahoma now part of HCSC, Oklahoma (through EDS), Premera Blue Cross, Regence Blue Cross of Utah, Regence Blue Cross of Washington, South Carolina, Tennessee, Texas (part of HCSC), Utah, Vermont, Virginia, Wellmark, and BCBS United of Wisconsin.

179.    Defendants and the co-conspirator Blue Plans also have their own exclusive committee with McKesson -- comprised of Blue Plans -- to determine what edits will be used in their version of ClaimCheck: the NASCO ClaimCheck Advisory Committee.

180.    In 1995, participants and users in the Fall Tuscon NASCO Conference included Darlene Stehlik of Blue Cross Arizona Tom Hart and three other representatives from of Blue Shield of California, John Havekost and Teri Knutson of Blue Cross Nebraska, Lisa Weakley of Blue Cross Blue Shield of Central New York,  as well as participants from BCBSA and Blue Cross Alabama, Blue Cross Colorado, Blue Cross Connecticut, Blue Cross of National Capital Area, Blue Cross Florida, Blue Cross Georgia, Blue Cross Illinois, Blue Cross Kentucky, Blue Cross Louisiana, Blue Cross Maryland, Blue Cross Massachusetts, Blue Cross Michigan, Blue Cross Minnesota, Blue Cross Mississippi, Alliance Blue Cross, Blue Cross New Jersey, Empire Blue Cross, Blue Cross North Carolina, Blue Cross Ohio, Community Mutual Insurance Company, Blue Cross Oklahoma, Blue Cross Oregon, Pennsylvania Blue Shield, Independence Blue Cross, Blue Cross of Northeastern Pennsylvania, Blue Cross Rhode Island, Blue Cross

Tennessee, Blue Cross Memphis, Blue Cross Texas, Trigon Blue Cross, Mountain State Blue Cross and Blue Cross United of Wisconsin.

181.    NASCO's Fall 1996 Conference in Lincolnshire, Illinois, included Defendants BCBSAZ, Blue Shield of California, BCBSD, Blue Cross Nebraska, Blue Cross Central New York, and a number of Blue Plans including the National Account Consortium.

182.    With respect to McKesson's User Conference and its Steering Committee, there have been a number of Defendants and co-conspirator Blue Plans that have been actively involved and directed its activities for years.   In 1996, GMIS User Conference Steering Committee members included Carolyn Johnson from BCBSAZ and representatives from other Blue Plans, like Linda Rumold from BCBS Georgia, Elisabeth Keliher from BCBS Maine, as well as Carol Stroud from NASCO.

183.    In 1997, NASCO's Network Conference at the Skamania Lodge included Defendants BCBSAZ, Blue Shield California, BCBSD, Blue Cross Kansas, Blue Cross Kansas City, Blue Cross Nebraska and over 29 other Blue Plans and BCBSA.

184.    In 1997, the McKesson (GMIS) User Conference Steering Committee members included from Defendants Shirley Murphy from BCBS Kansas City and from other co-conspirator Blue Plans Elisabeth Keliher from BCBS Maine and Justine Archibald from BCBS Georgia.

185.    Notably, Blue Plans in attendance at the 1997 User Conference included Defendants BCBS of Central New York and BCBS of Kansas City, as well as other Blue Plans such as Blue Cross Washington/Alaska (Premera); BCBS of Alabama; BCBS of Colorado; BCBS of Connecticut; BCBS of Florida; BCBS of Georgia; BCBS of Illinois; BCBS of Iowa; BCBS of Louisiana; BCBS of Maine; BCBS of Maryland; BCBS of Massachusetts; BCBS of

Memphis; BCBS of Michigan; BCBS of Minnesota; BCBS of North Carolina; BCBS of Oklahoma; BCBS of South Carolina; BCBS of Texas; BCBS of Utah; BCBS of Utica-Watertown; BCBS of Vermont; BCBS United of Wisconsin; Blue Care Network-Great Lakes; Mountain State BCBS; and NASCO.

186.    In 1998, the McKesson Steering Committee Members included, from Defendants, Shirley Murphy of BCBS Kansas City, and from other Blue Plans, Keith Warren and Justine Archibald from BCBS Georgia and Laurie Johnson from BCBS Florida.

187.    Defendants in attendance at the McKesson 1998 User Conference included BCBSAZ; Kansas; Kansas City and Utica-Watertown.  Other Blue Plans attending included: Blue Cross of Northeastern Pennsylvania; Alabama; Florida; Georgia; Louisiana; Maine, Maryland, Massachusetts, Michigan, Minnesota, New Hampshire, New Mexico, South Carolina, Texas, Blue Cross United of Wisconsin, Empire, Highmark, Mountain State, Premera and NASCO .

188.    In 1998, McKesson formed the "Payor Solutions Group" for the purpose of enhancing and supporting "its full range of automated encoding and claims auditing systems." "Directions, Newsletter of the HBOC GMIS Product Group", Vol. 1, Issue 3.   Since its inception, the Payor Solutions Group has provided a forum for the Blues to assist in developing McKesson's claims processing products.

189.    Further evidence of Defendants' active participation in and discussion of each other's claims editing practices and coding behavior is shown in the agenda for one five-day schedule of a McKesson-sponsored meeting entitled the "1999 Payor Solutions Group Overview Agenda," which included an all-day meeting referred to only as the "BCBS Meeting,"

190.    The BCBS Meeting took place on May 10, 1999 from 8:00 a.m. to 5:00 p.m. Defendants who participated and attended the 1999 McKesson User Conference include BCBSAZ, Kansas, Kansas City, Nebraska and Blue Cross Utica-Watertown.  A number of other Blue Plans and NASCO also attended.

191.    In addition to the Blues-only NASCO ClaimCheck Advisory Committee, Blue Plans are able to meet with each-other and with McKesson to determine what edits are to be used on the McKesson software through the Claim Check Advisory Committee, User Conferences, Annual Meetings and PAMMS (Physician Advisory Meetings of Medical Directors of Insurers).

192.    For example, on October 16 and 17, 2000, numerous Blue Plans participated in a Joint Meeting of the ClaimCheck Advisory Committee ("CCAC") and CodeReview Advisory Committee, at which time specific claims edits were discussed in detail.  The specific Blues represented at this Joint Meeting were BCBS-TX, Horizon BCBS, Carefirst BCBS and BCBS-MN, as well as NASCO.  *Id.*

193.    In 2001, Defendants Arkansas Blue Cross, Blue Shield of California, Blue Cross Utica Watertown, BCBSAZ and Blue Cross Kansas attended the McKesson User Conference along with a number of other Blue Plans and NASCO.

194.    McKesson's 2002 Payor Solution Conference materials stated that the purpose of the CCAC is to "formalize the input process from our client base for further development and enhancement of ClaimCheck."   CCAC is also described in the 1997 ClaimCheck Advisory Committee Report as follows:  "Teaming with HBOC, the CCAC facilitates the validation of the future direction and strategy of the ClaimCheck product suite."

195.    Members of the CCAC have communicated and worked together through various means, including newsletters, semi-annual meetings, and conference calls, and together worked

on "product development" in pursuit of its stated purpose of "formaliz[ing] the input process from our client base for further development and enhancement of ClaimCheck."  By the time of CCAC's 2002 "Payer Solutions Conference," the CCAC included representatives from BCBS of Texas, Carefirst BCBS, and Anthem BCBS of Connec12ticut and NASCO.  The "Mission Statement" on conference materials said that CCAC's mission was "[t]o help predict industry needs and trends and to be an essential part in the validation of McKesson's direction and strategy to meet future needs."  In addition, documents from the Blues indicate that McKesson has set up separate break-out sessions and meetings just for the Blues.

