**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

Case No. 03-21296-CIV-MORENO-TORRES

RICK LOVE, M.D., *et al.*,

    Plaintiffs,

vs.

BLUE CROSS AND BLUE SHIELD
ASSOCIATION, *et al.*,

    Defendants.
_____/

**REPORT AND RECOMMENDATION ON BLUE CROSS AND BLUE SHIELD OF
NORTH CAROLINA'S MOTION TO ENFORCE INJUNCTION ORDER**

This matter is before the Court on Defendant Blue Cross and Blue Shield of North Carolina's Motion and Supporting Memorandum to Enforce the Court's Injunction Order. ("Defendant's Motion") [D.E. 1306].[1] The Court has considered the motion, the response, the reply, and the pertinent portions of the record. For the reasons discussed below, this Court recommends that Defendant's Motion be **GRANTED in part and DENIED in part**.

### I.  BACKGROUND

#### A.  *The* **Love** *Case*

A class of doctors alleged that health insurance companies engaged in a conspiracy to inflate profits by systematically denying, delaying, and diminishing payments due to physicians. The HMOs allegedly effected this scheme through the manipulation of computerized billing programs. Throughout the pendency of this complex, multi-district, class-

---

[1] This motion was referred for a Report and Recommendation by the Honorable Federico A. Moreno pursuant to 28 U.S.C. § 636(b)(1) and the Magistrate Rules of the Local Rules of the Southern District of Florida. [D.E. 1419].

action litigation initiated by scores of physicians against various health insurance companies, settlements have been reached between numerous physicians and several of the insurers. The Court recently approved one such settlement, the Settlement Agreement dated as of April 27, 2007 ("Final Approval Order") [D.E. 1286]. The Final Approval Order enjoined class members from filing new lawsuits in which "Released Claims" are asserted against "Released Parties":

> The Releasing Parties are permanently enjoined from: (i) filing, commencing, prosecuting, intervening in, participating in (as class members or otherwise), or receiving any benefits from any lawsuit, arbitration, administrative or regulatory proceeding, or order in any jurisdiction based on any or all Released Claims against one or more Released Parties.

*See* Final Approval Order at ¶ 9.

### B.   *The North Carolina Action*

On September 18, 2006, Blue Cross and Blue Shield of North Carolina ("BCBSNC") filed a complaint against Jemsek Clinic, P.A. ("Jemsek Clinic") and Joseph G. Jemsek, M.D. ("Dr. Jemsek") (collectively "Jemsek") in North Carolina state court seeking to hold Jemsek liable for breaching the parties' provider agreement (the "Provider Agreement"). Shortly thereafter, Jemsek filed for bankruptcy under Chapter 11 of the Bankruptcy Code. The North Carolina state court case was removed to the United States Bankruptcy Court for the Western District of North Carolina on January 24, 2007.[2]

The next day, Jemsek filed its answer and counterclaims against BCBSNC ("Counterclaim")[3] raising nine different common law and statutory causes of action: (i) breach

---

[2]   BCBSNC also sued Jemsek for fraud and abusive billing practices, alleging that Jemsek submitted hundreds of reimbursement claims for services that were not "medically necessary" as the term is defined by the Provider Agreement and North Carolina state law. The merits of that complaint are immaterial to this Report and Recommendation.

[3]   For ease of the reader, we will refer to the nine causes of action as Counts I-IX. The Counterclaim misnumbered the causes of action: quantum meruit and defamation are both labeled "Counterclaim IV."

of contract (failure to pay for services provided); (ii) breach of contract (improper termination of agreement); (iii) breach of implied covenant of good faith and fair dealing; (iv) quantum meruit; (v) defamation; (vi) violation of the North Carolina Unfair and Deceptive Trade Practices Act; (vii) tortious interference with business relationship; (viii) fraudulent misrepresentation; and (ix) negligent misrepresentation.[4]

The causes of action for breach of contract (Counts I, II), breach of implied covenant of good faith and fair dealing (Count III), quantum meruit (Count IV), and fraudulent and negligent misrepresentation (Counts XIII, IX), all stem from the alleged failure to adhere to terms of the Provider Agreement. *See Counterclaim* at ¶ 28 [D.E. 1306-4 at 21]. According to the Counterclaim, Jemsek historically administered long-term intravenous antibiotics for certain Lyme disease patients. *See Counterclaim* at ¶¶ 1-3, 25. The Jemsek Clinic, which opened in 2000, provided medical services to participants in the medical insurance program administered by BCBSNC, and Jemsek received timely reimbursements for submitted claims.

