UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 03-21296-CIV-MORENO-TORRES

RICK LOVE, M.D., *et al.*,

    Plaintiffs,

vs.

BLUE CROSS AND BLUE SHIELD
ASSOCIATION, *et al.*,

    Defendants.

_____/

### REPORT AND RECOMMENDATION ON CERTAIN
### SETTLING DEFENDANT'S MOTION TO ENFORCE JUDGMENT

This matter is before the Court on Defendant Hawaii Medical Service Association's ("HMSA") Motion to Enforce Judgment and For a Rule to Show Cause Why Plaintiffs Homayon Tavakoli, M.D., Kihei Medical Services, Inc., and Urgent Care Maui, Inc., and Their Attorneys Should not be Held in Contempt ("Defendant's Motion") [D.E. 1659].[1] The Court has considered the motion, the response, the reply, and the pertinent portions of the record. For the reasons discussed below, this Court recommends that the Defendant's Motion be **GRANTED**.

### I.   BACKGROUND

A class of doctors alleged that health insurance companies engaged in a

---

[1] This motion was referred for a Report and Recommendation by the Honorable Federico A. Moreno pursuant to 28 U.S.C. § 636(b)(1) and the Magistrate Rules of the Local Rules of the Southern District of Florida. [D.E. 1665].

conspiracy to inflate profits by systematically denying, delaying, and diminishing payments due to physicians. The HMOs allegedly effected this scheme through the manipulation of computerized billing programs. Throughout the pendency of this complex, multi-district, class-action litigation initiated by scores of physicians against various health insurance companies, settlements have been reached between numerous physicians and several of the insurers. The Court approved one such settlement, the Settlement Agreement dated as of April 27, 2007 ("Final Approval Order") [D.E. 1286]. The Final Approval Order enjoined class members from filing new lawsuits in which "Released Claims" are asserted against "Released Parties:"

> The Releasing Parties are permanently enjoined from: (i) filing, commencing, prosecuting, intervening in, participating in (as class members or otherwise), or receiving any benefits from any lawsuit, arbitration, administrative or regulatory proceeding, or order in any jurisdiction based on any or all Released Claims against one or more Released Parties.

*See* Final Approval Order ¶ 9.

On February 12, 2007, Dr. Homayon Tavakoli ("Tavakoli"), Kihei Medical Services, Inc., and Urgent Care Maui, Inc. (collectively "Hawaii Plaintiffs") filed their First Amended Complaint in Hawaii state court ("Hawaii Complaint") against Hawaii Medical Service Association ("HMSA"), asserting nine causes of action: (i) violation of Haw. Rev. Stat. § 480-2 (unfair competition, practices, declared unlawful); (ii) violation of Haw. Rev. Stat. § 481-1 (unlawful practices); (iii) violation of Haw. Rev. Stat. § 481A-3 (deceptive trade practices); (iv) insurance bad faith; (v) unjust enrichment; (vi) promissory estoppel; (vii) tortious interference with contracts with associate physicians; (viii) tortious interference with economic advantage; and (ix) prima facie

tort. *See* Hawaii Complaint [D.E. 1659-2].

All causes of action stem from Defendant's alleged attempts to use its economic power coercively to destroy the Hawaii Plaintiffs' business practice. *See* Hawaii Complaint ¶¶ 49-56. According to the Complaint, HMSA has acquired a monopoly and "monopsony" in the health insurance market in Hawaii. *Id.* ¶ 42. This economic leverage allowed HMSA to manipulate the market share of health care providers, and to drive physicians and other health care providers out of business altogether. *Id.* The Hawaii Complaint further alleges that HMSA accomplished its destructive goals through the following means:

- Wrongfully interfering with Plaintiffs' relationship with associate physicians by harassing associate physicians by withholding participation in Defendant's plans and unreasonably denying or delaying the associate physicians' applications to participate with Defendant's plans, and/or failing to process such applications. *Id.* ¶ 58(a).

- Reducing payments to Plaintiffs' associate physicians without justification or in violation of prior reimbursement rate agreements, or paying associate physicians at lower rates than provided for in Defendant's reimbursement schedules through such schemes as: (i) "bundling," (ii) "downcoding," (iii) routinely and unjustifiably denying increased levels of reimbursement for complicated medical cases, (iv) systematically reducing reimbursement rates below reasonable levels, (v) denying payment without any clinical review, oversight or justification; and (vi) engaging in physician profiling for the purpose of penalizing physicians. *Id.* ¶ 58(b).