### The BlueCard Program Is Central to the National Conspiracy

196.    As is set forth above, every Defendant and all co-conspirator Blue Plans are participants in and utilize the Blue Card Program.  The Blue Card Program was created by Defendants and the co-conspirator Blue Plans in 1994 and was implemented on or about March 1, 1995.    Although the Association does not provide health services to the public directly by offering HMOs, POS plans, PPOs, Indemnity Plans or Self-Funded Plans (hereafter "health care plans"), the Association does contract with the federal government to provide health coverage to federal employees, which is then subcontracted to each of the Defendants and the other Blue Cross and Blue Shield licensed entities

197.    The Blue Card Program is described by BCBSA as a single electronic network for claims processing and reimbursement.  The Blue Card Program allows a Blue Cross member to receive care outside of his or her home licensee area.  When care is rendered to a Blue Card member, the provider submits the claim to his local plan with whom he or she has contracted (the "Host" plan).  The Host plan receives the claim and determines the price to the provider based on

the provider's contract.  The Host plan then submits the claim to the member's contracted plan (the "Home" plan) and the Home plan adjudicates the provider's claim.

198.    The Host plan then pays the provider according the provider's discounted fee schedule and the Home plan reimburses the Host plan and pays an access fee to the Host plan for the use of its provider network.

199.    Each Defendant and every co-conspirator Blue Plan is required to participate in the Blue Card Program Blue Card Program.  The Manual sets forth the requirements and agreements to allow each Blue Plan to utilize each other's provider networks and claims processing systems to jointly adjudicate claims submitted by physicians.

200.    The majority of the claims from the BlueCard program are processed by NASCO. NASCO is a company founded by the Blues that exclusively processes claims for the Blues, using the automated claims processing software known as ClaimCheck.  Every Blue Plan that remains as a Defendant or that settled their claims either currently participates or has previously participated in NASCO.  Thus, every BCBS Plan has had at least some portion of its claims processed through NASCO, using ClaimCheck software and an agreed-upon list of edits.  It is significant that the Blue Plans not only *use* the same edits through participation in NASCO, they actually *jointly decide* which edits will be used, added, and changed in the ClaimCheck software, through the NASCO ClaimCheck Advisory Committee and actual votes taken among member plans.  Based on such votes, as reflected in actual written ballots produced to Plaintiffs by NASCO, whatever decision the majority reaches is implemented through changes in ClaimCheck's edits.  This constitutes *direct evidence* that the Blues collectively decide what claims processing edits they will use.

201.   The Blue Card Program is administered by the BCBSA and operates under the direction of the BCBSA Board of Directors.  Defendants' and co-conspirator Blue Plans' CEOs sit on the BCBSA Board of Directors.   A sub-committee called the Inter-Plan Programs Committee ("IPPC") oversees all Blue Plans' use of the Blue Card Program and provides guidance to BCBSA management.  The IPPC directs the Blue Card's business plans, budgets, strategies and pricing.   The IPPC monitors pricing policies and standards applicable to Defendants and all co-conspirator Blue Plans.

202.   The Blue Card Program Manual specifically lists as its business objectives: to maximize the efficiency of out of area claims processing and customer service and to enable each Blue Plan to take advantage of the provider relationships maintained by other Blue Plans, resulting in shared provider discounts.  The Blue Card Program Manual specifically states that all claim types, with the exception of dental and prescription drugs claims, must be processed through the BlueCard program.

**The Blue Cross and Blue Shield Association Acts as the "Hub" of the Blues Conspiracy.**

203.   The Blue Cross and Blue Shield Association is the largest and most significant organization through which Defendants and their co-conspirators engage in concerted and collective action.  It acts as the "hub" of the Blues conspiracy, operating to create consistency and cooperation among the Blue Plans in a multitude of areas, thereby permitting the Blues to formulate and carry out their conspiracy.

204.   Furthermore, the Association provides direct assistance to its member Blue Plans to enable them to perpetuate their fraudulent scheme.   For example, meetings of the Association's board of directors are held where the Defendants and their co-conspirators discuss the administration and management of the Blue Plans.  Specific committees hold meetings on issues such as claims processing, utilization management and provider contracting where

attendees who are representatives from different Blue Plans around the country share information on such issues. The information that is gathered at these committee meetings is later disseminated by the Association and shared with all of the Blue Plans.

205. The Association also provides support services for all member Blue Plans. One such support service is provided by the Association through ITS, a private telecommunication system that provides computer access for Blue Plans and links all of the Blue Plans, as well as Blue Web, a message posting service amongst all Blue Plans. In addition, the Association provides and runs the Inter-Plans Service Benefit Bank, which conducts all transfers of funds between the Blue Plans. A transfer of funds between Blue Plans occurs when an enrollee of one Blue Plan receives medical services from a provider contracting with a different Blue Plan and the enrollee's Blue Plan needs to reimburse the provider's Blue Plan. The Association facilitates these transfers, thus allowing all Blue Plans nationwide to operate jointly with regard to provision of medical services to enrollees and payment for those services.

206. The Association is one of the organizations through which Defendants and their co-conspirators engage in concerted and collective action. The Association is comprised of approximately 39 Blue Plans. Originally, there were approximately 80 Blue Plans in the Association; however, due to mergers and consolidations amongst Defendants the number has been reduced and continues to be reduced.

207. The activities of the Association are far-ranging, operating to create consistency and cooperation among the Blue Plans in a multitude of categories, thereby permitting the Defendants to formulate and carry out their conspiracy. In addition, the Association includes numerous committees governed by the Association; it sponsors various meetings, seminars, and conferences attended by the other Defendants and co-conspirators; and it produces manuals,

reports, listserves, and other correspondence to its member Blue Plans, all in furtherance of the conspiracy. These meetings and materials are some of the methods by which the Association and the member Blue Plans communicate regarding claims processing and adjudication.

208.    The Association and certain Blue Plans either own or control certain entities that are directly involved in claims processing. For example, NASCO, or the National Account Service Company LLC®, was formed in approximately 1987 by the Association and certain member Blue Plans, and was engaged as a claim processing entity exclusively for member Blue Plans. Certain member Blue Plans and the Association have been owners of NASCO. During the Relevant Period, such owners have included Anthem BCBS, Empire BCBS, BCBS of Michigan, Horizon BCBS of New Jersey, and the Association. All Defendants and co-conspirator Blue Plans have participated in NASCO and its activities.

209.    NASCO has electronic connectivity with every Blue Plan. In 2003, it processed over 107 million healthcare claims for member Blue Plans. NASCO also states that it provides its clients with a single audit trail of member Blue Plan actions – thereby allowing users to know each edit they made on their claims processing systems.

210.    Additionally, the Association, along with the member Blue Plans, have established committees concerning claims processing, within the Association or with entities that are owned, controlled and/or utilized by the member Blue Plans, including, *inter alia*, with McKesson through the NASCO ClaimCheck Advisory Committee, with Trizetto through the Blues Strategy Group on TriZetto. NASCO also participates in McKesson activities and is a member of the ClaimCheck Advisory Committee.

211.    The Association represents the interests of all of the Blue Plans through its involvement with numerous health care groups, including other national health care plans with which the Association shares information, as described in more detail below.

212.    The Association, Defendants and the other member Blue Plans establish uniform policies and rules concerning claims processing and adjudication, medical necessity and medical policy under which all Blue Plans contract with physicians.

213.    Defendants and the other Blue Plans work closely on BCBSA committees and workgroups to reach consensus regarding claims processing, claims adjudication and medical necessity policies.  The Association not only provides the conduit for Defendants' concerted activities, it also provides mechanisms for monitoring and enforcement of the conspiracy.

214.    These organizations and programs serve to unite the Blues in their joint efforts to promote the ends of their fraudulent scheme and conspiracy, through meetings, shared decision-making, coordination regarding claims processing edits, the exchange of volumes of crucial claims and pricing information, and the transfer of funds wrongfully withheld from class members through the improper practices at the heart of the fraudulent scheme.

   a.    **BCBSA Coordinates the Activities of the Conspiracy by Monitoring and Enforcing Blue Plans' Compliance with Its Standards**

215.    BCBSA maintains strict control over all Blue Plans in a variety of ways.  First, all Blue Plans are required to be licensees of the BCBSA.  Currently comprised of 39 Blue Plans,[2] the Association monitors and maintains information on each Plan's performance, ensuring compliance with the goals and means of the conspiracy.  The Performance Measures and

---

[2] Originally, there were approximately 80 Blue Plans in the Association; however, due to mergers and consolidations amongst Plans, the number has been reduced to approximately 39 and continues to be reduced.