---

[4] We suspect (but have no authority to decide) that Jemsek's Counterclaim fails Fed. R. Civ. P. 10(b)'s requirement that discrete claims should be pled in separate counts. *See Anderson v. Dist. Bd. of Tr.*, 77 F.3d 364, 366-67 (11th Cir. 1996) ("[U]nless cases are pled clearly and precisely, issues are not joined, discovery is not controlled, the trial court's docket becomes unmanageable, the litigants suffer, and society loses confidence in the court's ability to administer justice."). The Counterclaim presents numerous factual allegations and reiterates them in their entirety into several counts asserting discrete claims for relief. *See Counterclaim* at ¶¶ 42, 49, 56, 61, 69, 76, 83, 90, 101. As the entire Complaint uses this "shotgun" tactic, it is virtually impossible to know which facts are intended to support which claims for relief. *See id.* As we discuss in more detail below, Count VII may require a repleading because certain elements of that cause of action will be enjoined.

Notably, district courts confronted by such pleadings have the inherent authority to demand repleader *sua sponte*. *Magluta v. Samples*, 256 F.3d 1282, 1284-85 (11th Cir. 2001) (remanding the case for the district court to enter an order striking the complaint and requiring a repleading conforming to the pleading requirements). However, in this case, we have no jurisdiction over the Counterclaim; our authority is limited to enforcing the injunction against Jemsek with respect to the *Love* settlement. Whether or not the Counterclaim (or at least the remaining elements of the Counterclaim) needs to be repled will be determined by the presiding Bankruptcy Judge in the United States District Court for the Western District of North Carolina.

*Id.* at ¶ 25-33. Supposedly, in early 2006, BCBSNC undertook a series of actions "in order to significantly limit the amount of money that it would have to pay for medical treatments provided to its policyholders," including, *inter alia*, refusing to reimburse Jemsek for past treatment of Lyme Disease patients, and unilaterally cancelling the Provider Agreement to avoid paying for future treatments. *Id.* at ¶ 34.

The claims for defamation (Count V) and tortious interference with business relationship (Count VII) arise from a related, albeit distinct set of allegations:

> Blue Cross, through its representatives, made untrue statements that were disparaging of Dr. Jemsek and/or the Clinic concerning the treatment of patients suffering from Lyme Disease. These statements were made to, among others, the Medical Board and the Center for Disease Control. The statements bade by Blue Cross were false and were known, or reasonably should have been known by Blue Cross to be false.

*Id.* at ¶ 70. BCBSNC's statements about Jemsek allegedly resulted in damage to Dr. Jemsek's reputation, thus triggering the defamation claim. *Id.* at ¶ 73. Jemsek further contends that "influencing a complaint with the Medical Board" hindered Jemsek's "ability to do business and [damaged] their reputation and standing in the community," ergo, Jemsek's claim for tortious interference. *See id.* at ¶ 88.

The final cause of action against BCBSNC, a violation of the North Carolina Unfair and Deceptive Trade Practices Act (Count VI), is premised on the facts pertaining to both breach of contract and defamation:

> Blue Cross attempted to unlawfully limit its liability to policyholders suffering from Lyme Disease by engaging in a series of unlawful and/or unethical actions . . . Those actions include attempts to discredit doctors, including Dr. Jemsek, who administered the more expensive Lyme Disease treatment, unilaterally and unlawfully withholding reimbursement to those providers, and terminating agreements to pay those provided for services provided to Blue Cross Members.

*Id.* at ¶ 78. Essentially, Count VI alleges that BCBSNC violated North Carolina deceptive trade practices regulations by making false statements to a Medical Board, terminating the Provider Agreement, and failing to pay and/or withholding reimbursement.

In light of the Final Approval Order, and the undisputed fact that Jemsek did not opt out of the class, BCBSNC moves this Court to enforce the injunction against Jemsek and compel withdrawal of the Counterclaim. BCBSNC further requests that this Court find Jemsek in contempt for violating the Court's Final Approval Order. BCBSNC argues broadly that the causes of action in the Counterclaim

> are related to the courses of conduct and business practices specifically addressed in the Settlement Agreement. For example, in addition to established a settlement fund for the payment of claims, the Settlement Agreement requires business practices changes relating to "medical necessity" determinations and the resolution of related disputes, claims payment, resolution of billing disputes, and termination of physicians' agreements.