- Wrongfully interfering with physician-patient and referral relationships by: (i) disparaging Plaintiffs' claims processing and/or administration to patients and other health care providers and; (ii) sending notices to Plaintiffs' patients urging them to switch to a participating provider. ¶¶ 59-61.

- Employing various claims-processing schemes to overburden Plaintiffs with costs to obtain reimbursements. *Id.* ¶ 64-97.

- Guaranteeing multi-million dollar loan for Plaintiffs' competitor in order to unfairly influence the market and destroy Plaintiffs' businesses. *Id.* ¶¶ 98-102.

In light of the Final Approval Order, and the undisputed fact that Hawaii Plaintiffs did not opt out of the class, HMSA moves this Court to enforce the settlement against the Hawaii Plaintiffs and compel withdrawal of the Hawaii Complaint. HMSA further requests that this Court find Hawaii Plaintiffs in contempt for violating the Court's final Approval Order. HMSA argues that the causes of action in the Hawaii Complaint are "based on the exact same type of conduct" that the Final Approval Order addressed. *See* Defendant's Memorandum in Support of Motion at 7. [D.E. 1659]. Hawaii Plaintiffs timely responded to the pending motion to oppose the enforcement of the judgment, arguing that: (i) the Hawaii Claims are not Released Claims because they are not based upon an identical factual predicate as claims asserted in the *Love* case; (ii) the Federal Anti-Injunction Act prohibits HMSA from seeking injunctive relief; and (iii) HMSA is estopped from asserting that the Hawaii Claims are "Released Claims" pursuant to the Final Approval Order. *See* Plaintiffs' Response. [D.E. 1702].

## II.   *ANALYSIS*

The language of the Court's Final Approval Order clearly prohibits Class members from initiating lawsuits against Released Parties for any claims released by the Settlement. This Court, therefore, must grant Settling Defendant's motion if three conditions exist: (i) the Hawaii Plaintiffs are class members; (ii) HMSA is a Released Party under the Settlement; and (iii) the claims at issue in the Hawaii Complaint are Released Claims.

The first and second prongs are not at issue. The Final Approval Order permanently certified a settlement class composed of the following class members:

> Any and all Physicians, Physician Groups and Physician Organizations who provided Covered Services to any Plan Member or services to any individual enrolled in or covered by a Plan offered or administered by any Person named as a defendant in the Complaint or by any other primary licensee of the BCBSA or by any of their respective current or former subsidiaries or Affiliates, in each case from May 22, 1999 through May 31, 2007, . . . .

*See* Final Approval Order ¶ 2. It is undisputed that Dr. Tavakoli did not opt out of the *Love* settlement, and is therefore a class member bound by the terms of the Final Approval Order. It is also undisputed that the Final Order includes HMSA as a Released Party. The key issue before this Court is whether the causes of action in the Hawaii Complaint are Released Claims. We also address, and ultimately reject, Hawaii Plaintiffs' contention that this Court lacks the authority to enforce the Final Approval Order and that Defendant is estopped from enforcing the terms of the settlement.

### A. *All Counts of the Hawaii Complaint are Released Claims*

The Final Approval Order defines Released Claims as:

> any and all causes of action, judgments, liens, indebtedness, costs, damages, obligations, attorneys' fees, losses, claims, liabilities and demands of whatever kind, source or character whether arising under any federal or state law, which . . . includes, but is not limited to, the Racketeer Influenced and Corrupt Organizations Act, antitrust and other statutory and common law claims, intentional or non-intentional . . . arising on or before the Effective Date, that are, were or could have been asserted against any of the Released Parties by reason of, arising out of, or in any way related to any of the facts, acts, events, transactions, occurrences, courses of conduct, business practices, representations, omissions, circumstances or other matters referenced in the Action, or addressed in the Settlement Agreement, whether any such Claim was or

>could have been asserted by any Releasing Party on its own behalf or on behalf of other Persons, or to the business practices that are the subject of Section 7 of the Settlement Agreement. This includes, without limitation and as to Released Parties only, any aspect of any fee for service claim[.]