Financial Committee evaluates and monitors every entity that wants to use the Blue Cross and Blue Shield names, logos and trademarks must be licensed either as a primary licensee or a controlled affiliate licensee.  The BCBSA has guidelines regarding timeliness and payments to providers).

216.    Significantly, the BCBSA has also established a committee called the Code Bundling Software Committee, which gathers information regarding what the particular Blue Plans are using in the form of CPT code bundling software and seeks to address any issues relating to the code bundling software that had been raised by physicians or medical societies. The committee members include Blue Defendants Arkansas BlueCross, Blue Shield of California, HealthNow, and other Blue Plans.  At meetings of these committees, issues such as the types of bundling software used by the participants were raised and discussed.  One of the goals identified in one of the meeting summaries produced by BCBSA was to "reduce inconsistencies between multiple systems (local, national) within Plans."  BCBSA, Defendants and other co-conspirators have facilitated communications regarding the clinical edits used by Blue plans.  In fact, in 2000 an email from Claudia Bonnell of the BCBSA solicited information and shared results of a survey on code bundling with Defendants Blue Shield of California, Arkansas and other respondents including BCBSA, Utah, Missouri, Capital Blue Cross, Michigan, Trigon, Wisconsin, Florida, NASCO, IBC, Regence, Alabama, Highmark, North Carolina, Texas and Maine.  The email also stated that a clinical editing task force had been created with the BCBSA and plans to review code bundling issues.

217.    Additionally the BCBSA has established a Medical Policy Resource Center which "provides Blue Plans with evaluations on medical technologies in the form of medical policy templates" and is used by the Blues to standardize their medical policies as well as provide the

Blues with standardized policies to assist them in matters of utilization management, managed care and quality assessment.  The Medical Policies that are developed and disseminated by the Medical Policy Resource Center are contained in a Medical Policy Reference Manual.

       **b.**     **BCBSA Facilitates The Exchange of Claims Processing and Pricing Information Amongst Defendants and the Co-Conspirators Through the BlueCard Program**

218.     As discussed above, in 1994, the Association launched the BlueCard® Program, a mandatory, nationwide program in which all BCBS licensees are required to participate, and which is designed to allow Blue Plans to share discounts when traveling or living in another Blue Plan's service area receive healthcare service benefits out of state.   Blue Plans meet approximately four times a year to discuss changes to the BlueCard Program, and the BCBSA staff supports Blue Card Committee.

219.     Through the BlueCard Program, the Defendants and Blue Plans share extensive claims processing, pricing and adjudication information with each-other in furtherance of their conspiracy to deny, reduce and delay reimbursements to physicians.

220.     In this regard, following the launch of the BlueCard Program, the Association and the licensees agreed to centralize the process and adjudication of provider claims on a nationwide basis.  Through this process Defendants and the other Blue Plans were able to utilize their provider networks to pass along the network discounts the "host" or local Plan had negotiated with its providers to the "home" or Plan that contracted to provide services to that subscriber.

221.     As part of this process, claims data, encounter data and adjudication information is shared between and among Blue Plans to enable one Blue Plan to reimburse a provider who provides services to another Blue Plan's members.  The BlueCard Program thus provides a single electronic network for claims processing and reimbursement among Plans. Significantly, savings that result from the improper reduction of payments to physicians on BlueCard claims

are shared by Defendants and co-conspirator Blue Plans, as reflected in a document entitled "Revenue Generated for BlueCard Host." Defendants and their co-conspirators worked together to generate revenue by reducing payments to physicians and sharing those gains among themselves. In addition to the payment of an "Administrative Expense Allowance," the home plan pays the host plan a so-called "Access Fee" reflecting a portion of the amount the home plan saved by paying the physician less than the properly billed amount.

222.    In addition to the exchange of individual claims information, the BlueCard program facilitates the exchange of information on a macro level as well. The BlueCard Executive Committee meets quarterly in Chicago and discusses aggregate pricing. This exchange of pricing information also furthers the Blues conspiracy.

223.    The BCBSA also established and controls the Central Financing Agency, which is a central repository for all Blue Cross national accounts' funds transfer and reconciliation. *All monies transferred between Blue Plans for processing claims pass through this BCBSA organization.* In other words, the Central Financing Agency is how each Blue Plan exchanges monies obtained through their improper coding practices.

### c.    The BCBSA Further Facilitates the Activities of the Conspiracy Through Its Board of Directors, Committees and Other Interactions Among Blue Plans

224.    BCBSA has a Board of Directors and an Executive Committee. The Board of Directors has accountability for providing oversight to the brand, brand protection, the competitive nature of the BCBSA, and the performance of the administration of the BCBSA; the Executive Committee provides oversight to the budget of the BCBSA and administrative performance. Members of the BCBSA Board of Directors include representatives from Defendants, including Blue Shield of California, BCBS Oklahoma, BCBS Wyoming and co-conspirators BCBS Montana, and Regence Oregon. Defendant Blue Shield of California, for

example, has had a representative on the Executive Committee in the past.  The Board of Directors holds "town hall meetings" around every six to eight weeks with all Blue Plans.

225.    The other activities of BCBSA are far-ranging, and include numerous committees governed by Blue Plans; it sponsors various meetings, seminars, and conferences attended by the Plans; and it produces manuals, reports, listserves, and other correspondence to Blue Plans, all in furtherance of the conspiracy.  In 1985, the BCBSA founded the Technology Evaluation Center ("TEC") to develop criteria to assess medical technologies for the Blues companies.  TEC is one of three "Centers" that make up the Office of Clinical Affairs ("OCA") which, according to BCBSA's own literature, "develops medically appropriate solutions to strengthen the prestige, credibility, and competitive position of the Blue Cross Blue Shield (BCBS) Plans.  OCA strives to create a national clinical Brand identity with America's physicians and . . . to differentiate the Blues from our competitors."  The TEC was created to review emerging services and technologies, and determine a consensus position that could be forwarded to the member Plans for use in their construction of policy documents.

226.    Business Systems Corporation of America ("BSCA"), a for-profit company spun off by the Blue Cross Blue Shield Association and certain Defendants, was incorporated in 1982.  According to the Illinois Secretary of State's corporate records, BSCA's primary years of business were 1995 through 2002.  Around Fall of 2000, BSCA became Cyvent Technologies.  BSCA developed and supported a comprehensive managed care software product called LRSP.  LRSP system functions included claims processing as well as enrollment, coverage, eligibility and billing.

227.    LRSP licensees, at one time or another, included Defendants Blue Shield of Delaware and co-conspirators Blue Cross and Blue Shield of Rhode Island, Blue Cross and Blue

Cross and Blue Shield of North Carolina, Blue Cross and Blue Shield of Montana, Empire Blue Cross Blue Shield, Hawaii Medical Services Association and Excellus Blue Cross Blue Shield.

228.   BCBSA also has a number of other formal and informal committees, focus groups and ad hoc organizations comprised of representatives of the Blue Plans that evaluate and establish medical policies, as well as standing committees on utilization review and medical management, finance committees, provider contracting, information systems, reimbursement issues (*i.e.*, NASCO and other issues), underwriting, sales and marketing.  The Committees of the BCBSA include: the Audit Committee, BCBSA Emerging Issues Committee, Blue Health Intelligence (a group of Plans putting together a data warehouse of claims information, which allows Plans to compare their specific data to an aggregate level of other Plans), BlueCard Adjustment Group, BlueCard Executives Meeting, BlueCard Oversight Group, BlueCard Performance Work Group, Blue Card Committee, Blue Exchange Plan Advisory Group, Blues Strategy Group on TriZetto (BSGT) (discussed below), Business Council, Customer Contact Center Conference, Customer Satisfaction Task Force, Emerging Issues Committee, Inter-Plan Operations Committee, Inter-Plan Program Committee,  ITS Roundtable, ITS Technical Advisory Committee, Medical Policy Panel (which was created to assist in the development of medical policy positions for Blues Plans that did not have adequate resources, so that such Plans could use such policies as source documents, National Accounts Policies Committee, National Business Advisory Group, National Council on Medical Management, National Council of Physician Executives, National Employee Benefits Administration Committee, National Labor Office, National Medical Management Forum (involving 42 Blue Plans) National Network Management Committee, National Program Membership Standards Committee, the Nominating Committee,  the  IT  Standards  Advisory  Group,  Plan  Performance  Financial  Standards

Committee, Product Development Work Group, Provider Education Task Force, and the Technology Advisory Committee.