[D.E. 1306 at 9-10] (internal citations omitted). Thus, argues BCBSNC, Jemsek's counterclaims are "Released Claims" and their continued prosecution violates the Final Approval Order. We agree, but only with respect to the causes of action for breach of contract (Counts I, II), breach of implied covenant of good faith and fair dealing (Count III), quantum meruit (Count IV), unfair and deceptive trade practices (Count VI), and fraudulent and negligent misrepresentation (Counts XIII, IX).

## II.   ANALYSIS

The language of the Court's Final Approval Order clearly prohibits Class members from initiating lawsuits against Released Parties for any Released Claims. This Court, therefore, must grant Defendants' Motion if three conditions exist: (i) Jemsek is a class member; (ii) BCBSNC is a Released Party; and (iii) the claims at issue in the Counterclaim are Released Claims.

The first and second prongs are not at issue. The Final Approval Order permanently certified a settlement class composed of the following class members:

> Any and all Physicians, Physician Groups and Physician Organizations who provided Covered Services to any Plan Member or services to any individual enrolled in or covered by a Plan offered or administered by any Person named as a defendant in the Complaint or by any other primary licensee of the BCBSA or by any of their respective current or former subsidiaries or Affiliates, in each case from May 22, 1999 through May 31, 2007, . . .

*See* Final Approval Order at ¶ 2. It is undisputed that Jemsek did not opt out of the *Love* settlement, and is therefore a class member bound by the terms of the Final Approval Order. It is also undisputed that the Final Approval Order includes BCBSNC as a Released Party. The key issue before this Court is whether the causes of action in the Counterclaim are Released Claims. We also address, and ultimately reject, Jemsek's contention that this Court lacks the authority to enforce the Final Approval because of Jemsek's status as a bankruptcy debtor.

### *A.     Counts I-IV, VI, VIII and IX of the Counterclaim are Released Claims*

The Final Approval Order defines Released Claims as

> any and all causes of action, judgments, liens, indebtedness, costs, damages, obligations, attorneys' fees, losses, claims, liabilities and demands of whatever kind, source or character whether arising under any federal or state law, which . . . includes, but is not limited to, the Racketeer Influenced and Corrupt Organizations Act, antitrust and other statutory and common law claims, intentional or non-intentional . . . arising on or before the Effective Date, that are, were or could have been asserted against any of the Released Parties by reason of, arising out of, or in any way related to any of the facts, acts, events, transactions, occurrences, courses of conduct, business practices, representations, omissions, circumstances or other matters referenced in the Action, or addressed in the Settlement Agreement, whether any such Claim was or could have been asserted by any Releasing Party on its own behalf or on behalf of other Persons, or to the business practices that are the subject of Section 7 of the Settlement Agreement. This includes, without limitation and as to Released Parties only, any aspect of any fee for service claim[.]

*See* Final Approval Order at ¶ 5.  Before we filter the Counterclaim through this release language, we must pinpoint the essence of the *Love* lawsuit.  The notice of settlement package sent to all potential class members aptly summarizes the *Love* case:

> The Complaint in the Action alleges, among other things, that between 1999 and the present, the Blue Parties, among others, engaged in a conspiracy to improperly deny, delay, and/or reduce payments to physicians, physician groups, and physician organizations by engaging in several types of allegedly improper conduct, including but not limited to:
>
> • Misrepresenting and / or failing to disclose the use of edits to unilaterally "bundle," "downcode," and/or reject claims for medically necessary covered services;
>
> • Failing to pay for "medically necessary" services in accordance with member plan documents;
>
> • Failing and/or refusing to recognize CPT® modifiers;
>
> • Concealing and/or misrepresenting the use of improper guidelines and criteria to deny, delay, and/or reduce payment for medically necessary covered services;
>
> • Misrepresenting and/or refusing to disclose applicable fee schedules;
>
> • Failing to pay claims for medically necessary covered services within the required statutory and/or contractual time periods.
>
> The Complaint in the Action claims that the conduct described above violated the federal statute entitled the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.*

[D.E. 1385-5 at 3].  Simply put, the *Love* case concerns insurance companies' improper methods of denying, delaying, and diminishing physicians' "fee for service" insurance claims.  Because the Final Approval Order prohibits Jemsek from filing Released Claims, we need to determine which claims in the Counterclaim are "in any way related to" fee for service claims.