*See* Final Approval Order ¶ 5. Before we filter the Hawaii Complaint through this release language, we must pinpoint the essence of the *Love* lawsuit. The notice of settlement package sent to all potential class members aptly summarizes the *Love* case:

>The Complaint in the Action alleges, among other things, that between 1999 and the present, the Blue Parties, among others, engaged in a conspiracy to improperly deny, delay, and/or reduce payments to physicians, physician groups, and physician organizations by engaging in several types of allegedly improper conduct, including but not limited to:
>
>- Misrepresenting and/or failing to disclose the use of edits to unilaterally "bundle," "downcode," and/or reject claims for medically necessary covered services;
>
>- Failing to pay for "medically necessary" services in accordance with member plan documents;
>
>- Failing and/or refusing to recognize CPT® modifiers;
>
>- Concealing and/or misrepresenting the use of improper guidelines and criteria to deny, delay, and/or reduce payment for medically necessary covered services;
>
>- Misrepresenting and/or refusing to disclose applicable fee schedule.
>
>- Failing to pay claims for medically necessary covered services within the required statutory and/or contractual time periods.
>
>The Complaint in the Action claims that the conduct described above violated the federal statute entitled the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.*

[D.E. 1385-5 at 3]. Simply put, the *Love* case concerns insurance companies' improper methods of denying, delaying, and diminishing physicians' "fee for service" insurance claims. Because the Final Approval Order prohibits the Hawaii Plaintiffs from filing Released Claims, we need to determine if the claims are "in any way related to" fee for service claims.

As HMSA correctly points out, the Hawaii Complaint contains multiple factual allegations related to fee for services claims payment and processing, and the refusal and/or denial of benefits. Almost all allegations common to all counts refer to what is at the core of the *Love* lawsuit: allegedly wrongful and improper claims handling practices on behalf of the Defendant. *See* Hawaii Complaint ¶¶ 42-114.

Now turning to the specific allegations asserted by the Hawaii Plaintiffs under each count, it is clear that Counts IV-IX all pertain to HMSA's allegedly improper claims handling:

- Count IV (Bad Faith) - Arising out of HMSA's alleged failure "to pay insured benefits to the insured's lawful assignee." *Id.* ¶ 140. Plaintiffs claim that as "lawful assignees of the unpaid benefits and benefits which were only partially paid or paid after unreasonable delay, [they] are entitled to bring a bad faith claim." *Id.* ¶ 141.

- Count V (Unjust Enrichment) - Arising out of HMSA's alleged inducement of "Plaintiffs to provide medical services to [HMSA's] subscribers and their dependents . . . by misrepresenting that Defendants would pay Plaintiffs fairly and in timely manner for the medically necessary services Plaintiffs associate physicians provided and for which Plaintiffs submitted the appropriate claims documentation." *Id.* ¶ 146. The allegations in Count V state that Plaintiffs are entitled to an unjust enrichment claim because "Defendants have wrongfully and unjustifiably failed to timely and fully pay Plaintiffs for the services Plaintiffs provided to Defendant's subscribers . . . ." *Id.* ¶ 148.

- Count VI (Promissory Estoppel) - Arising out of Plaintiffs' expectations that Defendant would treat them fairly. *Id.* ¶ 156. Instead, "Defendants

    commenced treating Plaintiffs unfairly, withholding the reasonable compensation for Plaintiffs' services . . . ." *Id.* ¶ 159.

- Count VII (Tortious Interference with Plaintiffs' Contracts with Associate Physicians) - Arising out of Defendants' alleged interference with "Plaintiffs' agreements with [their] associate physicians by unreasonably and unjustifiably failing to process their applications for participation, causing those associate physicians to terminate their agreements with Plaintiffs because they could not make living providing services only to patients who were not Defendants' subscribers . . . ." *Id.* ¶ 166. The Complaint further alleges that "[i]n case of some associate physicians, Defendants interfered with Plaintiffs' agreements with those associate physicians by unreasonably and unjustifiably delaying the processing of their applications for participation . . . ." *Id.* ¶ 167. Furthermore, "Defendants employed their claims-processing schemes to delay, deny, reduce, or fail to pay Affected Claims for services provided by Plaintiffs' associate physicians . . . ." *Id.* ¶ 168.

- Count VIII (Tortious Interference with Economic Advantage) - Arising out of Defendants' alleged retaliations "against their subscribers who seek [sic] care from Plaintiffs by denying and/or reducing their benefits and/or harassing the subscribers with more paperwork than subscribers are required to submit in order to have their claims paid by any other non-participating provider." *Id.* ¶ 174. Furthermore, the Complaint alleges that "Defendants' wrongful and tortious interference with Plaintiffs' contracts with associate physicians and various wrongful claims settlement schemes injured Plaintiffs' relations with the visitor industry entities and businesses. *Id.* ¶ 193.