229.    In addition, Defendants and all of the Blue Plans participate in the Blue Web, which is a communication device used among the Plans, as well as BlueExchange, a standard electronic software providing a centralized inter-Plan communication tool for Licensees to exchange electronic transactions.  BCBSA also sponsors national conferences where various Blue Plans get together on various issues.

230.    All of this demonstrates that the BCBSA works, through its centralized structure, to standardize the conduct of the Blue Plans to promote the aims of the conspiracy.

### The Blues Further the Aims of Their Conspiracy Through NASCO

231.    The National Account Services Company LLC®, better known as NASCO, is a for-profit entity formed in 1987 by a number of Blue Plans to be the Blues' claims processing company for their national accounts.  As will be shown below, all Blue Plans participate or have participated in NASCO in some capacity, whether as "Owner Plans," "Control Plans," or "Participating Plans."  In addition, NASCO unites the Blues in numerous other significant ways, such as through numerous committees, meetings, and other concerted activities.  Indeed, some of the most striking direct evidence of the conspiracy among the Blues comes from their activities through NASCO.

232.    For example, it is through NASCO that the Defendants and their co-conspirator Blue Plans agree to the specific edits in the NASCO ClaimCheck software that is used.  The process is conducted using a ballot listing numerous existing edits in the ClaimCheck software and the proposed changes to the edits, and the Control Plans indicate whether they agree or disagree with the proposed change by marking the ballot with an "A" or a "D".  A column on the ballot listed what "consensus" ultimately was reached on each proposed edit changes.

233.     As is explained by NASCO documents, "***When changes in medical policy occur, all edits are shared by user Plans.  Customizations are requested through the NASCO Product Management.  All Plans then have the opportunity to review and comment on the edits.  Majority decision is implemented.***" (emphasis added).

234.     As of 1997, NASCO full service plans included Defendants Blue Cross Arizona, Blue Shield California, BCBSD, Blue Cross Kansas City, Blue Cross Nebraska, Blue Cross Western New York, Blue Cross Central New York and Blue Cross Utica-Watertown along with 29 other Blue Plans.

235.     NASCO's public website materials state that it is "The National Delivery Solution for Blue Cross and Blue Shield Plans" and that it "[p]rovides a single database of information" and "general" comprehensive performance, inventory management, network and account management reports."   With respect to claims adjudication, NASCO states that it "provides complete and single audit trail of actions taken by servicing Plans regarding claims adjudication" and "processes all claims against a single procedure and diagnosis file and single adjudication logic, ensuring data integrity and reporting consistency."   Moreover, NASCO's website states that NASCO is a strategic or "Preferred BlueCard Partner."   NASCO's website goes on to state that:

> NASCO's affiliation with the Blue Cross Blue Shield Associations' BlueCard Program electronically links all Blue Cross and Blue Shield Plans and their providers, creating one large, national network.  The network encompasses more than 80 percent of all hospitals and nearly 90 percent of all physicians in the United States.

ClaimCheck has been the exclusive claims processing software used for all NASCO accounts for all Blue Plans since 1993.  Thus, with every Plan participating in NASCO in some capacity, as set forth below, Defendants and every co-conspirator have had some portion of their claims processed through NASCO using the identical ClaimCheck software.

236.    In addition to NASCO's own meetings regarding claims processing, NASCO has attended McKesson's annual user conferences since the early 90's and is a key member of the ClaimCheck Advisory Committee.   NASCO actively participates in directing McKesson (the manufacturer of ClaimCheck) on what specific edits need to appear in the ClaimCheck product. Specifically:

> NASCO maintains and manages the product and its shared decision-making and funding activities.   NASCO supplies a Project Manager to manage the ClaimCheck Advisory Committee, to assist User Plans in issue resolution and medical policy management as ell as managing any projects related to ClaimCheck.

237.    NASCO even has its own ClaimCheck committee - the NASCO ClaimCheck Advisory Committee - which is distinct from McKesson's CCAC discussed below.  The purpose of the NASCO ClaimCheck Advisory Committee is to provide consensus to NASCO on how the ClaimCheck product should function within the NASCO Processing System ("NPS").

238.    As one document explained, ***"User Plans, working together on the NASCO ClaimCheck Advisory Committee, share in the decision-making regarding ClaimCheck's customizable medical policy . . . and share the costs as well."*** (emphasis added).  Only NASCO members can participate in the NASCO ClaimCheck meetings.  NASCO members specifically discuss which edits to utilize on NPS, and as is shown above, decisions regarding the implementation of edits are made by a majority or "consensus" of the NASCO plans.

239.    In 1995, NASCO ClaimCheck Advisory Committee included Defendants BCBS-Kansas City and co-conspirators BCBS Connecticut, Empire, BCBS Georgia, BCBS Kentucky, BCBS Massachusetts, BCBS Michigan, BCBS Michigan, BCBS New Jersey, BCBS Ohio, and Trigon BCBS.

240.    In 1997, NASCO's ClaimCheck Advisory Committee included representatives from Defendants Blue Shield of California, BCBS of Kansas, and BCBS of Kansas City, and co-

conspirators BCBS of Connecticut, Empire BCBS, BCBS of Georgia, BCBS of Massachusetts, BCBS of Michigan, BCBS of New Jersey, and Trigon BCBS.

241.    By 2003, NASCO's ClaimCheck Advisory Committee included Defendants BCBSD/Carefirst, and BCBS of Kansas, and co-conspirators BCBS of Florida, BCBS of Louisiana, BCBS of Massachusetts, Empire BCBS, Horizon BCBS and NASCO.

242.    The NASCO ClaimCheck Advisory Committee reports to the NASCO System Steering Committee.  The NASCO System Steering Committee is required by NASCO's bylaws to provide oversight to NASCO systems development projects and evaluate NASCO on its performance in implementing those projects.

243.    During the Class Period, the NASCO System Steering Committee has been comprised of Defendants BCBSD/Carefirst and, BlueShield of California, and co-conspirators BCBSA and Consortium Health Plans, and has included Owner Plans such as Empire, Horizon, Michigan and Anthem and Control Plans including Massachusetts.  This committee meets in person approximately five times annually and meets by telephone as often as monthly.  Notably, a non-BCBS Plan cannot participate in NASCO ClaimCheck meetings.

244.    The original owners of NASCO supplied the financial support required to form the organization.  The Owner Plans included co-conspirators Empire BCBS, BCBS of Michigan, Horizon BCBS of New Jersey and BCBSA.

245.    In addition to Owner Plans, NASCO is comprised of Control Plans.  These plans contract with NASCO for the use of the system and must commit at least 55 percent of their business to NASCO.  The Control plans are comprised of Defendants Blue Shield of California and Blue Cross Blue Shield of Western New York, and co-conspirators BCBS Michigan, Empire BCBS (now WellPoint), New Jersey BCBS, Connecticut BCBS, Carefirst BCBS, Virginia

BCBS, National Capital Area BCBS, Massachusetts BCBS, Minnesota BCBS, Kentucky BCBS and BCBS Mutual of Northern Ohio.

246.    The last major category of membership in NASCO is the Participating or "Par" Plans.  These plans are not required to pay a fee to NASCO and are considered part of the NASCO network.  Further, these plans are categorized as either full service, limited service or storefront.  A full service Par Plan handles the data entry, claims adjudication and customer service aspects of claims processing.  A Limited Service plan enters and prices the claims while the Control Plan adjudicates the claim.  A store front Par Plan's participation is limited to mailing claims to the Control Plans or transferring them electronically in a standard format.