The Counterclaim contains factual allegations related to fee for service claims payment and processing, and the refusal and/or denial of benefits.  Jemsek generally asserts that BCBSNC breached the terms of the Provider Agreement and violated legal prohibitions on

unfair trade practices by "terminating reimbursement of treatment for Lyme Disease . . . merely because those treatments for policyholders suffering from Lyme Disease were too costly to Blue Cross." *Counterclaim* at ¶¶ 4, 34-41.

Specifically, in Count I, Jemsek contends that BCBSNC "breached the Provider Agreements by failing to provide reimbursement for covered services." *Counterclaim* at ¶ 45. The Counterclaim further alleges that BCBSNC's actions "are not based upon medical evidence, but upon a desire to limit its costs and punish providers that provide medically necessary and effective treatments." *Id.* at ¶ 47. Most tellingly, the heading for Count 1 is "Breach of Contract (failure to pay for services provided)." By any measure, these allegations (if true) are attempts to deny, delay, or diminish payment on a fee for service claim. The breach of contract claim in Count I is thus a Released Claim.

Jemsek argues that the breach of contract claim does not arise from the "identical factual predicate" as the claims raise in *Love*, but raises little discussion beyond this conclusory assertion. Jemsek relies almost entirely on the Court's Order in *Kruger*, where a plaintiff's breach of contract claim was not barred by the *Love* settlement. *See Love v. Blue Cross and Blue Shield Assoc.*, No. 03-21296 (S.D. Fla., Apr. 28, 2008). However, that case is distinguishable because Kruger was asking for damages for a breach of a contract to receive the same reimbursement rate as other orthopedic surgeons in Washington state. *Kruger Complaint* [D.E. 1238-7 at ¶¶ 4.2-4.3]. Kruger did not ask for reimbursement related to denial, delay, or diminishment of fee for service claims. *Id.* at 2. In contrast, Jemsek's claims arise from the same factual predicate as the *Love* case, i.e. the wrongful denial of claims based on factors other than medical necessity.

The denial of payment requests based upon cost criteria, rather than coverage and medical necessity, was expressly raised as a claim in the Fifth Amended Complaint of the *Love*

case. *See Fifth Amended Complaint* [D.E. 786 at ¶¶ 261-262]. Moreover, the *Love* Settlement resolved this very issue in Section 7.11: "A physician designated by each Blue Plan shall be responsible for making the initial determination for such Blue Plan whether proposed health care services or supplies are Medically Necessary." *See Settlement Agreement* [D.E. 928-2 at § 7.11(a)]. Count I of the Counterclaim falls squarely within the release language of the Final Approval Order. Therefore, Jemsek should be enjoined from pursuing its breach of contract claim in Count I. *Counterclaim* at ¶ 42-48.

We now turn to Counts II, VIII, and IX. In Count II, Jemsek alleges that BCBSNC "breached the Provider Agreements by failing to adhere to the requirements for terminating the agreement and refusing to further compensate the Clinic for services provided to members in health insurance plans administered by Blue Cross." *Counterclaim* at ¶ 52. Jemsek again suggests that BCBSNC's actions were motivated by a desire to limit costs. *Id.* at ¶ 54.

With respect to Counts VIII and IX, the causes of action for misrepresentation, Jemsek begins by pointing out that BCBSNC covered Lyme Disease treatments from 2001-2005. Jemsek then alleges that it detrimentally relied on BCBSNC's "fraudulent misrepresentations" that the services provided by Jemsek were covered claims: "[The] statements made by Blue Cross were either false or misleading . . . [Jemsek] relied upon these statements made by Blue Cross and undertook certain business obligations based upon that reliance." *Counterclaim* at ¶ 94-95. In other words, Jemsek maintains that BCBSNC's decision to cover claims from 2001-2005 was tantamount to a promise that BCBSNC would continue to reimburse Jemsek for these services. Jemsek takes the position that the failure to continue reimbursement for Lyme Disease treatment was a fraudulent misrepresentation, and that the failure "to exercise reasonable care and competence in obtaining and communicating the information to the Counterclaim Plaintiff's rights and interests" was a negligent misrepresentation. *Id.* at ¶ 103.