- Count IX (Prima Facie Tort) - Appears to be a "catch-all" claim based on totality of allegations listed in the Complaint. *Id.* ¶¶ 199-202.

Clearly, a careful analysis of the allegations raised in the Hawaii Complaint suggests that Counts IV-IX clearly fall under the scope of Released Claims under the Final Approval Order because they all relate to the denial, delay, and diminishment of physicians' fee for service claims. In other words, "but for" HMSA's alleged improper claims processing schemes, Counts IV-IX would simply not survive on their own. Allowing these claims to go forward will require litigating the merits of the alleged improper claims handling practices, clearly an issue addressed and settled by the Final

Approval Order. Thus, Claims IV-IX are Released Claims and Plaintiffs should be enjoined from pursuing them in the Hawaii State Court.

At first blush, Counts I-III do not appear to be Released Claims because they are based on Hawaii statutory law prohibiting unfair competition, unfair practices and deceptive trade practices. Plaintiffs point out that the allegations in the Complaint, including Counts I-III, address HMSA's determined campaign aimed at destroying their businesses. Plaintiffs attempt to distinguish the *Love* litigation by pointing out that the *Love* Complaint did not include claims that Defendants subsidized the *Love* plaintiffs' competitors so it could keep reimbursements artificially low, nor does *Love* include claims that the class plaintiffs were forced to choose between reducing business hours or closing their clinics for good. *See* Plaintiffs' Memorandum in Opposition at 5 [D.E. 1702]. To accept Plaintiffs' argument, however, it would require us to read the nature of the *Love* lawsuit very narrowly, contrary to the intent of the Final Approval Order.

Although the *Love* Complaint may not contain identical allegations as the Hawaii Complaint, it addresses the same type of coercive behavior and tactics that are the gist behind Counts I-III. The Fifth Amended Complaint in *Love* specifically alleges that:

> Defendants control a large percentage of the subscribers and providers in the managed care market in most states and in some local areas. In order to perpetuate the [coercive use of economic power scheme], Defendants use their overwhelming economic power and market dominance to coerce Individual Plaintiffs and the class, at the risk of being denied patient referrals and/or "black-listed" altogether, into providing care under Defendants' policies and practices on a "take it or leave it" basis and pursuant to "all products" requirements.

*See* Plaintiffs' Fifth Amended Class Action Complaint ¶¶ 282-83 [D.E. 774]. Thus, Counts I-III asserted under Hawaii unfair competition statutes are Released Claims, and should be stricken.

Plaintiffs argue that we should not enjoin the Hawaii Claims because the *Love* notice of settlement did not indicate that Dr. Tavakoli's claims are Released Claims. Plaintiffs contend that upon receipt of the Notice, Dr. Tavakoli had no reason to believe he should object. *See* Plaintiffs' Memorandum in Opposition at 7 [D.E. 1702]. We disagree. The Notice sufficiently describes the nature of Defendants' alleged practices that it intends to cover in the settlement. Almost all of the practices described in the Notice are the basis of the Hawaii Complaint.

Plaintiffs' reliance on *Klay v. Humana*, 382 F.3d 1241, 1264 (11th Cir. 2004), is highly misplaced. In *Klay*, the Eleventh Circuit rejected class certification for a group of physicians who raised breach of contract claims because contract claims would require individualized evidence, not the common issues of fact necessary for class representation. *Id. Klay* is unhelpful because it addresses a class certification issue, not whether a given claim falls within the umbrella of Released Claims under a Class Settlement. Here, the Court has already certified a class, thus the only question that remains before us is whether the Hawaii Claims relate to the claims addressed by the Final Approval Order.

Next, Plaintiffs cite to numerous orders entered by this Court in an attempt to convince this Court that the "identical factual predicate" doctrine renders the Hawaii claims not within the spectrum of Released Claims. Likewise, however, Plaintiffs' reliance on these cases is misplaced. In our previous orders, we did not enjoin only

those claims that were capable to survive on their own, without reference to Defendants' allegedly improper claims handling practices.

For example, in *Kruger Clinic Orthopaedics*, Judge Moreno denied Regence Blueshield's Motion for Injunction Against Kruger Clinic because the claims involved a particularized contract between Kurger and the health plan rather than the "form" provider agreements at issue in *Love*. *See* Order Denying Regence Blueshield's Motion for an Order Enjoining Kruger Clinic Orthopaedics, LLC from Prosecuting its State Court Action. [D.E. 1302].