247.    The following Defendants are or have been "Participating Plans" in NASCO, using its claims processing and adjudication system, or NPS: Arizona, Delaware, Blue Shield of Kansas City, Nebraska, co-conspirator par plans include Alabama, Colorado, Blue Cross and Blue Shield of Florida, Blue Cross Blue Shield of Georgia, Blue Cross and Blue Shield of Louisiana, Indiana, Iowa, Blue Cross and Kentucky, Missouri, Nevada, New Mexico, North Carolina, Highmark, Horizon Blue Cross Blue Shield of New Jersey, Independence Blue Cross, Oklahoma, Premera Blue Cross or Oregon, Tennessee, HCSC Texas, Blue Cross of Wisconsin.

248.    Defendants Arkansas, Idaho, Kansas, North Dakota, Wyoming are, or have been, storefront Par Plans.  Additionally the following co-conspirator par plans include: Hawaii, Maine, Mississippi, Montana, New Hampshire, Capital Blue Cross, NE Pennsylvania, Triple S, LaCruz, Rhode Island, South Carolina, South Dakota, Utah, Vermont, Premera Washington/Alaska and Mountain State.

249.    NASCO's website states that NASCO fully supports the BlueCross BlueShield Association's BlueCard[®] program (the nationwide program) and is the largest single processor of

BlueCard Host claims.  In 2003, Blue Plans used NASCO to process over 107 million healthcare claims for more than 7 million members.  In 2004, Blue Plans processed approximately 120 million claims through NASCO.  In 2005 NASCO processed over 127 million claims for Blue Plans - all using the same ClaimCheck software.

250.   NASCO touts the ability to provide its clients with a single audit trail of Defendant Plan actions – thereby allowing users to know each edit they made on their claims processing systems.  NASCO has electronic connectivity with every Defendant Plan in the United States.   Moreover, NASCO held conferences amongst the Blue Plans, NASCO, Consortium and BCBSA.

251.   In 2000 NASCO's Network Conference attendees included Defendants Blue Cross Blue Shield Delaware, Blue Cross Nebraska, Blue Cross Blue Shield Kansas City, and Blue Shield of California, and co-conspirators Michigan, Texas, Highmark, Premera, NASCO, Florida, Anthem, Alabama, Mountain State, Blue Cross Georgia, CareFirst, Blue Cross Wisconsin, Blue Cross Massachusetts, Blue Cross Louisiana, Regence, BCBSA, Independence Blue Cross, Horizon Blue Cross, Alliance Blue Cross, Blue Cross Illinois, and Consortium Health Plans.

252.   Defendants' and other Blue Plans' systems automatically, on a system-wide basis, perform practices commonly referred to as "downcoding," "bundling," and the disregard of important codes called "modifiers."  This is accomplished through "edits" in the software that take the AMA-approved CPT codes submitted by physicians and automatically change them from higher payment codes to lower payment codes, resulting in lower reimbursements to the physicians.  This is done across-the-board, and is not based upon any individualized review of claims, but through pre-programmed computer functions that are not predicated upon universally

accepted medical or coding practices but rather are agreed upon by the Blue Plans as cost-saving devices.

253.    Significantly, and as is discussed above, NASCO exclusively uses ClaimCheck, containing agreed-upon edits, to process claims. In 2005 NASCO processed over 127 million claims for Defendant Plans— all using the same ClaimCheck edits.  Indeed, as is set forth above, every Defendant and co-conspirator BCBS Plan participates or has participated in NASCO in some capacity; accordingly, every Defendant and co-conspirator BCBS plan has had some portion of its claims processed by NASCO using the same agreed-upon ClaimCheck edits.

254.    A 2001 document from Empire BCBS provides the following background on ClaimCheck and its use by NASCO:

> ClaimCheck is a 3rd party claims auditing software product.  ClaimCheck was integrated into the NPS [NASCO Processing System] for multiple [Blues] Plan use in 1993.  ClaimCheck allows Plans to edit claims for appropriate provider billing practices using consistently applied auditing rules.  ClaimCheck, as integrated on the NPS, also allows Plans to track savings dollars realized as a result of using the product.

255.    The document goes on to state that **"[f]rom the outset, NASCO and its Plans held the position that sharing the ClaimCheck auditing rules across Plans would create *greater standardization* in medical policy and would also provide greater cost efficiency in maintaining ClaimCheck on the NPS."** *Id.* (emphasis added). And indeed, use of ClaimCheck and the sharing of its edits among Blue Plans *has* created standardization among the Plans in how they reimburse providers for the services rendered.

256.    In addition to NASCO's processing claims for Defendants and all other participating Blue Plans *using the same ClaimCheck edits*, most of the Blue Plans use, or during the class period have used, ClaimCheck to process their own claims.  Certain of the Defendants use a functionally equivalent software called Facets, produced by TriZetto.  HealthNow used

ClaimCheck prior to installing Facets or comparable software programs which use similar automated claims processing software.

## THE NEED FOR DECLARATORY AND INJUNCTIVE RELIEF

257.    Defendants' automated scheme to deny, reduce and delay payments to physicians are ongoing problems that will continue to cause Plaintiffs and members of the class economic losses and threaten their ability to practice medicine and serve the public health.

258.    A money judgment in this case will only compensate Individual Plaintiffs and members of the class for past losses.  It will not stop Defendants' interference in medical treatment decisions, and it will not stop the Defendants from continuing to confiscate the money physicians earn, and that is necessary to maintain their practice on an ongoing basis.

259.    No Plaintiff has a practical or adequate remedy, either administratively or at law, to recover these future losses.  The cost of pursuing such claims far exceeds the amount at issue.

260.    Even a class action such as the one contemplated in this case is a monumental undertaking that cannot be mounted on a regular basis.

261.    Where multiple lawsuits are required to redress repeated wrongs, there is no adequate remedy at law and irreparable harm exists.

## RICO ALLEGATIONS

## THE BLUE CROSS AND BLUE SHIELD ENTERPRISE

262.    Plaintiffs, the class members and Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3).

263.    Based upon Plaintiffs' current knowledge, the following persons constitute a group of individuals associated in fact that Plaintiffs refer to as the "Blue Cross and Blue Shield Enterprise" ("BCBSE"): (1) Defendants; (2) the BCBSA; (3) other health insurance companies not named as Defendants herein including WellPoint, Inc.; Blue Cross of California; Rocky

Mountain Hospital and Medical Service, Inc.; Community Insurance Company; Anthem Health Plans, Inc.; Anthem Insurance Companies, Inc.; Blue Cross and Blue Shield of Georgia, Inc.; Anthem Health Plans of Kentucky, Inc.; Anthem Health Plans of Maine, Inc.; RightChoice Managed Care, Inc. (d/b/a Blue Cross and Blue Shield of Missouri); Anthem Health Plans of New Hampshire, Inc.; Anthem Health Plans of Virginia, Inc.; and Blue Cross Blue Shield of Wisconsin, Inc., Amerihealth Hmo, Inc.; Blue Cross And Blue Shield Of Alabama; Premera Blue Cross And Blue Shield Of Alaska Corp; Premera Blue Cross; Atrium Health Plan, Inc.; Carefirst, Inc.; Group Hospitalization And Medical Services, Inc.; Blue Cross And Blue Shield Of Florida, Inc.; Hawaii Medical Service Association; Blue Cross Of Idaho Health Service, Inc.; Regence Blue Shield Of Idaho, Inc.;  Wellmark, Inc.;  Keystone Health Plan East, Inc.; Blue Cross And Blue Shield Of Louisiana; Hmo Louisiana, Inc.; Louisiana Health Services And Indemnity Company; Carefirst Of Maryland, Inc.; Blue Cross And Blue Shield Of Massachusetts, Inc.; Blue Cross And Blue Shield Of Massachusetts HMO Blue, Inc.; Blue Cross Blue Shield Of Michigan; Blue Care Network Of Michigan; BCBSM, Inc.; Blue Cross & Blue Shield Of Mississippi; HMO Of Mississippi, Inc.; Blue Cross And Blue Shield Of Montana, Inc.; Horizon Blue Cross And Blue Shield Of New Jersey; Blue Cross And Blue Shield Of New Mexico; Empire Healthchoice HMO, Inc.; Empire Healthchoice Assurance, Inc.; Wellchoice Insurance Of New Jersey, Inc.; Wellchoice, Inc; Blue Cross And Blue Shield Of North Carolina;; Group Health Service Of Oklahoma, Inc.; Regence Blue Cross Blue Shield Of Oregon; Capital Blue Cross; Highmark, Inc.; Independence Blue Cross; Hospital Service Association Of Northeastern Pennsylvania; La Cruz Azul Of Puerto Rico; Triple-S, Inc., Of Puerto Rico; Blue Cross & Blue Shield Of Rhode Island; Blue Cross And Blue Shield Of South Carolina; Companion Healthcare Corporation; Planned Administrators, Inc.; The Regence Group; Regence