We conclude that we should also enjoin the breach of contract claim in Count II and the related claims for fraudulent and negligent misrepresentation in Counts VIII and IX of the Counterclaim. Counts II, VIII, and IX all turn on the purportedly unlawful termination of a provider agreement, a core concern addressed in the *Love* case. Notably, the *Love* Settlement speaks to this exact issue in Section 7.13(c), a section that outlines the procedural requirements for terminating a provider agreement. *See Settlement Agreement* [D.E. 928-2 at § 7.11(a)]. Counts II, VIII and IX are Released Claims because they relate to the same "facts, acts, events, transactions, occurrences, courses of conduct, business practices, representations, omissions, circumstances" of fee for service claims in *Love*. *See* Final Approval Order at ¶ 5.

To reiterate, the notice of proposed settlement describes the *Love* case as a conspiracy to improperly deny, delay, and/or reduce payments to physicians by, *inter alia*, "failing to pay claims for medically necessary covered services." [D.E. 1385-5 at 3]. BCBSNC's decision to discontinue reimbursement for Lyme Disease treatments is exactly that: the failure to pay a claim that Jemsek suggests is a medically necessary covered service. Thus, Count II is a Released Claim. And Counts VIII and IX are nothing more than breach of contract claims dressed in misrepresentation clothing. Putting aside the dubious merits of Counts VIII and IX, the linchpin of these claims is BCBSNC's decision to deny reimbursement for future Lyme Disease treatment. Given that the Final Approval Order enjoins "any and all causes of action . . . statutory and common law claims, intentional or non-intentional . . . in any way related to . . . any aspect of any fee for service claim," BCBSNC's refusal to further reimburse Jemsek for Lyme Disease treatments falls within this release language. Jemsek should be enjoined from pursuing Counts II, VIII and IX. *Counterclaim* at ¶¶ 49-55, 90-107.

Count III, breach of implied covenant of good faith and fair dealing, and Court IV, quantum meruit, are easily addressed. The entire basis for these two claims is that BCBSNC

allegedly failed to pay Jemsek for its medical services. For the reasons discussed above, Counts III and IV are clearly Released Claims therefore fall within the purview of the Final Approval Order. *Counterclaim* at ¶¶ 56-68.

Count VI, the claim for unfair and deceptive trade practices, is somewhat trickier. Jemsek alleges the following:

> Blue Cross attempted to unlawfully limit its liability to policyholders suffering from Lyme Disease by engaging in a series of unlawful and/or unethical actions intended to harm doctors who administer a form of treatment that is more expensive for insurers like Blue Cross. Those actions include attempts to discredit doctors, including Dr. Jemsek, who administered the more expensive Lyme Disease treatment, unilaterally and unlawfully withholding reimbursement to those providers, and terminating agreements to pay those providers for services provided to Blue Cross Members.

*Counterclaim* at ¶¶ 78. According to Jemsek, these actions are unfair methods of competition and deception that violate North Carolina's Unfair and Deceptive Trade Practices Act. *See* N.C.G.S. § 75-1.1 ("Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful.").

At first blush, Count VI is not a Released Claim because, as we discuss below, claims stemming from alleged defamation are not Released Claims. Count VI is premised entirely on Jemsek's accusation that BCBSNC made false, defamatory statements to a Medical Board and the Center for Disease Control. Whether BCBSNC representatives wrongly influenced a Medical Board is, however, wholly irrelevant to Jemsek's cause of action for unfair and deceptive trade practices. Assuming *arguendo* that BCBSNC *did* influence the Medical Board, we fail to see how this action qualifies as an "unfair method of competition" pursuant to N.C.G.S. § 75-1.1. We point this out not to attack the merits of Jemsek's claim, but rather to clarify that Count VI is really grounded in BCBSNC's purported failure to pay fee for service claims and/or prematurely terminating the parties' Provider Agreement.