Likewise, in our Report and Recommendation to deny Health Care Service Corporation's Motion to Prevent Dr. Kolbusz from Prosecuting his Illinois Claims, we did not enjoin defamation and tortious business interference claims. [D.E. 1600]. Our decision, however, was wholly based on specific allegations of defamatory statements regarding unnecessary or inappropriate care that, if true, would not relate to fee for service claim. *Id.* at 8.

In conclusion, we find that Hawaii Plaintiffs could have simply opted out of the settlement and pursued their claims in Hawaii, but they did not do so. The allegations raised in Counts I-III clearly implicate the fee for service claims and processing schemes implemented by Defendants. Therefore, these claims are Released Claims under the Final Approval Order and Plaintiffs are enjoined from prosecuting them in the Hawaii court.

### B. *The Court Has Authority to Enjoin Hawaii Plaintiffs' Claims*

The All Writs Act gives federal courts the power to issue injunctions in aid of their jurisdiction. 28 U.S.C. § 1651(a) ("The Supreme Court and all courts established

by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usage and principles of law."); *see also Wesch v. Folsom*, 6 F.3d 1465, 1470 (11th Cir. 1993). Accordingly, the Court ordinarily has broad authority to enforce the injunction in the Final Approval Order to protect the *Love* Settlement.

Plaintiffs argue that the party requesting injunction must make a strong and unequivocal showing of relitigation, similar to the showing that certain claims are barred by *res judicata*. *See* Plaintiffs' Memorandum in Opposition at 13. Next, Plaintiffs contend that this Court only has jurisdiction to enjoin the Hawaii claims if the *Love* allegations involve the same factual nexus as Dr. Tavakoli's allegations. Although we agree with Plaintiffs brief summary of *res judicata*, we disagree with Plaintiffs' conclusion regarding the similarity between the *Love* and the Hawaii Claims.

The fact that Plaintiffs may prevail on their unfair competition or tortious interference claims without proving one of the elements addressed by the *Love* Settlement is immaterial. Instead, we must compare the entirety of the allegations raised by the Hawaii Complaint to the issues settled in *Love*. If one were to remove from the Hawaii Complaint the allegations referencing HSMA's improper claims processing and handling, the nine-count thirty-one page Complaint could be reduced to ten pages, a majority of which would be committed to background information regarding Dr. Tavakoli's selfless and good hearted service to the Maui community. In other words, the issues addressed by the *Love* Settlement are central to Plaintiffs'

claims.

### C. *HMSA is not Estopped*

Finally, Plaintiffs argue that HMSA has waived the right to enjoin the Kihei Medical Services, Inc. and Urgent Care Maui, Inc. because it waited sixteen months to challenge their claims as Released Claims under the *Love* Settlement. We disagree, however, with Plaintiffs' contention that April 27, 2007, the date of preliminary *Love* Settlement, should be the proper date for laches doctrine calculation. Although the settlement was initially entered in April, 2007, Judge Moreno did not approve the settlement until April, 17, 2008. As such, laches began to run, if at all, on that date. We find four months to be a reasonable time to file the pending motion under the circumstances.

### III. CONCLUSION

Based on the foregoing, it is hereby **RECOMMENDED** that Hawaii Medical Service Association's Motion to Enforce Judgment and for a Rule to Show Cause Why Plaintiffs Should not be Held in Contempt [D.E. 1659] be **GRANTED**.

1. Plaintiffs Homayon Tavakoli, M.D., Mihei Medical Services, Inc., and Urgent Care Maui, Inc. should have twenty (20) days from the date of the Court's final Order to withdraw the Hawaii Complaint. If Plaintiffs fail to voluntarily withdraw the Hawaii action, HMSA's contempt motion shall be revisited by this Court.

2. Pursuant to Local Magistrate Rule 4(b), the parties have ten (10) business days from the date of this Report and Recommendation to serve and file written objections, if any, with the Honorable Federico A. Moreno, United States District Judge. Failure to timely file objections shall bar the parties from a *de novo*

determination by the District Judge of an issue covered in the report and bar the parties from attacking on appeal the factual findings contained herein. *R.T.C. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc); 28 U.S.C. § 636(b)(1).

**DONE AND ORDERED** in Chambers at Miami, Florida, this 16th day of January, 2009.

                                             */s/ Edwin G. Torres*
                                             EDWIN G. TORRES
                                             United States Magistrate Judge