Life And Health Insurance Company; Wellmark Of South Dakota, Inc.; Health Care Service Corporation; BlueCross BlueShield Of Tennessee, Inc.; Tennessee Health Care Network, Inc.; Regence Blue Cross Blue Shield Of Utah;  Premera; Regence BlueShield; Mountain State Blue Cross & Blue Shield, Inc.; Blue Cross And Blue Shield Of West Virginia, Inc.; and (4) NASCO.

264.    The BCBSE is an ongoing organization which engages in, and whose activities affect, interstate commerce.

265.    While the Defendants participate in and are members and part of the BCBSE, and are a part of it, they also have an existence separate and distinct from the enterprise.

266.    In order to successfully retain monies owed physicians in the manner set forth above, Defendants need a system that allows them to manipulate and control reimbursements to physicians and conceal the manner in which that is done.

267.    The BCBSE provides Defendants with that system and ability and the Blue Plans, including Defendants, benefit from their agreement because the scheme allows them to compete on national accounts, which in turn strengthens the Blue Cross Blue Shield brand and accordingly strengthens the ability of the Blue Plans to collectively compete both locally and with national competitors.   Lower reimbursement to physicians increase Defendants competitiveness.   However, the BCBSE provides Defendants with the system and ability to coordinate and improperly manipulate physician reimbursement and conceal their improper practices.   The Defendants control and operate the BCBSE through a variety of means, including, but not limited to, the following:

a) Developing and participating in the BlueCard Program and the creation and development of NASCO and NPS as described above;

b) By agreeing to and sharing information regarding specific improper edits;

c)  By sharing and disseminating claims processing, utilization management and physician contracting information through meetings conducted by the Association, including board of directors meetings and committee meetings at which attendees from different Plans around the country share information which is later disseminated by the Association and shared with all of the Plans;

d)  By engaging and paying HBOC McKesson, Trizetto and other third party entities which develop automated systems for editing and manipulating the claims information in violation of CPT;

e)  By agreeing to and using those systems to process claims in or to deny, diminish or delay payment; and

f)  By utilizing and participating in the Association programs and meetings as vehicles for communication and the exchange and dissemination of information necessary to the scheme.

268.  As set forth above, the BCBSE has an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants engage.

## PREDICATE ACTS

269.  Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud).  As set forth below, Defendants have engaged, and continue to engage, in conduct violating each of these laws to effectuate their scheme.

270.  In addition, in order to make their scheme effective, each of the Defendants sought to and did aid and abet the others' in violating the above laws within the meaning of 18 U.S.C. § 2.  As a result, their conduct is indictable under 18 U.S.C. §§ 1341 and 1343, on this additional basis.

## Violations of 18 U.S.C. §§ 1341 and 1343

271.    For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false pretenses, representations or promises, the Defendants, in violation of 18 U.S.C. § 1341, placed in post offices and/or in authorized repositories matter and things to be sent or delivered by the Postal Service, caused matter and things to be delivered by commercial interstate carrier, and received matter and things from the Postal Service or commercial interstate carriers, including but not limited to agreements, manuals, claims forms, correspondence, patient lists, payments, EOBs, reports, data, summaries, statements and plan materials.

272.    For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false pretenses, representations or promises, the Defendants, also in violation of 18 U.S.C. § 1343, transmitted and received by wire, matter and things which include but are not limited to agreements, manuals, claims forms, correspondence, patient lists, payments, EOBs, reports, data, summaries, oral and written statements, faxes and plan materials.

273.    The matter and things sent by Defendants via the Postal Service, commercial carrier, wire or other interstate electronic media include, *inter alia*:

a) material containing false and fraudulent misrepresentations that Defendants would pay Individual Plaintiffs and class members for the covered, medically necessary services they provided to Defendants' members in accordance with standard medical coding procedures;

b) material which concealed or failed to disclose that Defendants would and did use the techniques and procedures described above to deprive Individual Plaintiffs and class members of payment, through the use of cost-based criteria rather than medical necessity

and coverage to make payment decisions, as well as by downcoding, bundling, refusing to recognize modifiers, refusing to recognized valid assignments of benefits and intentionally delaying payments;

c) material constituting explanations for payments made or denied by Defendants, but which, in fact, fail to reveal and/or actively conceal the reasons that payment has been denied, diminished, delayed, or otherwise adjusted from the request for payment as submitted by the physician; and

d) Materials including provider manuals, newsletters, provider payment materials, and provider payments that are incident to an essential part of their scheme to defraud physicians by denying, delaying, and diminishing payment to physicians.  Also, when assignments of benefits are ignored, mail or wire is used to send payments directly to plan members.  The use of mail and wire communications is integral to the success of Defendants' scheme to defraud physicians.

274.   Other matter and things sent through or received from the Postal Service, commercial carrier or interstate wire transmission by Defendants included information or communications in furtherance of or necessary to effectuate the scheme.

275.   The Defendants' scheme and conspiracy injured Individual Plaintiffs and Class Members in their business or property by depriving them of fees to which they were entitled.

276.   The Defendants' misrepresentations, acts of concealment and failures to disclose were knowing and intentional, and made for the purpose of deceiving Individual Plaintiffs and the class and obtaining their property for the Defendants' gain.

277.    The Defendants either knew or recklessly disregarded the fact that the misrepresentations and omissions described above were material, and Individual Plaintiffs and the class relied on the misrepresentations and omissions as set forth above.

278.    Additionally, Plaintiffs have been injured in their money and property by Defendants' scheme to defraud them and their use of the mail or wire incident to essential parts of that scheme,  and by the conduct of the affairs of the Blue Cross Enterprise through a pattern of acts indictable as mail fraud.

279.    As a result, Defendants have obtained money and property belonging to the Individual Plaintiffs and class members, and Plaintiffs and the class have been injured in their business or property by the Defendants' overt acts of mail and wire fraud, by their conspiracy and by their aiding and abetting each other's acts of mail and wire fraud.

## PATTERN OF RACKETEERING ACTIVITY

280.    The Defendants have engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5), by committing or aiding and abetting in the commission of at least two acts of racketeering activity, i.e., indictable violations of 18 U.S.C. §§ 1341 and 1343 as described above, within the past ten years.  In fact, each of the Defendants has committed or aided and abetted in the commission of thousands of acts of racketeering activity.  Each act of racketeering activity was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results and impacted similar victims, including Individual Plaintiffs and class members.

281.    The multiple acts of racketeering activity which Defendants committed and/or conspired to or aided and abetted in the commission of, were related to each other and amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

282.     Representative examples of the types of predicate acts committed by Defendants pursuant to their scheme to defraud the Individual Plaintiffs and their conspiracy to violate RICO are set forth in the Civil RICO Case Statement which will be filed Pursuant to Local Rule 12.1.

## RICO VIOLATIONS

### § 1962(C)

283.     Section 1962(c) of RICO provides that it "shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity …"

284.     Through the patterns of racketeering activities outlined above, the Defendants have also conducted and participated in the affairs of the BCBSE.