As a whole, Jemsek's claim for unfair and deceptive trade practices does not turn on BCBSNC's statements to the Medical Board. Instead, the claim for unfair and deceptive trade practices rests with two core accusations: (i) that BCBSNC unlawfully terminated the Provider Agreement, and (ii) that BCBSNC failed to pay for claims and/or withheld reimbursement. Jemsek attempted to bolster its argument by suggesting that it is deceptive trade practice to "discredit doctors." But really, Count VI concerns BCBSNC's refusal to reimbursing fee for services claims for Lyme Disease treatments. Accordingly, the claim for unfair and deceptive trade practices is a cause of action "related to . . . any aspect of any fee for service claim." Count VI is therefore a Released Claim, and should be stricken from the Counterclaim. *Counterclaim* at ¶¶ 76-82.

### B. *Counts V and VII Are Not Released Claims*

Counts V and VII, on the other hand, all stem from alleged defamatory statements made by BCBSNC representatives. According to the Counterclaim, BCBSNC made untrue statements to the Medical Board and the Center for Disease Control. BCBSNC's statements about Jemsek allegedly resulted in damage to Dr. Jemsek's reputation, giving rise to a cause of action for defamation in Count V. *Counterclaim* at ¶ 73.

Specifically with respect to Count VII, Jemsek asserts that BCBSNC's statements in front of the Medical Board hindered Jemsek's "ability to do business and [damaged] their reputation and standing in the community." *Id.* at ¶ 88. The Counterclaim does not specify where or when the statements were made, much less what the statements were. There is a only a vague assertion that BCBSNC influenced "an adverse action" against Dr. Jemsek, and that "his ability to practice medicine has been limited." *Id.* at ¶ 87-88. Merits aside, it is clear that this cause of action is linked with the cause of action for defamation.

Essentially, Counts V and VII hinge on whether BCBSNC representatives intentionally communicated defamatory and false information to the Medical Board and Center for Disease Control, thus damaging his reputation in the medical community, and possibly impeding future business in the form of client referrals. As to these causes of action, the Counterclaim is not "in any way related to . . . any fee for service claim" and is unrelated to the allegations made in the *Love* lawsuit. These claims against HCSC turn on the falsity of the statements made to the Medical Board and Center for Disease Control, and the resulting immediate and future harm to Dr. Jemsek's medical practice. They are thus highly specific tort claims that, if true, exceed the scope of the *Love* lawsuit. Their resolution requires a highly factual analysis of events that allegedly took place long after the *Love* lawsuit was filed, and in some instances even after the parties entered into the settlement agreement ultimately approved by the Court. Counts V and VII of the Counterclaim, therefore, do not fall within the definition of Released Claims in the Final Approval Order. Because the causes of action for defamation and tortious interference are not Released Claims, Jemsek should be enjoined from pursuing these claims in North Carolina.

### C. *The Count Has Authority to Enjoin Jemsek's Counterclaim*

The All-Writs Act gives federal courts the power to issue injunctions in aid of their jurisdiction. 28 U.S.C. § 1651(a) ("The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."); *See Wesch v. Folsom*, 6 F. 3d 1465, 1470 (11th Cir. 1993). Accordingly, the Court ordinarily has broad authority to enforce the injunction in the Final Approval Order to protect the *Love* Settlement.

Jemsek urges this Court to refrain from enjoining the Counterclaim, and argues that it is subject to the exclusive jurisdiction of the North Carolina Bankruptcy Court:

> Although BCBSNC seeks to enforce an injunction first issued by this court in its Order Preliminarily Approving Proposed Settlement Agreement dated May 31, 2007, the claims at issue were subject already to the automatic stay in the bankruptcy proceeding upon filing of the Jemsek Defendants' bankruptcy petitions in October 2006. The Bankruptcy Court has at least an equal claim to exclusive jurisdiction over the Jemsek Defendant's counterclaims, which were raised in the bankruptcy proceedings as mandatory counterclaims and are core matters. It would not be "fair or just" for this court to interject its claim to jurisdiction over those matters at this stage.

[D.E. 1385 at 12-13]. While Jemsek is correct that the Bankruptcy Court has jurisdiction over the North Carolina case, we can nevertheless enjoin released claims even though we have no authority to actually *adjudicate* the claims. *See Matsushita Electric Industrial Co. v. Epstein*, 516 U.S. 367, 382-84, 116 S. Ct. 873, 881-82, 134 L. Ed. 2d 6 (1996).