### § 1962(D)

285.     Section 1962(d) of RICO makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b) or (c), of this section."

286.     Defendants' conspiracy to secure money due the Individual Plaintiffs and class members for their own use through the fraudulent scheme described above violates 18 U.S.C. §1962(d).

287.     Each of the Defendants agreed to participate, directly or indirectly, in the conduct of the affairs of the BCBSE through a pattern of racketeering activity comprised of numerous acts of mail fraud and wire fraud, and each Defendant so participated in violation of 18 U.S.C. § 1962(c).

## CLASS ALLEGATIONS

### CLASS DEFINITION

288.    Individual Plaintiffs bring this action on their own behalf and, pursuant to Fed.R.Civ.P. 23(b)(1)(A), (b)(2), and/or (b)(3), and USDC Southern District of Florida Local Rule 23.1, as a class action on behalf of a nationwide class of persons defined as:

> Class:  All physicians who, from May 22, 1999 through the date of certification, provided covered services to any patient insured by or to any individual enrolled in or covered by any licensee of the Blue Cross Blue Shield Association or by any of the respective current or former subsidiaries or affiliates of any licensee where the claims were processed through the Blue Card System and/or all physicians who, from May 22, 1999 through the date of certification provided covered services to any patient insured by or to any individual enrolled in or covered by Blue Cross and Blue Shield of Arizona, Inc. ("BCBS-AZ"); Arkansas Blue Cross and Blue Shield ("BCBS-AR"); Blue Shield of California ("BSC"); BCBSD, Inc. ("Blue Cross Blue Shield of Delaware" or "BCBSD"); HealthNow New York, Inc. ("HealthNow"); Blue Cross of Idaho Health Service, Inc. "Blue Cross of Idaho" or "BC-ID"); Blue Cross and Blue Shield of Kansas, Inc. ("BCBS-KS"); Blue Cross and Blue Shield of Kansas City ("BCBS-KC"); Blue Cross and Blue Shield of Nebraska ("Blue Cross and Blue Shield of Nebraska"); Blue Cross Blue Shield of North Dakota, Noridian Mutual Insurance Company (collectively "Blue Cross and Blue Shield of North Dakota" or "Noridian"); Premier Health, Inc. ("Premier"); Blue Cross and Blue Shield of Wyoming ("BCBS-WY") or by any of their respective current or former subsidiaries or affiliates.

289.    This class seeks certification of claims for declaratory and injunctive relief, and for damages pursuant to 18 U.S.C. § 1962(d) for conspiracy to violate 18 U.S.C. § 1962(c), and pursuant to 18 U.S.C. § 2 for aiding and abetting in violation of 18 U.S.C. 1962(c).

### RULE 23(A)

### TYPICALITY

290.    The named Individual Plaintiffs and the members of the class each and all have tangible and legally protectable interests at stake in this action.

291.    The claims of the named class representatives and the absent class members have a common origin and share a common basis.  Their claims originate from the same illegal,

fraudulent, confiscatory, conspiratorial, and aiding and abetting practices of the Defendants, and the Defendants act in the same way toward the Individual Plaintiffs and the members of the class. As such, each named Individual Plaintiff has been the victim of one or more of the following illegal practices at the hands of one or more of the Defendants: cost-based automated claims denials, bundling, downcoding, refusal to recognize modifiers, refusal to recognize valid assignments of benefit and delayed payment of claims.

292.    The proposed class representatives state claims for which relief can be granted that are typical of the claims of absent class members. If brought and prosecuted individually, the claims of each class member would necessarily require proof of the same material and substantive facts, rely upon same remedial theories, and seek the same relief.

293.    The claims and remedial theories pursued by the named class representatives are sufficiently aligned with the interests of absent class members to ensure that the universal claims of the class will be prosecuted with diligence and care by the Individual Plaintiffs as representatives of the class.

## NUMEROSITY

294.    The members of the class are so numerous that joinder of all members is impracticable. Defendants and their co-conspirators offer managed care services to approximately 100 million subscribers and accomplish this through the services of over 900,000 physicians. The class is, however, ascertainable as the names and addresses of all class members can be identified in business records maintained by the Defendants.

## COMMONALITY

295.    The questions of law and fact common to the class include, *inter alia:*

>    a. Whether the Blue Plans including Defendants conspired and/or aided and abetted each other in furtherance of the unlawful acts alleged;

b.   Whether Defendants have engaged in mail and wire fraud;

c.   Whether Defendants engaged in a pattern of racketeering activity;

d.   Whether the Blue Cross Blue Shield Enterprise ("BCBSE") is an enterprise within the meaning of 18 U.S.C. § 1961(4);

e.   Whether Defendants conducted or participated in the affairs of the BCBSE through a pattern of racketeering activity in violation on 18 U.S.C. § 1962(c);

f.   Whether Defendants have used the mails to send and receive matter and things which include but are not limited to agreements, manuals, claims forms, correspondence, patient lists, payments, EOBs, reports, data, summaries, written statements, and plan materials, for the purpose of executing and/or attempting to execute the above described scheme to defraud of obtain money by means of false pretenses, representations or promises, in violation of 18 U.S.C. §1341;

g.   Whether Defendants have transmitted or received by wire matter and things which include but are not limited to agreements, manuals, claims forms, correspondence, patient lists, payments, EOBs, reports, data, summaries, oral and written statements, faxes and plan materials, for the purpose of executing and/or attempting to execute the above described scheme to defraud of obtain money by means of false pretenses, representations or promises, in violation of 18 U.S.C. §1343;

h.   Whether the Blues' predicate acts in furtherance of the conspiracy and/or aiding and abetting and/or direct acts in violation of 18 U.S.C. §§1341,

1343 AND 1962(c) proximately cause injury to the Plaintiffs' and class members;

i.   Whether Blue Plans including Defendants improperly downcode;

j.   Whether Blue Plans including Defendants improperly bundle;

k.   Whether Blue Plans including Defendants deny claims on automated cost bases rather than on the basis on coverage and medical necessity;

l.   Whether Blue Plans including Defendants improperly refuse to recognize modifiers;

m.  Whether Blue Plans including Defendants represent that they will pay doctors for rendering covered, medically necessary services in accordance with standard CPT practices;

n.   Whether Blue Plans including Defendants fail to disclose their practices in denying, delaying and diminishing payments;

o.   Whether the Blue Plans have an obligation to make those disclosures; and

p.   Whether the BCBS Blues fraudulently conceal their scheme.

## ADEQUATE REPRESENTATION

296.   The named Individual Plaintiffs are willing and prepared to serve the Court and proposed class in a representative capacity with all of the obligations and duties material thereto. The Individual Plaintiffs will fairly and adequately protect the interest of the class and have no interests adverse to, or which directly and irrevocably conflict with, the interests of other members of the class.

297.   The self-interests of the named class representatives are co-extensive with and not antagonistic to those of the absent class members.  The proposed representatives will undertake to well and truly protect the interests of the absent class members.

298.   The named Individual Plaintiffs have engaged the services of counsel indicated below.  Said counsel are experienced in complex class litigation, will adequately prosecute this action, and will assert, protect and otherwise well represent the named class representatives and absent class members.

### RULE 23 (B)(1)(A) AND (B)

299.   The prosecution of separate actions by individual members of the class would create a risk of adjudications with respect to individual members of the class which would, as a practical matter, be dispositive of the interests of other members of the class who are not parties to the action, or could substantially impair or impede their ability to protect their interests.

300.   The prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the parties opposing the class. Such incompatible standards and inconsistent or varying adjudications, on what would necessarily be the same essential facts, proof and legal theories, would also create and allow to exist inconsistent and incompatible rights within the class.

### RULE 23 (B)(2)

301.   The Defendants have acted or refused to act on grounds generally applicable to the class, making final declaratory or injunctive relief appropriate.

### RULE 23 (B)(3)(2)

302.   The questions of law and fact common to members of the class predominate over any questions affecting only individual members.