In *Matsushita,* a group of plaintiffs filed a class action lawsuit in federal court alleging that the defendants had violated the Securities Exchange Act, a claim with exclusive federal court jurisdiction. While the federal case was on appeal, the defendants settled a parallel class action in Delaware Chancery Court. The class action plaintiffs did not opt out of the settlement class, or contest the fairness of the Chancery Court settlement. On appeal, the defendants invoked the settlement as a bar to the class action litigation, but the Ninth Circuit held that exclusively federal claims could not be released by a state court in which the federal claims could not have been litigated. The Supreme Court, however, saw it differently and held that a court need not have subject matter jurisdiction over claims in order to approve the release of those claims as part of a settlement. *Id.*, 516 U.S. at 384 ("[T]here is nothing sacred about the approval of settlements of suits arising under state law, even where the parties agree to release exclusively federal claims."). The Supreme Court noted that the Delaware Chancery Court "never trespassed upon the exclusive territory of the federal courts, but merely approved the settlement of a common-law suit." *Id.* at 382. Releasing claims as a part of a settlement "does not amount to a judgment on the merits of the claims." *Id.*

*Matsushita's* holding has been applied to cases nearly identical to the one presented here. *See, e.g., In re Doctors Health, Inc.*, Civ. No. L-05-01493, *13-16 (D. Md. Mar. 28, 2008) (reversing bankruptcy court decision and holding that the settlement in the *Shane* litigation could release the claims of a class member who had filed for bankruptcy during the pendency of that class action).

In response, Jemsek makes no attempt to distinguish *Matsushita* or *In re Doctors Health*. Instead, it relies on to two cases, neither of which addresses whether a federal district court can, as part of a global settlement, release a debtor's claim. *Cf. In re Williams,* 244 B.R. 858, 866 (S.D. Ga. 2000) (bankruptcy court did not have jurisdiction over claims raised by plaintiff on behalf of class members whose bankruptcy cases were pending in other districts; "causes of action for the violation of the automatic stay are property of the individuals debtor's bankruptcy estate"); *Gilchrist v. General Elec. Capital Corp. (In re Spartan Int'l)*, 262 F.3d 295, 304-05 (4th Cir. 2001) (a district court that has taken *in rem* jurisdiction over a company's assets in receivership should cede that jurisdiction to a bankruptcy court following the filing of an involuntary bankruptcy petition against the company). These cases deal with the jurisdiction of a bankruptcy court. What Jemsek fails to recognize is that, by enforcing the Final Approval Order, and enjoining certain portions of Jemsek's Counterclaim, we are not exercising jurisdiction over the case. Jemsek has not identified a tangible basis for exempting bankruptcy courts from the rule set forth in *Matsushita* and *In re Doctors health, Inc*. The Final Approval Order is fully enforceable against Jemsek, despite its status as a debtor in bankruptcy.

We now turn to Jemsek's next argument, that the filing of a bankruptcy triggers immediately an automatic stay of all matters concerning the property of the bankruptcy estate, including any act "to exercise control over property of the estate." 11 U.S.C. § 362(a)(3).

Although we acknowledge that the automatic stay applies to suits against the debtor, the stay is inapplicable to suits *by* the debtor:

> This appears from the statutory language, which refers to actions "against the debtor," and to acts to obtain possession of or exercise control over "property of the estate," and from the policy behind the statute, which is to protect the bankrupt's estate from being eaten away by creditors' lawsuits and seizures of property . . . There is, in contrast, no policy of preventing persons whom the bankrupt has sued from protecting their legal rights. True, the bankrupt's cause of action is an asset of the estate; but as the defendant in the bankrupt's suit is not, by opposing that suit, seeking to take possession of it, subsection (a)(3) is no more applicable than (a)(1) is.

*Martin-Trigona v. Champion Federal Sav. and Loan Ass'n*, 892 F.2d 575, 577 (7th Cir. 1989).

The case of *In re Santangelo*, 325 B.R. 874, 882 (Bankr. M.D. Fla. 2005) is particularly instructive on this point. There, the debtors were members of a class action lawsuit brought against their mortgage lender. The lawsuit settled, and an order was entered baring all class members from any further litigation of the settled claims. The debtors neglected to opt out of the class action settlement, and initiated adversary proceedings against the class action defendant before the bankruptcy court. *Id.* at 877. The class action defendant moved to dismiss the claim and argued that the debtors were bound by the class action settlement and related injunction. In response, the debtor-plaintiffs argued that the class action settlement violated the bankruptcy court's automatic stay. *Id.* at 880.