303.   A class action is superior to other available methods for the fair and efficient adjudication of the controversies herein in that:

a)  individual claims by the class members are impractical as the costs of pursuit far exceed what any one Individual Plaintiff or class member has at stake;

as a result, although multiple class actions have been filed, there has been very little individual litigation over the controversies herein, and individual members of the class have no interest in prosecuting and controlling separate actions; and

b)  as evidenced by the actions of the Panel on Multi District Litigation in MDL 1334, it is desirable to concentrate litigation of the claims herein in this forum.  The proposed class action is manageable.

## COUNT I

### VIOLATION OF RICO 18 U.S.C. § 1962(D) BY CONSPIRING TO VIOLATE 18 U.S.C. § 1962 (C)

**(All Plaintiffs and class members vs. all Defendants with whom Plaintiffs have no contracts and all Defendants with whom they have contracts to the extent their claims stem from contractual relationships with other Defendants)**

304.    Plaintiffs and class members incorporate and reallege paragraphs 1-303 above as if fully set out herein.

305.    This claim for relief arises under 18 U.S.C. § 1964(c).

306.    In violation of 18 U.S.C. § 1962(d), Defendants have, as set forth above, conspired to violate 18 U.S.C. § 1962(c) by conducting, or participating directly or indirectly in the conduct of, the affairs of the BCBSE through a pattern of racketeering.

307.    As a direct and proximate result of Defendants' and their co-conspirators' conspiracy, Plaintiffs and class members have been injured in their business or property.

308.    Specifically, Plaintiffs and class members have been injured in their business or property by the denial of payments for covered, medically necessary services that they have

rendered to Defendants' members, by reductions in such payments when made, by late payments and by the loss of interest on both late and withheld payments.

## COUNT II

### VIOLATION OF 18 U.S.C. § 2 BY SEEKING TO AND AIDING AND ABETTING IN THE VIOLATION OF 18 U.S.C. § 1962(C)

**(All Plaintiffs and Class Members vs. All Defendants with whom Plaintiffs have no contracts and all Defendants with whom Plaintiffs have contracts to the extent their claims stem from contractual relationships with other Defendants).**

309.    Plaintiffs incorporate and reallege paragraphs 1-303 above as if fully set out herein.

310.    This claim arises under 18 U.S.C. § 1964(c).

311.    As set forth above, Defendants knowingly, and with shared intent, sought to, and have, aided and abetted each of the other Defendants in the commission of predicate acts, in engaging in a pattern of racketeering activity, and in violating of U.S.C. § 1962(c) as described above.

312.    As a result, under 18 U.S.C. § 2, the RICO violations of each Defendant are those of the others as if they had been committed directly by them.

313.    As a direct and proximate result of the fact that each Defendant aided and abetted the others in violating 18 U.S.C. § 1962(c), Plaintiffs and class members have been injured in their business or property.

314.    Specifically, Plaintiffs and class members have been injured in their business or property by the denial of payments for covered, medically necessary services that they have rendered to Defendants' members, by reductions in such payments when made, by late payments and by the loss of interest on both late and withheld payments.

## COUNT III

## DECLARATORY AND INJUNCTIVE
## RELIEF UNDER 18 U.S.C. § 1964(A)

**(All Plaintiffs and class members vs. all Defendants with whom they have no contracts and all Defendants with whom they have contracts to the extent their claims stem from contractual relationships with other Defendants).**

315.     Plaintiffs, the Class reallege and incorporate paragraphs 1-303 above as if set forth fully herein.

316.     This claim arises under 18 U.S.C. § 1964(a), which authorizes the district courts to enjoin violations of 18 U.S.C. § 1962, and under 28 U.S.C. § 2201 which authorizes associated declaratory relief.

317.     As set forth in Counts I and II above, Defendants have violated 18 U.S.C. §§ 1962(c) and (d), and will continue to do so in the future.

318.     Enjoining the Defendants from committing these RICO violations in the future and/or declaring their invalidity is appropriate as Plaintiffs and the Class. Plaintiffs have no adequate remedy at law, and will, as set forth in paragraphs 257-261 above suffer irreparable harm in the absence of the Court's declaratory and injunctive relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs on behalf of themselves and members of the Class pray for the following relief:

**AS TO COUNTS I AND II:**     A judgment in favor of all Plaintiffs and the Class members against all Defendants, jointly and severally, for treble the amount of damages suffered by reason of payments due them for services rendered having been wrongfully withheld, denied or reduced as a direct and proximate result of the Defendants' involvement in the fraudulent scheme, conspiracy and aiding and abetting set forth herein, together with treble the amount of

interest due on payments delayed or withheld through the Defendants' predicate acts and RICO violations.

**AS TO COUNT III:**  Injunctive relief preventing Defendants from employing improper cost-based criteria to reject claims; injunctive relief preventing Defendants from using automated claims processing techniques that improperly downcode and bundle procedures, that ignore modifiers and that otherwise improperly alter or adjust claims as a means of denying or reducing payments due Plaintiffs and members of the Class for rendering covered, medically necessary services to Defendants' members; injunctive relief preventing Defendants from refusing to recognize valid assignments of benefits; injunctive relief preventing Defendants from "pending" claims that are ripe for payment and due Plaintiffs and members of the Class, for rendering covered, medically necessary services to Defendants' members; and a judgment declaring the above practices to be violative of federal law.

Plaintiffs and the Class members further pray for an award of attorneys fees where permitted by law against all Defendants and such other relief as the Court deems just and proper.

### JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable as a matter of right.

Dated: June 16, 2008


| | |
|---|---|
| _____/s/ Edith M. Kallas_____ | _____/s/ Harley S. Tropin_____ |
| Edith M. Kallas | Harley S. Tropin, Esq. (FBN 241253) |
| Joe R. Whatley | Janet L. Humphreys, Esq.(FBN 607258) |
| Joseph P. Guglielmo | **KOZYAK TROPIN & THROCKMORTON** |
| **WHATLEY DRAKE & KALLAS** | 2525 Ponce de Leon9th Floor |
| 1540 Broadway, 37th Floor | Coral Gables, FL  33134 |
| New York, NY  10036 | Tel: (305) 372-3508 |

Archie C. Lamb, Jr. (FBN 742597)
**LAW OFFICES OF ARCHIE LAMB**
2017 2nd Avenue North
Birmingham, AL  35203

James B. Tilghman
**STEWART TILGHMAN FOX**
1 S.E. 3rd Avenue
Suite 3000
Miami, Florida  33131

Aaron S. Podhurst
**PODHURST ORSECK**
25 W. Flagler Street
Suite 800
Miami, FL  33130

Nicholas B. Roth
**EYSTER KEY TUBB ROTH
MIDDLETON & ADAMS**
402 E. Moulton Street
Decatur, AL  35601

Dennis G. Pantazis
**WIGGINS CHILDS QUINN & PANTAZIS**
301 19th Street North
Birmingham, AL  35203

Kenneth S. Canfield
**DOFFERMYRE SHIELDS CANFIELD
KNOWLES & DEVINE**
1355 Peachtree Street
Suite 1600
Atlanta, GA  30309

*Counsel for Plaintiffs*

J. Mark White
**WHITE ARNOLD ANDREWS & DOWD**
2025 3rd Avenue North
Suite 600
Birmingham, AL  35203

Mark Gray
**GRAY & WEISS**
1200 PNC Plaza
500 West Jefferson
Louisville, KY  40202

Guido Saveri
**SAVERI & SAVERI**
111 Pine Street
Suite 1700
San Francisco, CA  94111

Robert Foote
**FOOTE MEYERS MIELKE & FLOWERS**
416 S. 2nd Street
Geneva, IL  60134

James E. Harley, Jr.
**DRUBNER & HARTLEY**
500 Chase Parkway4th Floor
Waterbury, CT  06708

Kenneth Trujillo
**TRUJILLO RODRIGUEZ
& RICHARDS, LLC**
226 W. Rittenhouse Square
Philadelphia, PA 19103

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 16th day of June, 2008, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.


<u>s/ Janet L. Humphreys</u>