Ultimately, the *Santangelo* court rejected the debtors' arguments, and found that "debtors holding claims as plaintiffs, like the debtors here, must play by the same rules of procedure as any other plaintiff . . . [and] decide whether to remain in a class or opt out." *Id.* at 881. The court further held that the district court "administering a class action suit does not violate the automatic stay or exercise any control over the claim by requiring debtors to make this election. Nor is the stay violated because the debtors are now bound by the approved settlement." *Id.*

Jemsek's attempts to rebut BCBSNC's arguments and to distinguish *Santangelo* are quite unpersuasive. [D.E. 1385 at 17-18]. For instance, Jemsek suggests that the *Santangelo* court did not "engage at all the relevant provisions of bankruptcy law." [D.E. 1385 at 17]. To the contrary, the court offered a detailed background as to what happens upon the filing of a bankruptcy case, and specifically addressed the stay provision in 11 U.S.C. § 362(a)(3). And the cases Jemsek cites trying to rebut *Santengelo* are simply inapposite. *Cf. National Tax Credit Partners, L.P. v. Havlik*, 20 F.3d 705, 708 (7th Cir. 1994) (investors attempt to exercise control over estate property by seeking mandatory injunction requiring debtor's principals to defray shortfalls in debtor's operating accounts violated automatic stay provision); *In re Baldwin Corporation Litigation*, 765 F.2d 343 (2d Cit. 1985) ("Fundamentally at issue is whether the Bankruptcy Court in Ohio or District Court in New York ought to be the first court to determine whether the automatic stay . . . applies to indemnity and contribution claims filed against [debtor] after the filing of the Chapter 11 petition but based on facts occurring prior to the filing of that petition.").

We should, therefore, follow the reasoning of the Bankruptcy Court in *Santangelo* here and hold that enforcing the Final Approval Order does not violate the Bankruptcy Code's automatic stay provision.

Jemsek's final argument is that it would be inequitable to preclude its counterclaims because the counterclaims were compulsory. Fed. R. Civ. P. 13(a). Regardless of whether the counterclaims were compulsory (and BCBSNC admits that they were) the *Love* Settlement released these claims. Jemsek could have opted out of the settlement and pursued its claims in North Carolina, but did not do so. BCBSNC's attempt to preclude Jemsek's claims through this injunction motion is not, as Jemsek argues, "illogical and unfair." What would be unfair is allowing Jemsek to further prosecute Released Claims and potentially reap double recovery.

### III.   CONCLUSION

Based on the foregoing, it is hereby **RECOMMENDED** that Blue Cross and Blue Shield of North Carolina's Motion and Supporting Memorandum to Enforce the Court's Injunction Order [D.E. 1306] be **GRANTED in Part and DENIED in Part.**

1.   Jemsek shall have twenty (20) days from the date of the District Court's adoption of this report and Recommendation to withdraw Counts I-IV (¶¶ 42-68), Count VI (¶¶ 76-82), and Counts VIII-IX (¶¶ 90-107). In addition, Jemsek shall withdraw all factual allegations related to these particular causes of action. If Jemsek fails to voluntarily withdraw these paragraphs from the Counterclaim, BCBSNC's contempt motion shall be revisited by this Court.

2.   Counts V and VII of the Counterclaim are not Released Claims, and therefore Jemsek is not enjoined from pursuing these causes of action against BCBSNC.

3.   Pursuant to Local Magistrate Rule 4(b), the parties have ten (10) business days from the date of this Report and Recommendation to serve and file written objections, if any, with the Honorable Federico A. Moreno, United States District Judge. Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and bar the parties from attacking on appeal the factual findings contained herein. *R.T.C. v. Hallmark Builders, Inc.,* 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger,* 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright,* 677 F.2d 404, 410 (5th Cir. Unit B 1982)(en banc); 28 U.S.C. § 636(b)(1).

**DONE AND SUBMITTED** in Chambers at Miami, Florida, this 8th day of August, 2008.

EDWIN G. TORRES
United States Magistrate Judge